# 22-1222

## In the
## United States Court of Appeals
### For the Second Circuit

IN RE: ARCAPITA BANK B.S.C.(C),

*Debtor.*

_____

BAHRAIN ISLAMIC BANK,

*Appellant.*

v.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
ARCAPITA BANK B.S.C.(C), ET AL.,

*Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## BRIEF AND SPECIAL APPENDIX FOR APPELLANT

K&L GATES LLP
*Attorneys for Appellant*
599 Lexington Avenue
New York, New York 10022
(212) 536-3900
john.bicks@klgates.com
brian.koosed@klgates.com
robert.honeywell@klgates.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, the undersigned counsel for Appellant Bahrain Islamic Bank ("BisB") hereby certifies that BisB is a commercial bank licensed by the Central Bank of Bahrain and is a subsidiary of the National Bank of Bahrain B.S.C. There is no publicly-held company that owns 10% or more of BisB's stock, directly or indirectly.

Pursuant to 26.1(c) of the Federal Rules of Appellate Procedure, the other debtors not named in the caption in the Chapter 11 bankruptcy case below are:

> Arcapita Investment Holdings Limited
> Arcapita LT Holdings Limited
> Windturbine Holdings Limited
> AEID II Holdings Limited
> Railinvest Holdings Limited
> Falcon Gas Storage Company, Inc.

All of these entities were indirect wholly owned subsidiaries of Arcapita Bank B.S.C.(c) ("Arcapita"). The debtors' Chapter 11 plan of reorganization (the "Plan") became effective on September 17, 2013. To the knowledge of BisB: (1) under the Plan, holders of shares in Arcapita had the option to either (a) exchange their shares for warrants to purchase shares in a new holding company established under the Plan, RA Holding Corp., or (b) retain their shares in Arcapita; (2) the majority of such shareholders elected to exchange their shares; (3) Arcapita and the other above debtors became at least majority-controlled subsidiaries of RA

Holding Corp.; and (3) no publicly-held company owns 10% or more of the stock of RA Holding Corp., directly or indirectly.

## **<u>TABLE OF CONTENTS</u>**

**Page**

TABLE OF AUTHORITIES ........................................................................iv

JURISDICTIONAL STATEMENT ............................................................1

PRELIMINARY STATEMENT .................................................................2

STATEMENT OF ISSUES ........................................................................9

STATEMENT OF THE CASE ..................................................................10

I.     NATURE OF THE CASE AND PROCEDURAL HISTORY ....................10

II.    FACTUAL BACKGROUND.................................................................11

     1.    BisB's Lack of Contacts with the United States .................................11

     2.    Arcapita's *Murabaha* Investments with BisB....................................12

     3.    Arcapita's Chapter 11 Filing and the Banks' Collection Efforts
        against Each Other..............................................................................13

     4.    The CBB's Intervention in the Banks' Dispute .................................14

SUMMARY OF ARGUMENT ...................................................................17

ARGUMENT ...........................................................................................20

I.     STANDARD OF REVIEW.....................................................................20

II.    THE DISTRICT COURT ERRONEOUSLY APPLIED THE TEST FOR
     SPECIFIC PERSONAL JURISDICTION OVER BISB ..............................22

A.    The District Court was Required to Apply the Two-Part Test for Specific Personal Jurisdiction to Each of the Committee's Claims ................................................................................... 22

B.    This Court's *Licci* and *Daou* Rulings Confirm that the Use of a New York Correspondent Bank Account Must Itself be Part of the Alleged Wrongful Conduct for Jurisdiction to Lie ........................... 25

C.    The Committee's Claims Fail the Test of *Licci* and *Daou* ................ 29

D.    The District Court in *Arcapita I* Erroneously Found that the New York Wire was "the Heart" of this Litigation ..................................... 30

E.    In *Arcapita V*, the District Court Disregarded New Evidence that Arcapita, Not BisB, Initiated the Parties' Sole Contact with the U.S. Banking System ......................................................................... 32

III.    THE DISTRICT COURT ERRED IN FINDING THAT COMITY PRINCIPLES DID NOT MANDATE ABSTENTION FROM THIS DISPUTE ..................................................................................... 35

A.    The U.S. Does Not Have a Stronger Regulatory Interest than Bahrain in this Bahraini Law Contract Dispute between Bahraini Banks ..................................................................................... 36

B.    There is a True Conflict Between U.S. and Bahraini Setoff Law, as the Former Imposes Requirements Under Section 553 of the Bankruptcy Code that Do Not Exist in Bahrain .................................. 40

C.    The Committee Should Be Required to Seek Its Remedies in Bahrain, Not Rewarded for Forum Shopping in the U.S. to Accomplish What It Could Not Achieve in Bahrain ......................... 45

IV.    THE DISTRICT COURT ERRONEOUSLY FOUND THAT BISB BREACHED ARCAPITA'S INVESTMENT CONTRACT AS A MATTER OF BAHRAINI LAW ................................................................. 48

A.  The District Court Provided No Analysis of Why BisB's Exercise of Setoff Was Not Lawful Under Bahraini Contract Law .......................................................................48

B.  BisB's Exercise of Setoff Complied with Bahraini Law and Performed, Rather than Breached, Its Contract with Arcapita ...........50

V.  THE AUTOMATIC STAY MAY NOT BE ENFORCED AGAINST ACTS ABROAD BY A FOREIGN DEFENDANT NOT SUBJECT TO PERSONAL JURISDICTION .......................................................52

VI.  THE DISTRICT COURT ERRED BY UPHOLDING THE USE OF THE NEW YORK PREJUDGMENT INTEREST RATE FOR THIS BAHRAINI LAW DISPUTE .......................................................53

A.  Bahraini Law and Shari'a Principles Prohibit the Awarding of Interest on a Debt Collection.............................................................54

B.  New York's Prejudgment Interest Rate is Inappropriate Based on this Dispute's Merely Incidental Contacts with the U.S.....................57

CONCLUSION .......................................................................................................58

CERTIFICATE OF COMPLIANCE .......................................................................60

## <u>TABLE OF AUTHORITIES</u>

**Page**

## <u>Cases</u>

*Averbach v. Cairo Amman Bank,*
    No. 19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020)......28

*Bank Leumi USA v. Ehrlich,*
    98 F. Supp. 3d 637 (S.D.N.Y. 2015)..................................................................34

*Bartlett v. Société Générale de Banque Au Liban SAL,*
    No. 19-CV-00007, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .................28

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.,*
    137 S.Ct. 1773 (2017) ......................................................................................24

*Carco Grp., Inc. v. Maconachy,*
    718 F.3d 72 (2d Cir. 2013)................................................................................22

*Chaiken v. VV Publ'g Corp.,*
    119 F.3d 1018 (2d Cir. 1997)...........................................................................23

*Chloe v. Queen Bee of Beverly Hills, LLC,*
    616 F.3d 158 (2d Cir. 2010)..............................................................................25

*Daou v. BLC Bank, S.A.L.,*
    42 F.4th 120 (2d Cir. July 28, 2022)..........................................................*passim*

*Goodyear Dunlop Tires Operations S.A. v. Brown,*
    564 U.S. 915 (2011) .........................................................................................24

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984) .........................................................................................23

*In re Banco Santander Sec.-Optimal Litig.,*
    732 F. Supp. 2d 1305 (S.D. Fla. 2010) ............................................................29

*In re Fogarty,*
    39 F.4th 62 (2d Cir. 2022)................................................................................21

*In re Motors Liquidation Co.,*
    565 B.R. 275 (Bankr. S.D.N.Y. 2017) ........................................................25, 26

*In re Picard,*
    917 F.3d 85 (2d Cir. 2019) ..............................................................................21

*In re Vitamin C Antitrust Lit.,*
    8 F.4th 136 (2d Cir. 2021) ...............................................................................38

*Jota v. Texaco Inc.,*
    157 F.3d 153 (2d Cir 1998) ...................................................................8, 46, 47

*Khalife v. Audi Saradar Private Bank SAL,*
    129 A.D.3d 468, 11 N.Y.S.3d 573 (N.Y. App. Div. 2015) ........................28, 29

*Kittay v. Korff (In re Palermo),*
    739 F.3d 99 (2d Cir. 2014) ..............................................................................54

*LaMonica v. CEVA Grp. PLC (In re CIL Ltd.),*
    582 B.R. 46 (Bankr. S.D.N.Y. 2018) ..............................................................43

*Licci v. Lebanese Canadian Bank, SAL,*
    673 F.3d 50 (2d Cir. 2012) ................................................................................4

*Licci v. Lebanese Canadian Bank, SAL,*
    20 N.Y.3d 327, 960 N.Y.S.2d 695, 984 N.E.2d 893 (N.Y. 2012) ...............4, 26

*Licci v. Lebanese Canadian Bank, SAL,*
    732 F.3d 161 (2d Cir. 2013) ....................................................................*passim*

*Marfia v. T.C. Ziraat Bankasi,*
    147 F.3d 83 (2d Cir. 1998) ..............................................................................56

*Maxwell Commc'n Corp. v. Societe Generale*
    *(In re Maxwell Commc'n Corp.),*
    93 F.3d 1036 (2d Cir. 1996) ...................................................................*passim*

*O'Toole v. MyPlace Dev. SP. Z O.O. (In re Sledziejowski),*
    Adv. No. 15-08207, 2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016) ......23

*Official Comm. of Unsecured Creditors v. Mfrs. & Traders Tr. Co.*
    *(In re Bennett Funding Grp.),*
    212 B.R. 206 (B.A.P. 2d Cir. 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998).........41

*Oscar Gruss & Son, Inc. v. Hollander,*
    337 F.3d 186 (2d Cir. 2003)..................................................................21

*Rushaid v. Pictet & Cie,*
    28 N.Y.3d 316, 68 N.E.3d 1 (2016)........................................26, 28

*Schwimmer v. Allstate Ins. Co.,*
    176 F.3d 648 (2d Cir. 1999)...............................................................54

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Sec. LLC,*
    460 B.R. 106 (Bankr. S.D.N.Y. 2011).........................................23, 53

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Sec. LLC,*
    474 B.R. 76 (S.D.N.Y. 2012)........................................................23, 53

*Sunward Elecs., Inc. v. McDonald,*
    362 F.3d 17 (2d Cir. 2004)................................................................23

*United States v. Johnson,*
    616 F.3d 85 (2d Cir. 2010)................................................................34

*Walden v. Fiore,*
    571 U.S. 277 (2014)..........................................................................24

## Rules, Laws and Statutes

11 U.S.C. § 362...........................................................................41, 42

11 U.S.C. § 553.........................................................................*passim*

28 U.S.C. § 158.................................................................................1

28 U.S.C. § 1291...............................................................................2

Accounting and Auditing Organization for Islamic Financial Institutions (AAOIFI), Standard No. (3) .......................................................55, 56

Accounting and Auditing Organization for Islamic Financial Institutions (AAOIFI), Standard No. (4) .........................................................51

Bahraini Civil Code, Preamble ........................................................54, 55

Bahraini Civil Code, Article 129 ...........................................................50

Bahraini Civil Code, Article 140 ....................................................50, 54

Bahraini Civil Code, Article 188 ...........................................................54

Bahraini Civil Code, Article 223 ...........................................................54

Bahraini Civil Code, Article 353 .......................................42, 43, 50, 51

Bahraini Civil Code, Article 354 .......................................42, 43, 50, 51

Bahraini Civil Code, Article 355 .......................................42, 43, 50, 51

Bahraini Civil Code, Article 356 .......................................42, 43, 50, 51

Bahraini Civil Code, Article 357 .......................................42, 43, 50, 51

Bahraini Civil Code, Article 358 .......................................42, 43, 50, 51

Bahraini Civil Code, Article 359 .......................................42, 43, 50, 51

Bahraini Civil Code, Article 360 .......................................42, 43, 50, 51

Bahraini Civil Code, Part Five, Chapter One ........................................51

Bahraini Civil Code, Part Five, Chapter Two.........................................51

Bahraini Civil Code, Part Five, Chapter Three.......................................51

Central Bank of Bahrain and Financial Institutions Law, Article 125 ....................16

Central Bank of Bahrain and Financial Institutions Law, Article 126 ....................16

Central Bank of Bahrain Rulebook, Volume 2, Chapter EN-3 .........................15, 16

N.Y. CPLR § 302 ...................................................................................25

**<u>Secondary Authorities</u>**

Restatement (Third) of Foreign Relations (1986), § 403 ........................................37

## JURISDICTIONAL STATEMENT

The District Court had appellate jurisdiction, pursuant to 28 U.S.C. § 158(a)(1), over two final orders issued by the bankruptcy court for the Southern District of New York (the "Bankruptcy Court"):

(1)    The first dismissed the adversary proceeding that the Appellee (the "Committee") filed against BisB for lack of personal jurisdiction over BisB, by its order published at 529 B.R. 57 (Bankr. S.D.N.Y. 2015) (the "Bankruptcy PJ Order").  (A730.)[1]  The District Court reversed the Bankruptcy PJ Order on appeal, by its order published at 549 B.R. 56 (S.D.N.Y. 2016) (the "Interlocutory PJ Order" or "*Arcapita I*").  (SPA42.)

(2)    The second issued a final judgment against BisB in the Committee's adversary proceeding on September 23, 2021 (the "Judgment").  (A6550.)  BisB timely filed a notice of appeal to the District Court on October 1, 2021, and an amended notice of appeal on October 5, 2021.  (A6553; A6557.)  The District Court affirmed the Judgment by its order entered on May 23, 2022, published at 640 B.R. 604 (S.D.N.Y. 2022) (the "Order" or "*Arcapita V*"), and its related judgment entered on May 24, 2022.  (SPA2; SPA1.)

The District Court's Order and judgment disposed of the parties' claims in

---

[1]    References to "A" are to pages in the parties' Joint Appendix.  References to "SPA" are to pages in the Special Appendix.

the adversary proceeding, including by affirming several interlocutory orders of the Bankruptcy Court issued prior to its Judgment.[2]  BisB timely filed a notice of appeal to this Court on June 3, 2022 and an amended notice of appeal on June 16, 2022.  (A6808; A6810.)

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## PRELIMINARY STATEMENT

BisB has vigorously protested since this litigation began in 2013 that this dispute should be heard and decided in Bahrain, not the U.S.

This is a contract dispute between two Islamic banks based in Bahrain – BisB and Arcapita Bank B.S.C.(c) ("Arcapita") – related to an Islamic investment contract expressly governed by Bahraini law and shari'a principles, known as a *murabaha*.  The alleged wrong targeted by the Committee is BisB's failure to remit the proceeds of a $10 million investment that Arcapita placed with BisB under the

---

[2] The Bankruptcy Court orders affirmed in *Arcapita V* by the District Court (collectively, the "Bankruptcy Court Orders") are: (1) an order entered on October 13, 2017, denying BisB's motion to dismiss on the basis of comity and extraterritoriality, published at 575 B.R. 229 (Bankr. S.D.N.Y. 2017) ("*Arcapita II*") (A1057); (2) an order entered on February 5, 2018, denying BisB's motion for reconsideration of that order, published at 2018 Bankr. LEXIS 295 (Bankr. S.D.N.Y. Feb. 5, 2018) (A1119); (3) an order entered on April 23, 2021, granting the Committee's motion for summary judgment and denying BisB's cross-motion for summary judgment, published at 628 B.R. 414 (Bankr. S.D.N.Y. 2021) ("*Arcapita III*") (A6335); (4) an order entered on September 22, 2021, setting the prejudgment interest rate, published at 633 B.R. 207 (Bankr. S.D.N.Y. 2021) ("*Arcapita IV*") (A6537); and (5) the Judgment (A6550).

contract on March 14, 2012. Arcapita filed for Chapter 11 bankruptcy less than a week after its investment, and demanded the investment proceeds when they matured on March 29, 2012. BisB asserted setoff under Bahraini law in June 2012. The banks' Bahraini regulator, the Central Bank of Bahrain (the "CBB"), intervened in the dispute by issuing a directive in July 2012 that ordered BisB to reverse the setoff and remit the investment proceeds to Arcapita.

BisB immediately objected to the CBB's directive, creating a contested regulatory proceeding in Bahrain. The CBB has never enforced the directive since, in the more than ten years since issuing it. Instead the Committee, taking upon itself to act as an enforcement arm of the CBB outside of Bahrain, filed this adversary proceeding in the United States seeking *exactly* the same relief as the CBB's directive: *i.e.*, reversal of BisB's setoff and return of the investment proceeds to Arcapita. The Committee made no attempt to enforce the CBB's directive *in Bahrain*, where the CBB actually has jurisdiction and where BisB could exercise its procedural rights and defenses under Bahraini law.

The Committee has made no secret of its intentions: to enforce the CBB's directive in a U.S. lawsuit. It openly admitted as much to the Bankruptcy Court, stating at oral argument on summary judgment:

> [I]n 2013, the committee brought this litigation to seek to get these funds back and have Your Honor decide exactly what the CBB directed them to do.

(A2762 at 22:16-18.)   On BisB's appeal to the District Court, the Committee further complained that BisB – by simply defending itself in this suit – was trying to "strip the CBB of its authority," pleading there:

> If this Court were to interfere with the CBB's authority, the policing power of agencies around the world would be threatened.

(A6588 (Committee response brief on appeal) at A6654.)

The Committee thus seeks to enforce the CBB's directive in a U.S. bankruptcy court, in the guise of a breach of contract suit, even though the CBB has itself declined to enforce the very same directive in Bahrain.

The Bankruptcy Court initially dismissed the Committee's suit, agreeing with BisB that it lacked personal jurisdiction over BisB under this Court's *Licci* line of decisions,[3] because all conduct relevant to the dispute occurred in Bahrain. As to BisB's sole contact with the United States – its momentary use of a New York correspondent bank account to receive Arcapita's wire of its $10 million investment – the Bankruptcy Court found that the New York wire was "an act

---

[3]     *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012), which certified a question of personal jurisdiction under the New York long-arm statute to the New York Court of Appeals, which ruled on the certified question in *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 960 N.Y.S.2d 695, 984 N.E.2d 893 (N.Y. 2012) ("*Licci I*"); and *Licci ex. rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ("*Licci II*"), which applied *Licci I*.  (The Court's 2012 *Licci* decision and *Licci II* are together referred to herein as "*Licci*".)

which no party has alleged was improper," so no wrongful conduct occurred in the United States. 529 B.R. at 71.[4] To the contrary, the alleged wrongful conduct targeted by the Committee's suit was BisB's assertion of setoff and failure to remit the investment proceeds on their maturity date, all of which occurred in Bahrain. *Id.*

The Bankruptcy Court thus found that the Committee's breach of contract claim (Count I), and its claims for turnover of the contract proceeds (Count II) and stay violation based on BisB's setoff (Count IV), did not arise from conduct in the United States. As to the preference claim (Count III), the Bankruptcy Court ruled in a footnote that the New York wire became actionable as an alleged preference under the Bankruptcy Code solely because of Arcapita's own Chapter 11 filing, not because of any wrongful conduct by BisB, and only assuming that U.S. law applied to the dispute at all. *Id.* at 71 n.12.[5]

On appeal from that dismissal, the District Court in *Arcapita I* turned the Bankruptcy Court's correct reading of *Licci* on its head. The District Court found

---

[4] The Committee's complaint, for example, alleges that Arcapita's investment through the New York wire created "a valid, enforceable, and legally binding contract between Arcapita and [BisB]." (A361 ¶¶ 39, 44.)

[5] The Committee's complaint also asserted a claim for claim disallowance (Count V), but the Bankruptcy Court did not mention it in its personal jurisdiction ruling (*see* Bankruptcy PJ Order), and found on summary judgment that it did not need to reach that claim. *Arcapita III*, 628 B.R. at 479 n.67.

that the New York wire was "the heart" of the Committee's preference claim and "precisely the conduct targeted by the Committee," *Arcapita I*, 549 B.R. at 69, and reversed the Bankruptcy Court's personal jurisdiction ruling solely on that basis. But the District Court did not address *any* of the other claims by the Committee – *i.e.*, breach of contract, turnover or stay violation – or analyze whether they had any connection at all to conduct by BisB *in the United States*.

This was reversible error. Both *Licci* and this Court's recent ruling in *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120 (2d Cir. July 28, 2022) ("*Daou*"), hold that use of a New York correspondent bank account confers personal jurisdiction over a foreign defendant ***only if*** the use of that account was itself part of the alleged wrongful conduct (*e.g.*, to finance terrorism or launder money). But where the use of such an account was lawful and *not* the targeted wrong, and where the plaintiff would have made the same litigation claims if U.S. dollars had been routed from anywhere else in the world, the use of the New York account is "merely coincidental" to the plaintiff's claims and cannot confer personal jurisdiction. *Daou*, 420 F.4th at 130-32.

That was exactly the case here. The Committee's claims against BisB – seeking to recover the proceeds of Arcapita's $10 million investment – would have been identical even if BisB received Arcapita's dollar-based investment using accounts anywhere else in the world. Indeed, the Committee's own complaint

does not describe the New York wire as wrongful, but as creating a legally binding contract.[6]  And it expressly seeks as damages the amount of $10,002,292, which is the amount of investment proceeds due on the contract's *maturity date* (March 29, 2012) – *not* the amount of the New York wire on March 14, 2012.  (A361 ¶¶ 42, 45-48, 57, 65, Prayer for Relief.)   The Bankruptcy Court's Judgment likewise calculated interest on BisB's breach of contract liability as accruing from the *maturity date*.  (A6550 ¶ III.b.)

In other words, the harm complained of by the Committee occurred on the investment's maturity date based on BisB's conduct in Bahrain – *i.e.*, its failure to remit the investment proceeds on that due date – not on the date of the New York wire, which was BisB's sole contact with the United States here.

The District Court thus erred in finding personal jurisdiction over BisB in *Arcapita I*, and that error has permeated this litigation ever since.  The Bankruptcy Court's comity ruling, its personal jurisdiction and interest rate rulings on summary judgment, and the District Court's affirmation of those rulings on appeal all cite to *Arcapita I*, agreeing with its assertion that the New York wire is "the heart" of this contract dispute.  It is not.  Under this Court's rulings in *Licci* and *Daou*, the heart of this contract dispute is the parties' conduct in Bahrain.  That is

---

[6]      *See supra* at n.4.

where: Arcapita and BisB negotiated the master investment contract and the investment at issue; BisB took all of the purportedly wrongful actions complained of by the Committee; Bahrain's bank regulator (the CBB) intervened in the dispute; and BisB then urged the CBB to reverse its directive.

Paradoxically, after the lower courts' focus since *Arcapita I* on the preference claim as "the heart" of this litigation, the Bankruptcy Court on summary judgment declined to rule on the preference claim at all. *Arcapita III*, 628 B.R. at 476 n.63. It instead made the *CBB's regulatory proceeding* "the heart" of this dispute: it held that – as a matter of Bahraini law – BisB breached its investment contract with Arcapita by asserting setoff because the CBB's *later* directive was a superior form of "Bahraini law," which trumped BisB's setoff rights under the Bahraini Civil Code. *Id.* at 438-45. The Bankruptcy Court's reasoning? Comity: to "defer to proceedings taking place in foreign countries." *Id.* at 445 (quoting *Jota v. Texaco Inc.*, 157 F.3d 153, 159-60 (2d Cir 1998)).

On appeal, the District Court followed the Bankruptcy Court's lead in deferring to the CBB's proceeding, agreeing that its directive retroactively "abrogated" BisB's setoff even if that setoff was lawful and proper under Bahraini law when exercised. *Arcapita V*, 640 B.R. at 620-22.

This, too, was reversible error. The lower courts were required, for breach of contract purposes, to review BisB's disputed conduct in Bahrain – *i.e.*, its failure

to remit the contract proceeds and assertion of setoff in March-June 2012 – to determine whether its actions complied with Bahraini contract law at the time. They did. But the lower courts did not conduct a breach of contract analysis at all as to BisB's conduct, but instead focused *only* on enforcing the CBB's later regulatory directive.

The lower courts cannot have it both ways. Under their approach, the New York wire made the U.S. courts the proper forum for this dispute for one purpose (*i.e.*, jurisdiction); but the U.S. courts must completely defer to a regulatory proceeding in Bahrain for all other purposes (*i.e.*, substantive liability). But nowhere did the lower courts explain – nor has the Committee ever explained – why the Committee should not have been required to pursue its remedies directly in that same regulatory proceeding, in Bahrain.

This Court should reverse *Arcapita I* and *Arcapita V* and allow this dispute to be resolved in Bahrain.

## STATEMENT OF ISSUES

The issues on appeal are:

1.      Whether the District Court erred by concluding, in both *Arcapita I* and *Arcapita V*, that the Bankruptcy Court had specific personal jurisdiction over BisB for purposes of this dispute.

2.      Whether the District Court erred by affirming, in *Arcapita V*, the

Bankruptcy Court's failure to dismiss the complaint and abstain from hearing this dispute based on the doctrine of international comity.

3.      Whether the District Court erred by affirming, in *Arcapita V*, the Bankruptcy Court's ruling that, as a matter of Bahraini law, BisB breached its investment contract with Arcapita by exercising setoff and must turn over the related investment proceeds.

4.      Whether the District Court erred by affirming, in *Arcapita V*, the Bankruptcy Court's ruling that BisB's exercise of setoff under Bahraini law violated the Bankruptcy Code's automatic stay.

5.      Whether the District Court erred by affirming, in *Arcapita V*, the Bankruptcy Court's ruling that New York's prejudgment interest rate of 9% per annum applies to BisB's breach of contract liability under a contract that is expressly governed by Bahraini law.

## STATEMENT OF THE CASE

## I.    NATURE OF THE CASE AND PROCEDURAL HISTORY

This case involves a breach of contract dispute between two Islamic banks licensed by the CBB – Arcapita and BisB – over whether BisB was permitted to exercise setoff against investment proceeds due on March 29, 2012, from a *murabaha* investment placed by Arcapita with BisB on March 14, 2012. Arcapita filed for Chapter 11 bankruptcy protection in New York on March 19, 2012. The

Committee filed suit to recover the investment proceeds for the Arcapita bankruptcy estate on August 26, 2013.  (A361.)

The Bankruptcy Court dismissed the suit for lack of personal jurisdiction over BisB on April 17, 2015.  (A730.)  The District Court (Daniels, J.) reversed in *Arcapita I* on March 30, 2016.  (SPA42.)

The Bankruptcy Court declined to dismiss the suit based on comity in *Arcapita II* on October 13, 2017, and denied a motion for reconsideration. (A1057; A1119.)  The Bankruptcy Court granted summary judgment to the Committee, and denied BisB's cross-motion for summary judgment, in *Arcapita III* on April 23, 2021.  (A6335.)  It issued its prejudgment interest rate decision in *Arcapita IV* and its Judgment on September 22 and 23, 2021, respectively. (A6537; A6550.)

The District Court (Hellerstein, J.) affirmed all of the Bankruptcy Court Orders in *Arcapita V* and issued its judgment on May 23 and 24, 2022, respectively.  (SPA2; SPA1.)

## II.    FACTUAL BACKGROUND

### 1.    BisB's Lack of Contacts with the United States

Appellant BisB is an Islamic financial institution in Bahrain and does no business in the U.S.  All of its banking business with Arcapita, including the negotiation and execution of the investment contracts at issue, was conducted in

- 11 -

Bahrain. (A2237 ¶¶ 1-12; A426 ¶¶ 2-5, 9; A556 ¶ 4; A1204 (Jarrar dep.) at 211:16-213:9 (A1258).)

BisB's sole contact with the U.S. in connection with this dispute was its temporary use of its own correspondent bank account in New York to receive Arcapita's initial U.S. dollar investment, which was immediately transferred to BisB's account in Bahrain. (A426 ¶ 10; A556 ¶¶ 2-4; A1824-43.)

## 2. Arcapita's *Murabaha* Investments with BisB

Arcapita and BisB signed the master *murabaha* contract at issue on July 10, 2003. (A431 (Investment Agreement) at A433.) Under the contract, Arcapita appointed BisB as its agent to purchase commodities, then BisB would simultaneously re-purchase them from Arcapita for a deferred payment at a later date equal to the original purchase price plus an agreed mark-up. (*Id.* ¶¶ 1-6.) The contract is expressly governed by Bahraini law to the extent it does not conflict with Islamic shari'a principles, "the latter of which shall prevail." (*Id.* ¶¶ 12.)

Arcapita made three *murabaha* investments of $10 million each with BisB on March 13-15, 2012. (A1769-90.)[7] Arcapita initiated all three investments with BisB through calls by Arcapita's treasury officers, who expressly asked to use U.S.

---

[7] BisB repaid two of these investments to Arcapita. *See infra* at 14.

dollars as the investment currency. (A1406 (call transcripts) at A1450, A1455, A1459, A1463-64; *see also* A200-02.)

BisB provided information on its New York correspondent bank account to Arcapita, for the wiring of Arcapita's three investments. (A532-33; A1824-31; A1842-43.) BisB also agreed – at Arcapita's request – to roll over its own *murabaha* investments with Arcapita, which would otherwise mature and require full payment by Arcapita of the principal plus mark-up (or "profit") on March 15-16, 2012. BisB instead agreed to receive only the profit then due, and asked for it to be wired to the same New York correspondent bank account. (A1832-41; *see also* A2237 ¶¶ 46-49.)

BisB later reported to the CBB that it had agreed to the rollover of its own investments at the request of Arcapita, who had promised to repay the proceeds from financing that it was purportedly arranging. (A1550-52.) Instead, Arcapita filed for Chapter 11 protection in New York on March 19, 2012. (A361 ¶ 7.)[8]

### 3. <u>Arcapita's Chapter 11 Filing and the Banks' Collection Efforts against Each Other</u>

Arcapita's Chapter 11 filing was a surprise to BisB and the rest of the Bahraini banking community, in which it was standard industry practice for banks

---

[8] The mechanics and history of the banks' *murabaha* investments with each other are further described in *Arcapita III*. 628 B.R. at 423-28. (*See also* A2237 ¶¶ 15-50.)

to address any temporary liquidity issues with consensual workouts.  There is no evidence in the record that BisB had knowledge of Arcapita's imminent Chapter 11 filing when BisB accepted Arcapita's *murabaha* investments and agreed to roll over its own.  (A1204 (Jarrar dep.) at 134:15-135:4 (A1239), 155:25-158:4 (A1244-45), 226:5-13 (A1262); *see also* A2237 ¶¶ 29-40.)  In fact, before Arcapita's bankruptcy filing, BisB made no move to exit from or reserve for its own investments with Arcapita, and expected continuing future returns on those investments.  (A1204 (Jarrar dep.) at 217:14-219:16 (A1259-60), 222:24-223:25 (A1261).)

 After Arcapita's Chapter 11 filing, BisB employees expressed confusion and demanded repayment in full of BisB's *murabaha* investments with Arcapita that it had agreed to roll over just before the bankruptcy filing.  In turn, Arcapita demanded repayment of its own three *murabaha* investments (from March 13-15, 2012).  BisB agreed to repay two of them, then considered for the first time its setoff options under Bahraini law.  BisB's management then decided in a series of June 2012 meetings to assert setoff as to the March 14 investment.  (A1860-90; A1541-47; (A1204 (Jarrar dep.) at 192:2-17 (A1253); *see also* A2237 ¶¶ 50-63.)

### 4.    The CBB's Intervention in the Banks' Dispute

Arcapita informed the CBB in early June 2012 that BisB had "unilaterally frozen" its $10 million investment.  (A1891-97.)

The CBB then issued a directive on July 4, 2012 ordering BisB to either reverse its setoff and release Arcapita's investment funds or seek permission from the Bankruptcy Court for the setoff. The CBB cited Chapter EN-3 of the CBB Rulebook, "which provides further details of the regulatory process in matters of this nature," and stated that BisB's failure to comply within a week could result in "further enforcement action in accordance with the regulations set out in Chapter EN-3 of the CBB Rulebook, Volume 2." (A1548-49.)

BisB responded by meeting with the CBB at its office on July 10, 2012, sending a written response defending the setoff on July 16, 2012, having a further call with the CBB through its counsel on July 18, 2012, and sending a further detailed written response objecting to the CBB's directive and defending the setoff under Bahraini law. (A1550-52; A1898-1901; *see also* A2237 ¶¶ 64-66.)

The Bankruptcy Court acknowledged on summary judgment that BisB had objected to the CBB's directive, but concluded the CBB had not withdrawn it. *Arcapita III*, 628 B.R. at 444. Yet it is undisputed that the CBB has never taken any action to enforce its July 2012 directive. (A2741 (transcript of summary judgment hearing before the Bankruptcy Court), at 20:23-21:2 (A2760-61); *id.*, at 140:17-142:1 (A2918-20); *id.*, at 200:20-202:10 (A2978-80); *see also* A6588 (Committee response brief on appeal) at A6652.)

- 15 -

It is also true that the CBB never issued a "final determination" after receiving BisB's objections, as required by the CBB's own procedural rule for addressing objections to its directives (referred to therein as "directions"), set out in Chapter EN-3 of the CBB Rulebook. Indeed, the Bankruptcy Court acknowledged this rule in *Arcapita III*:

> Upon the issuance of a Direction, the recipient "will normally be given 30 days from the Direction's date of issuance in which to make objections to the CBB concerning the actions required. This must be done in writing, and addressed to the issuer of the original notification. **Should an objection be made, the CBB will make a final determination, within 30 days of the date of the objection**, as specified in Articles 125(c) and 126 of CBB Law."

*Arcapita III*, 628 B.R. at 441 (quoting Rule EN-3.2.2 of the CBB Rulebook) (emphasis added). The Bankruptcy Court cited the enforcement provisions for the CBB's directives (*i.e.*, Chapter EN-3) extensively in its summary judgment ruling, noting that they had "special significance." *Arcapita III*, 628 B.R. at 440 n.25, 441-42.

But the CBB has never taken any further enforcement action against BisB in Bahrain. Instead, the Committee has pursued this suit against BisB in the United States. At oral argument on summary judgment, the Committee confirmed to the Bankruptcy Court that the CBB is a member of the Committee and was "fully aware that the creditors' committee brought this litigation." (A2741 (transcript of summary judgment hearing before the Bankruptcy Court), at 22:1-4 (A2762).) The

Committee also confirmed that its suit is seeking exactly the same relief as that sought by the CBB directive:

> And then what superseded that or what came thereafter is, in 2013, the committee brought this litigation to seek to get these funds back and have Your Honor decide exactly what the CBB directed them to do.

(*Id.* at 22:14-18 (A2762).)

## <u>SUMMARY OF ARGUMENT</u>

The District Court's Interlocutory PJ Order (*Arcapita I*) and its Order affirming the Bankruptcy Court's Judgment (*Arcapita V*) should be reversed for several reasons.

*First*, the District Court's personal jurisdiction decisions in *Arcapita I* (at the motion to dismiss stage) and *Arcapita V* (after final summary judgment) were erroneous. In *Arcapita I*, the District Court incorrectly applied the two-part test for specific personal jurisdiction – *i.e.*, (1) for minimum contacts, whether (a) BisB purposefully directed its activities to the United States and (b) the Committee's claims arise from such contacts; and (2) for due process, whether the assertion of jurisdiction would be reasonable – by addressing *only* the Committee's preference claim. Finding BisB's sole contact with the U.S. – its use of a New York correspondent bank account to receive Arcapita's investment – to be "the heart" of the Committee's preference claim, the District Court failed to address whether the Committee's *other* claims (breach of contract, turnover, and stay violation) arose

from such account use. They did not, as all of the Committee's other claims arose from BisB's conduct in Bahrain. Under this Court's rulings in *Licci* and *Daou*, the Bankruptcy Court lacked personal jurisdiction over BisB.

Moreover, in *Arcapita V*, the District Court erred by discounting new evidence produced during discovery showing it was Arcapita, not BisB, who initiated its investment and chose to use U.S. dollars for its currency. It was thus Arcapita, not BisB, whose actions led to the parties' momentary use of the U.S. banking system, for purposes of the personal jurisdiction analysis.

*Second*, the District Court's affirmation of the Bankruptcy Court's comity decision in *Arcapita II* was erroneous. The District Court held that the parties' use of New York correspondent bank accounts gave the United States a "stronger regulatory interest" in the conduct at issue in this litigation. But this ruling was based on the flawed premise that such use of the New York accounts gave rise to *all* of the Committee's claims, contradicting *Licci* and *Daou*. Neither the Bankruptcy Court nor the District Court below explained what "regulatory interest" the United States possibly has in breach of contract claims among Bahraini banks, based on conduct in Bahrain and arising from contracts expressly governed by Bahraini law.

The District Court further erred by concluding there is no "true conflict" for comity purposes between Bahraini and U.S. setoff law, pointing only to the CBB's

July 2012 directive. It thus suggested that BisB's setoff rights in Bahrain and under U.S. bankruptcy law are the same. They are not. Both the Bankruptcy Court and the District Court applied U.S. standards for setoff under Section 553 of the Bankruptcy Code that do not exist in Bahraini setoff law – including a requirement to get bankruptcy court approval, an "intent" disqualifier for setoff under Section 553(a)(3)(C), and the equitable discretion of a bankruptcy court to permit or deny setoff based on the goals of the Bankruptcy Code. These are creatures of the U.S. Bankruptcy Code, not Bahraini law, creating a true conflict since applying U.S. setoff law here leads to a different distributional outcome than in Bahrain, warranting comity abstention under this Court's *Maxwell II* ruling.[9]

*Third*, the District Court erred in affirming the Bankruptcy Court's Judgment against BisB for breach of contract in *Arcapita III*. Specifically, both of the lower courts ruled that the CBB's regulatory directive overrode all of BisB's setoff rights under Bahraini contract law, *retroactively*. But neither court held that BisB's exercise of setoff was unlawful under Bahraini law when exercised. Instead, they decided that, even if BisB lawfully exercised its setoff rights under Bahraini law, the CBB's later regulatory directive was the applicable "Bahraini law" for determining whether BisB breached its contract with Arcapita – notwithstanding

---

[9]     *Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1050 (2d Cir. 1996) (*"Maxwell II"*).

that BisB immediately objected to that directive and the CBB has declined to enforce it for over ten years. The lower courts thus transformed the Committee's breach of contract claim into a suit to enforce a foreign regulatory directive.

*Fourth*, the District Court's erroneous ruling in *Arcapita I*, revesting the Bankruptcy Court with personal jurisdiction over BisB, is the sole source of its authority to enforce the Bankruptcy Code's automatic stay against BisB. If this Court reverses *Arcapita I*, as BisB urges, then the Bankruptcy Court lacks personal jurisdiction over BisB and may not enforce the automatic stay against its acts abroad.

*Fifth*, and finally, the District Court erred in affirming the Bankruptcy Court's ruling on prejudgment interest. Both courts below agreed that Bahraini law determines the applicable interest rate, and conceded that both Bahraini law and shari'a principles forbid such interest. But both courts nonetheless ignored these prohibitions and imposed New York's prejudgment interest rate based on this dispute's purported contacts with the United States, even though the Bankruptcy Court's Judgment was based only on conduct in Bahrain.

## ARGUMENT

### I. STANDARD OF REVIEW

On this appeal, this Court independently reviews the decisions of the Bankruptcy Court (as the trial court), accepting its factual findings unless they are

clearly erroneous and reviewing its conclusions of law *de novo*. *In re Fogarty*, 39 F.4th 62, 70 (2d Cir. 2022).

As to the specific issues in this appeal:

The Bankruptcy Court's dismissal of this action for want of personal jurisdiction over BisB in its Bankruptcy PJ Order, and the District Court's reversal of that dismissal in *Arcapita I* and its further affirmation of personal jurisdiction in *Arcapita V*, are subject to *de novo* review. *Daou*, 42 F.4th at 128.

The Bankruptcy Court's ruling on prescriptive comity, and the District Court's affirmation of that ruling, are subject to *de novo* review. *In re Picard*, 917 F.3d 85, 101 (2d Cir. 2019).

The Bankruptcy Court's ruling on the Committee's breach of contract claim, and the District Court's affirmation of that ruling, are subject to review for whether the Bankruptcy Court committed clear error in its factual findings, and *de novo* review as to conclusions of law and mixed questions of law and fact. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir. 2003).

The scope of the Bankruptcy Court's authority to enforce the Bankruptcy Code's automatic stay against BisB (which BisB argues herein is limited by its lack of personal jurisdiction over BisB) is subject to *de novo* review. *In re Fogarty*, 39 F.4th at 70.

The Bankruptcy Court's application of the prejudgment interest rate to the Committee's breach of contract claim, and the District Court's affirmation of that ruling, is subject to *de novo* review to the extent based on interpretation of Bahraini law and the investment contract between Arcapita and BisB, and otherwise for whether the Bankruptcy Court abused its discretion. *Carco Grp., Inc. v. Maconachy*, 718 F.3d 72, 79-80, 87 (2d Cir. 2013).

## II. THE DISTRICT COURT ERRONEOUSLY APPLIED THE TEST FOR SPECIFIC PERSONAL JURISDICTION OVER BISB

The District Court committed a fundamental error in *Arcapita I*: it applied the two-part test for specific personal jurisdiction to only *one* of the Committee's claims, the preference claim (Count III), but not to any of the Committee's other claims, as precedent required. Then in *Arcapita V*, the District Court compounded this error by disregarding new evidence that it was Arcapita, not BisB, who chose to use U.S. dollars for its investment and thus use the U.S. banking system. This undermined a critical factual premise of *Arcapita I* and showed it was Arcapita, not BisB, whose actions led to the parties' only contact with the U.S.

Both *Arcapita I* and *Arcapita V* should be reversed on these grounds.

### A. The District Court was Required to Apply the Two-Part Test for Specific Personal Jurisdiction to Each of the Committee's Claims.

The Committee has conceded that the Bankruptcy Court did not have general personal jurisdiction over BisB. *Arcapita I*, 549 B.R. at 63 n.9.

- 22 -

The Committee was thus required to prove the Bankruptcy Court's specific personal jurisdiction over BisB under a two-part test: namely, (1) as to minimum contacts, that (a) BisB "purposefully availed" itself of the privilege of doing business in the forum state, and (b) the Committee's claims "arise out of or relate to" such contacts; and (2) that the assertion of jurisdiction over BisB would be "reasonable" under "traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1028 (2d Cir. 1997).

In bankruptcy adversary proceedings, the minimum contacts test applies to contacts with the United States at large, rather than the forum state. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Sec. LLC*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) ("*Madoff I*") (citing cases), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012) ("*Madoff II*"); *O'Toole v. MyPlace Dev. SP. Z O.O. (In re Sledziejowski)*, Adv. No. 15-08207, 2016 WL 6155929 at *4 (Bankr. S.D.N.Y. Oct. 21, 2016).

The Committee was required to prove specific personal jurisdiction as to *each* of its claims. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)). A federal court is then required to conduct a fact-intensive inquiry to "closely examine the defendant's contacts for their quality," *Licci II*, 732 F.3d at 168, and must review *each* of the plaintiff's claims in this light based on the "totality of the circumstances" in the record. *Sunward Elecs.*, 362 F.3d at 23. The

Supreme Court has further held that for purposes of specific personal jurisdiction, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

These constitutional standards exist to ensure that federal courts rule *only* on claims arising from a foreign defendant's deliberate contacts with the forum. As this Court put it in *Licci II*:

> Specific jurisdiction, on the other hand, depends on an "affiliation between the forum and the underlying controversy," principally, **activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation**. In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of "issues deriving from, or connected with, the very controversy that establishes jurisdiction."

*Licci II*, 732 F.3d at 169 n.6 (emphasis added) (quoting *Goodyear Dunlop Tires Operations S.A. v. Brown,* 564 U.S. 915, 919 (2011)); *see also Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 137 S.Ct. 1773, 1776 (2017) (personal jurisdiction requires a "connection between the forum and the specific claims at issue").

If the minimum contacts test is met, the court is then required to apply the due process "reasonableness" analysis under a five-part balancing test:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and

effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*In re Motors Liquidation Co.*, 565 B.R. 275, 287 (Bankr. S.D.N.Y. 2017) ("*In re Motors Liquidation Co.*") (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010)). Where a dispute involves a defendant in another country rather than another American state – as here – the federal court must look to the interests of that foreign country and principles of comity. *In re Motors Liquidation Co.*, 565 B.R. at 287 (citing *Maxwell II*, 93 F.3d at 1048)).

**B.** **This Court's *Licci* and *Daou* Rulings Confirm That the Use of a New York Correspondent Bank Account Must Itself be Part of the Alleged Wrongful Conduct for Jurisdiction to Lie.**

In its recent ruling in *Daou*, this Court applied personal jurisdiction standards under the New York long-arm statute to hold that where a foreign defendant's use of a New York correspondent bank account is asserted as the basis for specific personal jurisdiction, the use of that account must itself be part of the *wrong targeted by the plaintiff's complaint* for jurisdiction to lie.[10] As the Court

---

[10] The courts of this Circuit have regularly applied the principles of specific personal jurisdiction under the New York long-arm statute to the minimum contacts analysis under the Constitution, finding the two-prong tests similar. *See* New York CPLR § 302(a)(1) (personal jurisdiction lies over a foreign defendant who "transacts any business within the state" if the cause of action "arises from" such business); *see also Licci II*, 732 F.3d at 168-74 (applying both CPLR § 302(a)(1) and federal constitutional due process standards); *In re Motors*

stated, there must be a "substantial relationship" or "articulable nexus" between the foreign defendant's transactions in the forum and the claims asserted by the plaintiff. *Daou*, 42 F.4th at 130. And if the contact with the forum is the use of a New York correspondent bank account, a transaction through such an account must form "part of the alleged unlawful course of conduct underlying the cause of action set out in the complaint." *Id.* (citing *Licci I*, 20 N.Y.3d at 330-31, 960 N.Y.S.2d 695, 984 N.E.2d 893 (a terrorist financing case), and *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 329-30, 68 N.E.3d 1 (2016) (a money laundering case)).

By contrast, if the dollar-based transactions could have been effected from other accounts throughout the world and the plaintiff would still pursue the same claims, then the use of a New York account is "merely coincidental" to the claims and insufficient to confer personal jurisdiction. *Daou*, 42 F.4th at 130-32.

The facts of *Daou* are instructive here. In *Daou*, this Court ruled that three Lebanese banks were *not* subject to the personal jurisdiction of the New York federal court, for purposes of breach of contract and other common law claims and federal and state statutory claims based on the banks' refusal to honor the plaintiffs' demands for withdrawals from their Lebanese bank accounts. The

---

*Liquidation Co.*, 565 B.R. at 285-86 (while the New York long-arm statute does not apply in bankruptcy adversary proceedings, it is "relevant on the use of New York banks to establish specific jurisdiction" (citing *Licci I*, 20 N.Y.3d at 338-39)).

account agreements were expressly governed by Lebanese law or a Beirut forum selection clause, and the banks had used New York correspondent bank accounts for multiple transactions with the plaintiffs and other customers. 42 F.4th at 126-27. But this Court found it dispositive that the banks' refusal to honor the plaintiffs' withdrawal requests occurred in *Lebanon*, not New York. *Id.* at 132. As this Court stated:

> Here, however, **the alleged unlawful conduct underlying the [plaintiffs'] claims does not involve a specific transaction through New York correspondent accounts** – rather, the [plaintiffs] allege that the Commercial Banks have used their New York correspondent accounts to handle the [plaintiffs'] and other investors' money *in the past* ….
> ….
> **[A]ll of [the plaintiffs' claims] turn on alleged measures taken by Lebanese banks in Lebanon** to ensure that USD deposits remained in that country.

*Id.* at 131-32 (italics in original; bold emphasis added). Finally, because the banks could have received the plaintiffs' U.S. dollar deposits "through correspondent accounts in Florida, London, or Switzerland, or through no correspondent account at all," the connection between the past use of the New York correspondent accounts and the plaintiffs' claims in their complaint was "merely coincidental." *Id.* at 132.

This Court's *Daou* ruling was consistent with *Licci II*, which applied both the New York long-arm statute and federal minimum contacts standards to the use of New York correspondent bank accounts. There, this Court held that a Lebanese

bank that allegedly executed wire transfers through such accounts to finance terrorist attacks was subject to personal jurisdiction under the minimum contacts test because the wire transfers were "**part of the principal wrong at which the plaintiffs' lawsuit is directed**." *Licci II*, 732 F.3d at 170 (emphasis added). The Court further emphasized that the mere maintenance of a correspondent bank account in the United States is insufficient to confer personal jurisdiction; instead, it must be "**used as an instrument to achieve the very wrong alleged**." *Id.* at 171 (emphasis added).

Other New York federal and state courts have applied the guidance of the *Licci* decisions to distinguish between litigation that targets a foreign defendant that used a New York bank account to perpetuate a wrong *through that account itself*, and litigation that targets a foreign defendant that used a New York account but *committed the wrong abroad*, independent of the account itself. The former is subject to specific personal jurisdiction. The latter is not.[11]

---

[11]    *See Averbach v. Cairo Amman Bank*, No. 19-cv-0004-GHW-KHP, 2020 WL 486860, at *4-9 (S.D.N.Y. Jan. 21, 2020) (personal jurisdiction based on use of New York correspondent bank accounts to aid Hamas); *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-00007, 2020 WL 7089448 at *4-6 (E.D.N.Y. Nov. 25, 2020) (personal jurisdiction based on use of New York correspondent bank accounts to aid Hezbollah); *Rushaid*, 28 N.Y.3d at 319-29, 68 N.E.3d at 2-10 (personal jurisdiction based on use of New York correspondent bank accounts to route illegal bribes and kickbacks in a money-laundering scheme); *cf. Khalife v. Audi Saradar Private Bank SAL*, 129 A.D.3d 468, 11 N.Y.S.3d 573 (N.Y. App. Div. 2015) (applying New York long-arm statute;

**C.**     **The Committee's Claims Fail the Test of *Licci* and *Daou*.**

The courts below erred because the Committee's claims against BisB fail to meet the minimum contacts test set forth in *Licci* and *Daou*.  The Committee does not target the use of the New York correspondent bank accounts as the wrong it seeks to remedy.  To the contrary, its complaint describes Arcapita's initial $10 million investment through those accounts as creating "a valid, enforceable, and legally binding contract between Arcapita and [BisB]."  (A361 ¶¶ 39, 44.)

Instead, the wrong that the Committee seeks to remedy is based on *later* conduct, specifically BisB's failure to remit the contractual investment proceeds on their due date and subsequent assertion of setoff.  This is clear from, among other things, the amount of damages sought by the Committee for *all* of the claims in its complaint: $10,002,292, which is the amount due under the contract on the *maturity date* of Arcapita's investment, March 29, 2012 – not on March 14, 2012, the date Arcapita's $10 million investment was wired through the parties' New York correspondent bank accounts.  (A361 ¶¶ 42, 45-48, 57, 65, Prayer for Relief.)

_____

personal jurisdiction did not lie over a Lebanese bank that executed securities transactions through a U.S. bank account, where all of the plaintiffs' claims based on the freezing of its bank accounts in Lebanon were "based solely upon actions taken by defendant bank in Lebanon").  *See also In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305, 1324 (S.D. Fla. 2010) (no personal jurisdiction for tort claims against Irish banking entities arising from their alleged failure to perform adequate due diligence in Ireland, finding "the actions giving rise to the Plaintiffs' claims necessarily occurred in Ireland").

The Bankruptcy Court likewise calculated the prejudgment interest on BisB's breach of contract judgment as accruing from that *maturity date*. (A6550 ¶ III.b.)

In other words, the Committee's complaint itself admits that the damages the Committee seeks from BisB's actions arose not from the New York wire – BisB's sole contact with the United States – but from BisB's later conduct in Bahrain. The Committee would have sought these same damages, and asserted the same claims, if BisB had received Arcapita's investment wire from anywhere in the world. The New York wire was thus "merely coincidental" to the Committee's claims. *Daou*, 42 F.4th at 132.

### D. The District Court in *Arcapita I* Erroneously Found that the New York Wire was "the Heart" of this Litigation.

In *Arcapita I*, the District Court missed this Court's guidance in *Licci* completely, and instead made the New York wire the center of this litigation, *even though the wire itself was not wrongful*. As the District Court found with respect to the Committee's preference claim:

> The Banks' New York contacts—*i.e.*, the receipt of the transferred funds in New York correspondent bank accounts—are at the heart of this cause of action. The receipt of the funds in New York is precisely the conduct targeted by the Committee, and the activity that the cause of action seeks to have voided.

*Arcapita I*, 549 B.R. at 69.

The District Court thus found that for purposes of minimum contacts, the Committee's preference claim (Count III) "arises from" the parties' use of New York correspondent bank accounts to effect Arcapita's investment. *Id.* It further found that BisB "purposefully availed" itself of the U.S. banking system by choosing to receive Arcapita's investment in U.S. dollars and designating its New York correspondent bank account to receive them. *Id.* at 69-70. And it found the due process "reasonableness" standard fulfilled because "the United States has a strong interest in adjudicating claims that arise under its Bankruptcy Code," and it was unclear if the Committee could bring "similar causes of action to those grounded in the United States bankruptcy code" in a non-U.S. forum. *Id.* at 71-72.

The District Court's *Arcapita I* ruling was in error. The *only* claim it analyzed for personal jurisdiction purposes was the Committee's preference claim. While claiming the New York wire was "the heart" of this claim, it failed to address how *any* of the Committee's other claims arose from the New York wire. Instead, as the Committee's own complaint acknowledged, the harm it is seeking to remedy is BisB's *later* failure to remit the investment proceeds on their maturity date and its assertion of setoff. (A361.)

Moreover, given its sole focus on the preference claim, the District Court failed to apply the "reasonableness" balancing test to *any* of the Committee's other claims. Instead, it applied the test only to claims *under the Bankruptcy Code*, thus

- 31 -

leading it to find that the Committee might not be able to pursue "similar" claims outside of the U.S. Had the District Court applied the same test to the Committee's *breach of contract claim under Bahraini law*, it would have had to determine whether it was reasonable, for due process purposes, to force BisB to litigate that Bahraini law claim in the United States, rather than in Bahrain.

The later path of this litigation proved the unreasonableness of the District Court's personal jurisdiction analysis. On summary judgment, the Bankruptcy Court ruled against BisB on the breach of contract claim under Bahraini law and the related turnover and stay violation claims arising from that ruling, but did not rule on the preference claim at all. *Arcapita III*, 628 B.R. at 476 n.63. In other words, the claim at "the heart" of the District Court's personal jurisdiction analysis in *Arcapita I* was not the heart of this litigation after all.

**E.** **In *Arcapita V*, the District Court Disregarded New Evidence that Arcapita, Not BisB, Initiated the Parties' Sole Contact with the U.S. Banking System.**

One of the express premises of Judge Daniels' personal jurisdiction ruling in *Arcapita I* was that it was BisB, not Arcapita, who chose to use U.S. dollars for Arcapita's *murabaha* investment:

> The Banks' purposeful use of correspondent bank accounts in New York constitutes a "transaction of business" within New York. **The Banks, not Arcapita, set the terms of each placement transaction**, and then presented those terms in an offer to Arcapita. … **The Banks' selection of dollars and their**

> decision to utilize **New York's banking system** to effectuate the transfer was no less deliberate than LCB's use of New York's banking system in *Licci*.
>
> ….
>
> Nevertheless, **both Banks deliberately chose to receive Arcapita's funds in U.S. dollars and designated correspondent bank accounts in New York to receive the funds**, even though they presumably could have performed the Placement transactions without ever directing the funds through New York or anywhere else in the United States.

*Arcapita I*, 549 B.R. at 68-70 (emphasis added). Judge Daniels further acknowledged that he would have conducted a different jurisdictional analysis if the evidence proved otherwise:

> **Had the record demonstrated that Arcapita, as opposed to the Banks, selected the U.S. dollar and the New York accounts to effectuate the Placements**, the Banks' contacts with the United States would have been adventitious, and **jurisdiction would not have lied**.

*Arcapita I*, 549 B.R. at 71 (emphasis added).

Both before the Bankruptcy Court on summary judgment, and then on appeal to the District Court, BisB presented new evidence that Judge Daniels did not have before him for his *Arcapita I* ruling: undisputed evidence that Arcapita, not BisB, chose to use U.S. dollars for Arcapita's investment. (A1406 (call transcripts) at A1450, A1455, A1459, A1463-64; A2316 (opening summary judgment brief) at A2336-38, A2349-51; A2237 (BisB statement of material facts

- 33 -

for summary judgment) ¶ 46; A176 (opening brief on appeal) at A200-02.)  But both of the lower courts gave this undisputed evidence short shrift.

The Bankruptcy Court concluded that the new evidence was "simply more of the same" as that before Judge Daniels.  *Arcapita III*, 628 B.R. at 433.  BisB asked Judge Hellerstein to reverse that ruling because it was not.

The District Court doubly erred.  First, it called *Arcapita I* "law of the case" that could not be reversed by the Bankruptcy Court.  *Arcapita V*, 640 B.R. at 616-17.  This ignored the fact that *Arcapita I* was an interlocutory ruling based on a limited record on a motion to dismiss, and could of course be revisited on summary judgment on a full evidentiary record.  *United States v. Johnson*, 616 F.3d 85, 93 (2d Cir. 2010), *rev'd and remanded on other grounds*, 576 U.S. 591 (2015); *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 647 (S.D.N.Y. 2015).

Second, the District Court conceded "the evidence showing that Arcapita chose to invest in U.S. Dollars," but concluded that it did not undercut the premise of *Arcapita I* because "BisB chose to accept those terms and then designated correspondent bank accounts in New York to receive the fund transfers."  *Arcapita V*, 640 B.R. at 617.  In other words, the simple act of designating a New York correspondent bank account to receive the wire of a U.S. dollar investment chosen by Arcapita was sufficient to subject BisB to the jurisdiction of the U.S. courts as to *all* of the Committee's claims.  This was at odds with the undisputed evidence

that *all* of the other conduct in this dispute, before and after that wire transfer, occurred in Bahrain, and notwithstanding that *only* the preference claim – which was not the basis for the Judgment here, *Arcapita III*, 628 B.R. at 476 n.63 – arguably has any connection to the wire transfer itself.

Taking into account the constitutional test for personal jurisdiction set forth above, *see supra* at 23-25, it is clear that the lower courts in *Arcapita III* and *Arcapita V* failed to follow it here. It was Arcapita, not BisB, who chose to initiate the dollar-based investment at issue here, triggering BisB's momentary use of a New York correspondent bank account – while *all* other conduct at issue occurred in Bahrain, and the parties' *murabaha* contract is expressly governed by Bahraini law. Based on the totality of circumstances, BisB could not have foreseen that this Bahraini law contract dispute would be adjudicated in the U.S. courts. The assertion of specific personal jurisdiction over BisB fulfills neither the minimum contacts nor the due process "reasonableness" test.

No personal jurisdiction therefore lies over BisB, and the lower courts' rulings should be reversed.

## III. THE DISTRICT COURT ERRED IN FINDING THAT COMITY PRINCIPLES DID NOT MANDATE ABSTENTION FROM THIS DISPUTE

The District Court's comity ruling on appeal is brief but makes a few remarkable holdings: (1) that the United States has a stronger regulatory interest in

the Committee's breach of contract claim – *i.e.*, an alleged breach of an Islamic *murabaha* contract, governed by Bahraini law and shari'a principles, between two Islamic banks based in Bahrain and supervised by a Bahraini bank regulator, who in fact opened a regulatory proceeding on this very dispute; and (2) there is no true conflict between U.S. and Bahraini setoff law, because of the Bahraini regulator's *later* directive after BisB had already exercised its setoff rights under Bahraini law. *Arcapita V*, 640 B.R. at 619.

Each holding was reversible error.

**A.    The U.S. Does Not Have a Stronger Regulatory Interest than Bahrain in this Bahraini Law Contract Dispute between Bahraini Banks.**

Under this Court's ruling in *Maxwell II*, the comity analysis requires a balancing test to determine which country has the strongest connection to the dispute:

> [E]valuating **all relevant factors**, including, where appropriate, such factors as **the link between the regulating state and the relevant activity**, the connection between that state and the person responsible for the activity (or protected by the regulation), **the nature of the regulated activity and its importance to the regulating state**, the effect of the regulation on justified expectations, the significance of the regulation to the international system, the extent of other states' interests, and the likelihood of conflict with other states' regulations.

*Maxwell II*, 93 F.3d at 1048 (emphasis added) (citing Restatement (Third) of Foreign Relations (1986), § 403(2)).[12]

In its *Arcapita II* comity ruling, the Bankruptcy Court followed *Arcapita I* to find that the U.S. is the "regulating state" of this dispute because the New York wire is "the heart" of the Committee's "avoidance and recovery" claims, citing only various remedies *under the Bankruptcy Code*. *Arcapita II*, 575 B.R. at 236, 239-41. Conspicuously, the Bankruptcy Court did not apply its comity analysis to the Committee's breach of contract claim *under Bahraini law*.

On appeal, the District Court in *Arcapita V* tried to cover this hole in the Bankruptcy Court's comity analysis by going even farther than *Arcapita I*:

> The failure to properly consider the breach of contract claim, BisB argues, lead [sic] the Bankruptcy Court to conclude that the U.S. has a stronger regulatory interest. This argument misconstrues both the facts and the Bankruptcy Court's

---

[12] In *Maxwell II*, the Second Circuit affirmed a bankruptcy court's abstention on comity grounds from adversary proceedings seeking to claw back pre-bankruptcy funds transfers by an English company (the debtor) to three European banks. The Second Circuit found that England had "the strongest connection" to the dispute – and there was a "considerably lesser American connection to the dispute" – where the underlying contracts were negotiated in England, administered primarily in England and governed by English law, and where the debtor was "largely controlled by British nationals, governed by a British board of directors, and managed in London by British executives"; and most of the debtor's creditors were British and most of its debt was incurred in England. The Second Circuit affirmed the bankruptcy court's abstention notwithstanding that one of the challenged transfers was routed through a New York bank account, "like all payments received in U.S. dollars." *Maxwell II*, 93 F.3d at 1051-52.

> opinion.   Contrary to BisB's assertion, **the conduct at the heart of this action is the wire transfers routed through the New York correspondent banks**.  As the Committee correctly notes, **those transfers gave rise to *all* of its claims**.  Indeed, if the transfers had never been effectuated, the Committee would not have had reason to institute the adversary proceedings against BisB.  The fact that BisB asserted its setoff rights in Bahrain, which the Bankruptcy Court concluded was a breach of the placement agreements, does not render BisB's conduct extraterritorial, nor does it give the Bahraini government a greater regulatory interest.

*Arcapita V*, 640 B.R. at 619 (italics in original; bold emphasis added).

This approach flips the basic principle of comity – "respect for another country's sovereign authority within its borders," *In re Vitamin C Antitrust Lit.*, 8 F.4th 136, 146 (2d Cir. 2021) – on its head.  For one, it clearly contradicts the personal jurisdiction principles of *Licci*, *Daou* and the other authorities cited above requiring that *each* of the Committee's claims must "arise from" conduct *in the United States*.  Instead, the District Court adopts a "but for" test, claiming that if a link in the chain of events underlying a dispute happens to occur in the U.S., then *ipse dixit* the U.S. has a greater regulatory interest in the dispute because, without the (even momentary) U.S. event, the dispute would not have arisen.

The District Court failed to explain what "regulatory interest" the United States possibly has in Bahraini law breach of contract claims among Islamic banks in Bahrain, based on conduct in Bahrain.  Its silence is especially troubling because – in another flip of logic – it concludes throughout its *Arcapita V* opinion that the

CBB's directive is superior and binding on BisB, even to the point of retroactively voiding a prior lawful setoff. *Arcapita V*, 640 B.R. at 619-22. This begs the question of why the lower courts would not then *invoke* comity and defer to the CBB's enforcement decisions with respect to BisB in Bahrain. As noted above, *supra* at 15-16, the CBB has never enforced its directive against BisB. Yet in the eyes of the lower courts, they themselves are now tasked with enforcing it – presumably because they believe the U.S. has a greater "regulatory interest" in the CBB's directives than Bahrain and the CBB itself.

Applying the *Maxwell II* balancing test correctly, even a cursory analysis of this dispute makes clear that the "regulated activity" that is the subject of the Committee's claims – particularly its breach of contract claim (and thus its turnover and stay violation claims) – is *conduct in Bahrain*, specifically BisB's exercise of its setoff right and failure to repay the contractual investment returns. As the parties have conceded,[13] the legality of these activities turns on Bahraini law, not U.S. law, specifically (1) Bahraini civil statutes governing BisB's exercise of setoff under Bahraini contract law (A1902 ¶¶ 28-48), and (2) any related issues of Bahraini banking law (as both BisB and Arcapita were licensed by the CBB). (A1624; A1627; A1629-35; *see also* A2237 ¶¶ 1-2, 13-14.)

---

[13]    *See Arcapita III*, 628 B.R. at 476 ("The parties agree that the breach of contract claims are governed by Bahraini law.").

Based on this record, it is clear that the Committee's claims are governed by Bahraini law, and Bahrain is the proper "regulating state" here. The Bankruptcy Court erred by improperly focusing its comity analysis only on "avoidance and recovery" claims under the U.S. Bankruptcy Code, and ignoring the Committee's breach of contract claims. The District Court erred by obscuring this limitation in the Bankruptcy Court's analysis and incorrectly assuming that *all* of the Committee's claims arise from the New York wire. Neither of the lower courts properly applied the comity balancing test required by *Maxwell II*. This was reversible error.

### B.  There is a True Conflict Between U.S. and Bahraini Setoff Law, as the Former Imposes Requirements Under Section 553 of the Bankruptcy Code that Do Not Exist in Bahrain.

The District Court also erred in its conclusion that there is no "true conflict" between U.S. and Bahraini setoff law because once the CBB issued its directive, it "eviscerated any conflict that might have existed between the Bahraini Civil Code and the U.S. Bankruptcy laws." *Arcapita V*, 640 B.R. at 619.

This disregards what actually happened below. Both lower courts applied multiple provisions of Section 553 of the Bankruptcy Code that do not exist in Bahraini law, including the requirement to obtain the approval of a U.S. bankruptcy court to exercise setoff (under Section 553(a), by cross-reference to

Section 362)[14] and an "intent" provision (Section 553(a)(3)(C)) that disqualifies a setoff if a creditor accumulated a debt to the debtor in order to obtain setoff rights. (SPA94.) In fact, both courts devoted several pages of their rulings to applying Section 553(a) here. *Arcapita III*, 628 B.R. at 433-34, 438-51, 456-59; *Arcapita V*, 640 B.R. at 620-22, 627-29.[15] And both courts expressly invoked the equitable power of the Bankruptcy Court not to recognize BisB's setoff, *even if* it "technically" complied with Bahraini law, based on "the Bankruptcy Code's goals and objectives." *Arcapita III*, 628 B.R. at 434, 444 (citing *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Tr. Co. (In re Bennett Funding Grp.)*, 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998)); *Arcapita V*, 640 B.R. at 620 (same).

---

[14] Section 362(a)(7) applies the automatic U.S. bankruptcy stay to setoff of pre-petition debts, and Section 362(d) requires bankruptcy court approval for relief from the stay imposed by Section 362(a). (SPA96.)

[15] BisB vigorously opposed the lower courts' application of Section 553(a)(3)(C), presenting extensive evidence that it had no prior knowledge of – and absolutely no basis to expect – Arcapita's impending Chapter 11 filing, as it was standard in the Bahraini banking industry for any temporary liquidity issues to be worked out consensually. Moreover, BisB never exited from its own pre-bankruptcy investments with Arcapita; agreed – at the request of *Arcapita* – to roll over its own *murabaha* investment with Arcapita, based in part on the latter's assurances that new financing was imminent; and did not even consider its setoff options until *after* Arcapita's Chapter 11 filing. *See supra* at 13-14; *see also* A2607 (summary judgment reply brief) at A2614-19; *id.* at A2623 n.42; A176 (opening appeal brief) at A280-83; A6707 (appeal reply brief) at A6747-51.

But Bahraini setoff law has no "intent" provision like Section 553(a)(3)(C) of the Bankruptcy Code, and of course no requirement to first obtain the approval of a foreign bankruptcy court. Articles 353-360 of the Bahraini Civil Code simply require that the two debts be liquidated, undisputed money debts. (SPA71.) BisB's Bahraini law expert (Ms. Al Mansoori) thus found that BisB had properly exercised setoff under the Bahraini Civil Code and parallel shari'a principles, thereby extinguishing BisB's payment obligations under Arcapita's investment contract. (A1902 ¶¶ 23-37, 49-55.) She specifically found that once these conditions for setoff were fulfilled, the setoff was deemed to have taken place and did not require the consent of Arcapita or any court, under either the Bahraini Civil Code or parallel shari'a principles. (A1902 ¶¶ 25, 28, 54-55.)

The lower courts' application of both the Bankruptcy Code's court approval requirement (in Sections 553(a) and 362) and its "intent" provision (in Section 553(a)(3)(C)) thus revealed a basic conflict with Bahraini setoff law, and led to a different outcome here than if Bahraini setoff law alone were applied.

In *Maxwell II*, this Court focused in particular on differing "intent" provisions in countries' avoidance regimes, to determine whether applying them in the bankruptcy context would lead to different *distributional outcomes*:

> First, avoidance rules do not regulate conduct in the same fashion as do prohibitions against anti-competitive conspiracies. … Thus, it may be seen that although avoidance rules unquestionably aim to influence pre-petition conduct, **a conflict**

**between two avoidance rules exists if it is impossible to distribute the debtor's assets in a manner consistent with both rules**. Second, although our allusions to English law should not be understood as an attempt to prejudice the outcome of any future litigation on that subject in British courts, the parties in the present actions have assumed that **the "intent" requirement in the English law would dictate a different distributional outcome than would United States law**. Consequently, it is not possible to comply with the rules of both forums and the threshold requirement of a true conflict exists for purposes of comity analysis.

*Maxwell II*, 93 F.3d at 1050 (emphasis added) (internal citation omitted); *see also LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*, 582 B.R. 46, 103 (Bankr. S.D.N.Y. 2018) ("Here, as in *Maxwell II*, the 'intent' requirement in the **[Cayman Islands] law would dictate a different distributional outcome than would United States law**. Consequently, it is not possible to comply with the rules of both forums and the threshold requirement of a true conflict exists for purposes of comity analysis.") (emphasis added).

While *Maxwell II* and *CIL Limited* dealt with bankruptcy avoidance suits (to void preferences and fraudulent transfers, respectively), the same approach to "true conflict" applies here, where the Committee seeks to void BisB's prior setoff. Different distributional outcomes for Arcapita's creditors would result under the setoff rules of U.S. law (in Bankruptcy Code § 553 (SPA94)) and those under Bahraini law (in the Bahraini Civil Code, Articles 353-360 (SPA71)).

Indeed, that is why the Committee has fought so zealously to apply Bankruptcy Code § 553(a) to this dispute.  It seeks to alter BisB's right to assert setoff under *Bahraini* law.

The District Court did not address this conflict between the U.S. and Bahraini setoff regimes, but instead relied *solely* on the CBB's directive – issued *after* BisB's exercise of setoff – to conclude there is no conflict between Bahraini setoff law and the Bankruptcy Code's setoff provisions.  *Arcapita V*, 640 B.R. at 619.  But this ignores the actual *legal conflict* between the two legal regimes.  The CBB – if it enforced its directive – could not apply the requirements of Section 553(a) of the Bankruptcy Code because they are *not part of Bahraini law*.  They are a creature only of the U.S. Bankruptcy Code, and yield a different distributional outcome here than under Bahraini law.

And the lower courts' reliance on "the Bankruptcy Code's goals and objectives" to override BisB's setoff **even if** it complied with Bahraini law, *Arcapita III*, 628 B.R. at 434, 444, *Arcapita V*, 640 B.R. at 620, further proves BisB's point.  The Bankruptcy Court acknowledged that BisB objected to the CBB that requiring BisB to seek the permission of the Bankruptcy Court for its setoff was "tantamount to ignoring the sovereignty of the legal system in Bahrain." *Arcapita III*, 628 B.R. at 445 n.33; *see also* A1553 (BisB letter to CBB) at A1556.  Yet the lower courts did exactly that – ignored Bahrain's sovereignty over setoff

exercised with its borders – by layering Bankruptcy Code requirements over Bahraini setoff law and invalidating BisB's setoff based on the alleged needs of Arcapita's Chapter 11 bankruptcy.  This, too, was reversible error.

        **C.**      **The Committee Should Be Required to Seek Its Remedies in Bahrain, Not Rewarded for Forum Shopping in the U.S. to Accomplish What It Could Not Achieve in Bahrain.**

In any case, the CBB has never enforced its directive in the decade since it was issued – as the Committee has conceded.[16]  This too should factor into the *Maxwell II* balancing test: the courts below gave greater weight to the CBB's directive, making it the superior Bahraini law governing this dispute, than has the CBB itself.

The Committee's complaint asserted only a breach of contract claim, not a count to enforce the CBB's directive.  (A361.)  Yet its actions below reveal that its primary goal is to enforce the CBB's directive, in the guise of a breach of contract suit.  *See supra* at 3-4, 16-17.  As the Committee stated on appeal to the District Court:

> On a more basic level level, this Court cannot, as BisB asks, **strip the CBB of its authority** to supervise Bahraini financial institutions and enforce against their prior bad acts.  Section 553 expressly defers to applicable non-bankruptcy law.  **A United States court should not have the ability to deny the CBB its enforcement power**, exercised in Bahrain pursuant to

---

[16]    *See* A2741 at 20:23-21:2 (A2760-61); *see also* A6588 at A6652.

> its established authority and Bahraini law. … **If this Court were to interfere with the CBB's authority, the policing power of agencies around the world would be threatened**.

(A6588 (Committee response brief on appeal) at A6654 (emphasis added).)

But BisB is not asking this Court or any other U.S. court to "interfere with the CBB's authority." BisB is simply arguing that the U.S. is not the proper forum for enforcing or challenging the CBB's authority. Bahrain is. The lower courts erred in deciding that it is the role of the U.S. courts to step into the shoes of a foreign regulator and enforce its directives in the U.S., even when the foreign regulator itself has declined to do so.

BisB further notes that in *Arcapita V*, the District Court failed to respond to its argument that *Maxwell II* does not require that a "parallel insolvency proceeding" be in place abroad to support comity, but only an *alternative mechanism* for seeking the same relief as sought in the U.S. (A6707 (reply brief) at A6737-39.) The CBB's regulatory directive is the alternative mechanism here. It is an open, contested regulatory proceeding in Bahrain seeking exactly the same relief as the Committee seeks here. *See supra* at 15-17. The Bankruptcy Court even defended its deference, on summary judgment, to the CBB proceeding as the superior, binding "Bahraini law" on the basis of *comity*. In doing so, it favorably quoted this Court's *Jota* decision:

> "Under the principles of comity, United States courts ordinarily refuse to review acts of foreign governments and **defer to**

- 46 -

> **proceedings taking place in foreign countries**, allowing those acts and proceedings to have extraterritorial effect in the United States."

*Id.* at 445 (quoting *Jota v. Texaco Inc.*, 157 F.3d at 159-60) (emphasis added). But this deference to the CBB was noticeably absent in the lower courts' comity rulings below.

In sum, this Court should reverse the lower courts' errors and defer to the CBB regulatory proceeding in Bahrain. That is where the parties should seek their enforcement remedies, not here before the U.S. courts. The Committee's suit is seeking exactly the same relief as that sought by the CBB in its proceeding. But the Committee wants to be able to seek that relief here while availing itself of the Bankruptcy Code's more favorable setoff restrictions, instead of subjecting itself to Bahraini regulatory procedures and allowing BisB to assert its rights and defenses in Bahrain before the CBB and, if necessary, the Bahraini courts.

This is classic forum shopping, which has been indulged by the lower courts for the six and a half years since *Arcapita I* was issued. The proper forum for the Committee to try to enforce the CBB's directive is Bahrain. The comity rulings of the lower courts in *Arcapita II* and *Arcapita V* should be reversed.

## IV. THE DISTRICT COURT ERRONEOUSLY FOUND THAT BISB BREACHED ARCAPITA'S INVESTMENT CONTRACT AS A MATTER OF BAHRAINI LAW

The District Court's affirmation of the Bankruptcy Court's interpretation of Bahraini contract law in *Arcapita III* was also erroneous. Both of the lower courts ruled that the CBB's regulatory directive *retroactively* overrode all of BisB's setoff rights under Bahraini law. But they provided no analysis of why BisB's exercise of setoff was not lawful under Bahraini law when exercised. The lower courts instead made the CBB's later directive the sole basis for their decisions, in effect transforming the Committee's breach of contract claim into an enforcement proceeding for the CBB's directive.

### A. The District Court Provided No Analysis of Why BisB's Exercise of Setoff Was Not Lawful Under Bahraini Contract Law.

The District Court acknowledged that BisB may have had a lawful setoff right under Bahraini law when it exercised it in June 2012. *Arcapita V*, 640 B.R. at 621-22. But it provided no counter-analysis of why BisB's setoff did *not* lawfully extinguish its duty to remit the contractual investment proceeds to Arcapita, under both Bahraini contract law and shari'a setoff principles – as BisB argued below. (A2316 (opening summary judgment brief) at A2363-64; A2607 (summary judgment reply brief) at A2621-23; A1902 (Al Mansoori expert report) ¶¶ 23-37, 49-55, 66-76; A176 (opening appeal brief) at A255-61; A6707 (appeal reply brief) at A6740-45.)

Instead, the District Court simply decided that the CBB's later directive voided BisB's previously lawful setoff:

> **Although BisB may have had a right of setoff when asserted on June 28, 2012, that right was abrogated when the CBB issued the Formal Direction on July 4, 2012**, instructing BisB to return the funds or seek relief from the Bankruptcy Court.
> ….
> **Assuming the setoff itself was valid when exercised, the CBB Formal Direction can simply be viewed as making unlawful BisB's continued retention of the proceeds.** But even if the CBB Formal Direction were deemed a retroactive application, BisB cites no authority for its contention that CBB Formal Directions cannot supersede existing law and **make previously lawful conduct unlawful once issued**.

*Arcapita V*, 640 B.R. at 621 (emphasis added).

Similarly, the Bankruptcy Court on summary judgment ruled that, against BisB's protest that the CBB's directive could not be applied retroactively as a matter of Bahraini contract law, "**there is nothing in the Bahraini law cited by Ms. Mansoori that suggests such a temporal limitation on the CBB's authority**." *Arcapita III*, 628 B.R. at 443 (emphasis added).

The stance of the lower courts shows that they did not actually analyze the Committee's breach of contract claim under Bahraini contract law, as in effect at the time of the complained-of BisB conduct in March-June 2012. They instead applied a *future* iteration of purported Bahraini law, in the form of the CBB's July 2012 directive – which, as noted, remains in dispute as a matter of Bahraini regulatory law. *See supra* at 15-16. This is fundamentally at odds with basic legal

- 49 -

analysis. The role of the parties and court in litigating a breach of contract claim in a U.S. federal court is to apply the law in effect at the time of the alleged breach: *i.e.*, Did BisB's setoff comply with Bahraini contract law? The lower courts could not deny that it did, so they instead asked a different legal question: Did BisB comply with the CBB's regulatory directive when it was issued *later*?

This was a regulatory analysis, not a breach of contract analysis, and was reversible error.

**B.**    **BisB's Exercise of Setoff Complied with Bahraini Law and Performed, Rather than Breached, Its Contract with Arcapita.**

On the merits of the Committee's breach of contract claim, the Bankruptcy Court ruled that BisB breached its *murabaha* investment contract with Arcapita, citing two Bahraini statutes: Articles 129 and 140(a) of the Bahraini Civil Code, each of which requires a party to "perform" a contract according to its terms and awards "performance" or damages if it does not. *Arcapita III*, 628 B.R. at 476-77; *see also* SPA64.

Before the Bankruptcy Court, BisB and its Bahraini law expert cited other provisions of the Bahraini Civil Code (Articles 353-360), which expressly provide that setoff is a type of "performance" of a contract – specifically, an "extinction of the obligation equivalent to performance." (SPA69-71; A2316 (summary judgment brief) at A2363-64; A2607 (summary judgment reply brief) at A2622-23; A1902 (Al Mansoori expert report) ¶¶ 34-37.) As Ms. Al Mansoori testified:

> [BisB] properly exercised statutory set-off under Bahraini Law, extinguishing any remaining obligations to Arcapita as to the off-set contract obligations. **Under Bahraini law, the set-off itself is a type of payment of the amounts due under the contract**.

(A1902 (Al Mansoori expert report) ¶ 37 (emphasis added).)

These setoff provisions (Article 353-360) are in a portion of the Bahraini Civil Code (Part Five) entitled "The Extinction of Obligations," in a chapter (Chapter Two) entitled "Methods of Extinction of the Obligation Equivalent to Performance." Setoff is included among such methods, along with payment (Chapter One); settlement, novation, delegation or merger of parties (Chapter Two); and release or impossibility of performance (Chapter Three). (SPA66-73.)[17]

The Bankruptcy Court failed to address this argument anywhere in its *Arcapita III* ruling. Instead, the Bankruptcy Court simply found that BisB had breached Arcapita's investment contract under Bahraini law by failing to remit the proceeds on its maturity date. *Arcapita III*, 628 B.R. at 476-77.

On appeal, the District Court purported to respond to BisB's argument that its setoff constituted performance of the contract rather than its breach. But the

---

[17]   BisB provided the Bankruptcy Court with a copy of Part Five in its entirety (A2692-2700; *see also* SPA66-73), as well as a copy of the shari'a standard for setoff, issued by the Accounting and Auditing Organization for Islamic Financial Institutions ("AAOIFI") as Standard No. (4), "Settlement of Debts by Set-Off." (A2720-40; *see also* SPA74-93.)

District Court simply referred again to the future CBB directive, which it held "superseded" BisB's setoff rights under the Bahraini Civil Code. *Arcapita V*, 640 B.R. at 622. The District Court did not analyze the lawfulness of BisB's setoff under Bahraini contract law at all: *i.e.*, whether it extinguished its debt to Arcapita at the time it was exercised. The District Court instead admitted that it was analyzing only the lawfulness of the CBB's directive:

> Thus, even assuming that the Bahraini Civil Code permitted setoff as performance of a contract, **the lawfulness of BisB's conduct was to be adjudged according to the special law (the [CBB's] Formal Direction)** enacted to cover the specific issue (BisB's refusal to turn over the proceeds).

*Id.* (emphasis added).

There is no clearer statement than this excerpt of what the lower courts saw as their role below: simply to enforce the CBB's regulatory directive, rather than conduct a breach of contract analysis of the Committee's claim under Bahraini contract law. This was reversible error as a matter of law.

## V. THE AUTOMATIC STAY MAY NOT BE ENFORCED AGAINST ACTS ABROAD BY A FOREIGN DEFENDANT NOT SUBJECT TO PERSONAL JURISDICTION

BisB also appeals the District Court's affirmation of the Bankruptcy Court's finding of a stay violation, *Arcapita V*, 640 B.R. at 629-30, based on the lack of personal jurisdiction over BisB for the reasons set forth in Part II of this argument.

The case law is clear that if the Bankruptcy Court lacks personal jurisdiction over a foreign defendant, it may not stay or otherwise enjoin that defendant's acts abroad. *Madoff II*, 474 B.R. at 82 ("[A] bankruptcy court can enforce the automatic stay extraterritorially only against entities over which it has *in personam* jurisdiction."); *Madoff I*, 460 B.R. at 116 ("Courts have the power to enjoin litigants subject to their jurisdiction from proceeding with an action in a foreign jurisdiction.").

The District Court's personal jurisdiction rulings in *Arcapita I* and *Arcapita V* should be reversed for the reasons noted above. Accordingly, the Bankruptcy Court lacked personal jurisdiction over BisB and thus lacked any authority to enforce the stay against BisB for its setoff in Bahrain. *See* Bankruptcy PJ Order, 529 B.R. 57.

## VI. THE DISTRICT COURT ERRED BY UPHOLDING THE USE OF THE NEW YORK PREJUDGMENT INTEREST RATE FOR THIS BAHRAINI LAW DISPUTE

Finally, the District Court's affirmation of the Bankruptcy Court's ruling on prejudgment interest was erroneous because the Bankruptcy Court misapplied Bahraini law and abused its discretion by applying New York's 9% prejudgment interest rate to this Bahraini law contract dispute.

**A.** **Bahraini Law and Shari'a Principles Prohibit the Awarding of Interest on a Debt Collection.**

As this Court has stated, "the law of the jurisdiction that determines liability governs the award of pre-judgment interest." *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999); *see also Kittay v. Korff (In re Palermo)*, 739 F.3d 99, 107 (2d Cir. 2014).

The courts below agreed that Bahraini law determines whether prejudgment interest is available here. *Arcapita V*, 640 B.R. at 631-32; *see also Arcapita IV*, 633 B.R. at 211. The District Court further recognized that both Bahraini law and shari'a principles forbid the payment of interest. *Arcapita V*, 640 B.R. at 631-32. But it nonetheless found no abuse of discretion in the Bankruptcy Court's awarding of prejudgment interest. *Id.* Specifically, the District Court endorsed the Bankruptcy Court's citation of various provisions of the Bahraini Civil Code (Articles 140(a), 188 and 223) as analogous to prejudgment interest. *Id.* (*See also* SPA64-65; A1559-60.)

This was error.

None of the Bahraini statutes cited by the Bankruptcy Court and the District Court mention prejudgment interest. In fact, those statutory provisions appear in the Bahraini Civil Code, the preamble to which states the following:

> In the absence of a provision of a law that is applicable, the Judge will decide according to custom **and in the absence of custom in accordance with the principles of Islamic Shariaa**

that suit the conditions and circumstances of the country. In the absence of such principles, the Judge will apply the principles of natural justice and the rules of equity.

(SPA63 at Part I, Art. 1(b); *see also* A1558 (emphasis added).)

As the preamble notes, *all* Bahraini laws, including those relied on by the Bankruptcy Court below, are guided by shari'a principles – which supplement and fill in any gaps in statutory provisions, as confirmed by BisB's Islamic finance expert. (A1946 (Thomas expert report) at A1954, A1969 (Islamic banking contracts, including *murabahas*, typically make their choice of governing law subject to shari'a, and the Bahraini constitution provides that shari'a is "a principal source for legislation").) BisB's Bahraini law expert further confirmed that under the CBB's own regulations, Islamic bank licensees like BisB must comply with *all* shari'a standards issued by the Islamic accounting board, known as AAOIFI. (A1902 (Al Mansoori expert report) ¶¶ 49-55.)

Standard No. 3 of AAOIFI's standards (entitled "Procrastinating Debtor") provides the following:

> 2/1/2. **It is not permitted to stipulate any financial compensation, either in cash or in other consideration, as a penalty clause in respect of a delay by a debtor in settling his debt**, whether or not the amount of such compensation is pre-determined; this applies both to compensation in respect of loss of income (opportunity loss) and in respect of a loss due to a change in the value of the currency of the debt.

2/1/3.  **It is not permitted to make a judicial demand on a debtor in default to pay financial compensation, in the form of either cash or of other consideration, for a delay in settling his debt**.

*See* AAOIFI, *Shari'ah Standard No. (3), Procrastinating Debtor*, at 88, http://aaoifi.com/ss-3-procrastinating-debtor/?lang=en (last visited Sept. 15, 2022).

Bahraini law thus could not be clearer: a creditor like Arcapita may not recover late payment interest from a debtor like BisB without violating Bahraini law and shari'a principles.

The Bankruptcy Court abused its discretion in ignoring this black-letter Bahraini law and its governing shari'a principles.  It also ignored this Court's precedent that where state law governs a claim – here, Bahraini law as to the Committee's breach of contract claim – a U.S. federal court is bound by the substantive law of the state on prejudgment interest and does not have the discretion to fashion its own interest rate.  *See, e.g.*, *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998).

The District Court erred in affirming these rulings on appeal.  Simply put, New York's pre-judgment interest rate does not, and cannot, apply here as a matter of Bahraini law.

**B.** **New York's Prejudgment Interest Rate is Inappropriate Based on this Dispute's Merely Incidental Contacts with the U.S.**

The District Court also found no abuse in the Bankruptcy Court's calculation of prejudgment interest based on *contacts with the United States* – including the parties' use of New York correspondent bank accounts, Arcapita's financing costs in its Chapter 11 bankruptcy, and hypothetical investment returns in the U.S. and Bahraini markets. *Arcapita V*, 640 B.R. at 632; *see also Arcapita IV*, 633 B.R. at 213-14 (comparing returns in the S&P 500 index, the Dow Jones Industrial Average and Russell 2000 (ranging from 11-13%), with the returns on Arcapita's debtor-in-possession bankruptcy financing (at least 12%), and with returns in Bahrain (from 4% over six months to over 8% per annum)).

As to the parties' use of New York correspondent bank accounts, the District Court cited back to Judge Daniels' ruling in *Arcapita I*:

> Finally, the Bankruptcy Court noted the importance of **the suit's connections to New York**, citing to Judge Daniel's observation that **BisB deliberately chose to utilize New York correspondent back accounts, and more generally, New York's and the United States's banking system**.

*Arcapita V*, 640 B.R. at 632 (citing *Arcapita IV* and *Arcapita I*) (emphasis added).

As with its rulings on personal jurisdiction and comity in *Arcapita I* and *Arcapita V*, the District Court's fundamental error in reviewing the Bankruptcy Court's interest decision was to presume that this breach of contract dispute was based on contacts with the U.S. in the first place. It was not. As noted, *see supra*

at 11-12, BisB's sole contact with the U.S. in this dispute was its momentary use of a New York correspondent bank account to receive Arcapita's investment, and that account use was, in the words of *Daou*, "merely coincidental" to the Committee's claims against BisB in this Bahraini contract dispute. The conduct giving rise to the claims against BisB in this suit did not occur in the U.S. at all, but in Bahrain.

The application of New York's prejudgment interest rate to the Committee's claims was thus inappropriate and an abuse of discretion. It should be reversed.

## **CONCLUSION**

For the foregoing reasons, BisB respectfully asks this Court to reverse the District Court's Interlocutory PJ Order (*Arcapita I*) and its Order and judgment (*Arcapita V*), and remand this matter to the Bankruptcy Court for entry of judgment in favor of BisB.

*[Signature page follows]*

Dated:  September 16, 2022
      New York, NY

     /s/ Robert T. Honeywell

John A. Bicks
Robert T. Honeywell
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 536-3900

Brian D. Koosed
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 778-9000

*Attorneys for Appellant Bahrain Islamic Bank*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Local Rule 32.1(a)(4)(A) of the United States Court of Appeals for the Second Circuit because, exclusive of the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 13,927 words.

2.     This brief complies with the typeface requirements of Rule 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

Dated:  September 16, 2022
            New York, NY

    /s/ Robert T. Honeywell
John A. Bicks
Robert T. Honeywell
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 536-3900

Brian D. Koosed
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 778-9000

*Attorneys for Appellant Bahrain Islamic Bank*

**SPECIAL APPENDIX**

i

# Table of Contents

**Page**

Judgment of The United States District Court Southern District
    of New York, Dated May 24, 2022............................................SPA-1

Order and Opinion Affirming Judgments of Bankruptcy Court
    of Honorable Alvin K. Hellerstein, Dated May 23, 2022 .........SPA-2

Memorandum Decision and Order of Honorable
    George B. Daniels, in the Matter of *Official Committee of*
    *Unsecured Creditors of Arcapita v. Bahrain Islamic Bank,*
    *et al.*, 15-cv-03828 (GBD), Dated March 30, 2016 ..................SPA-42

True and Correct Copy of an English Translation of
    Excerpts of the Bahraini Civil Law, Available at:
    http://www.moj.gov.bh/en/default2e2e.html?action
    =article&ID=1466 (*see also* A-1557) ......................................SPA-63

True and Correct Copy of the Bahrain Civil Code, Part Five,
    Articles 314-380, Obtained from the Website of the Kingdom
    of Bahrain's Ministry of Justice and Islamic Affairs,
    Available at: http://www.moj.gov.bh/en/default0605.html?
    action=article&ID=1467 (*see also* A-2692).............................SPA-66

True and Correct Copy of Shari'ah Standard No.(4), Settlement
    of Debts by Set-Off (Revised Standard), in SHARI'AH
    STANDARDS: FULL TEXT OF SHARI'AH STANDARDS
    FOR ISLAMIC FINANCIAL INSTITUTIONS AS AT
    SAFAR 1439 A.H. –NOVEMBER 2017 A.D. (2015),
    Issued by the Accounting and Auditing Organization for
    Islamic Financial Institutions, Obtained from AAOIFI's
    Website at: http://aaoifi.com/shariaa-standards/?lang=en
    (*see also* A-2720) ....................................................................SPA-74

11 U.S.C. § 553 .........................................................................SPA-94

11 U.S.C. § 362 .........................................................................SPA-96

SPA-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
In re:

ARCAPITA BANK B.S.C.(C),

                      Debtor.
------------------------------------------------------------X
BAHRAIN ISLAMIC BANK,

                BisB,                      21 **CIVIL** 8296 (AKH)

      -against-                           __JUDGMENT__

 ARCAPITA BANK B.S.C.(C),

                     Appellee.
------------------------------------------------------------X

        It is, **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated

in the Court's Opinion and Order dated May 23, 2022, the challenged orders of the Bankruptcy

Court are affirmed, and the appeal dismissed. Judgment is entered in favor of the Committee;

accordingly, the case is closed.

**Dated:**  New York, New York
       May 24, 2022

                               **RUBY J. KRAJICK**

                               _____
                               **Clerk of Court**

        **BY:**        K. Mango

                               _____
                               **Deputy Clerk**

**SPA-2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                 :

IN RE:                          :

                                :     **ORDER AND OPINION**

ARCAPITA BANK B.S.C.(C),      :     **AFFIRMING JUDGMENTS OF**

                                :     **BANKRUPTCY COURT**

                    Debtor,     :

                                :     21 Civ. 8296 (AKH)

                                :

                                :

                                :

------------------------------------------------------------ X
                                :

BAHRAIN ISLAMIC BANK,       :

                                :

                    BisB,    :

-against-                     :

                                :

ARCAPITA BANK B.S.C.(C),      :

                                :

                  Appellee.  :

                                :

------------------------------------------------------------ X

ALVIN K. HELLERSTEIN, U.S.D.J.:

       This appeal arises out of the Chapter 11 proceedings for Appellee-Debtor

Arcapita Bank B.S.C.(C) ("Arcapita").  Prior to its bankruptcy filing, Arcapita was licensed as an

Islamic wholesale bank by the Central Bank of Bahrain and operated as an investment bank and

global manager of Shari'a compliant investments.  Arcapita maintained a pre-Petition business

relationship with BisB Bahrain Islamic Bank[1] ("BisB"), through which Arcapita and BisB made

_____

[1]   This appeal was initially consolidated with that brought by another bank, Tadhamon Capital B.S.C.(c), *see* 21-
   cv-8325, based on the substantially similar legal and factual issues presented, and because the Bankruptcy Court
   heard the arguments and denied them in consolidated orders.  After the opening brief was filed, however, the

1

several Shari'a-compliant short-term investments with each another.  Upon its bankruptcy filing,

Arcapita attempted to recover the proceeds of certain investments made just days before the

Petition Date.  However, Bisb refused to turn over the proceeds, asserting that it exercised a

purported right to a setoff under Bahraini law, reconciling the debts owing between them.

Thereafter, Appellee Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c) (the

"Committee") instituted adversary proceedings against Bisb, asserting claims for breach of

contract and violation of the automatic stay, and seeking turnover of the investment proceeds and

claims disallowance.

     BisB mightily fought to avoid litigating before the Bankruptcy Court.  It first

moved to dismiss based on lack of personal jurisdiction.  The motion was granted by the

Bankruptcy Court but reversed on appeal to the District Court.  BisB next moved to dismiss on

grounds of international comity.  The Bankruptcy Court denied that motion and BisB's

subsequent request for reconsideration.  Finally, the parties cross-moved for summary judgment.

The Bankruptcy Court granted the Committee's motion and denied BisB's motion, entered

judgment in favor of the Committee, and awarded prejudgment interest at New York's statutory

rate of 9 percent.

     BisB now appeals from five orders[2] of the Bankruptcy Court of the Southern

District of New York.  *See* Appellant's Brief ("A.B."), ECF No. 12-1.  It identifies fourteen

_____

Committee reached a settlement with Tadhamon and dismissed its appeal.  *See* 21-cv-8325, ECF No. 15.
Accordingly, this opinion addresses only the arguments raised by BisB.

[2]    BisB appeals an order entered on October 13, 2017, denying BisB's motion to dismiss on the basis of comity
and extraterritoriality, *see* 575 B.R. 229 (Bankr. S.D.N.Y. 2017) ("Comity Order"); an order entered on
February 5, 2018, denying BisB's motion for reconsideration of the October 13, 2017 decision, *see* 2018 Bankr.
LEXIS 295 (Bankr. S.D.N.Y. Feb. 5, 2018) ("Reconsideration Denial"); the Bankruptcy Court's decision dated
April 23, 2021, granting Appellee's motion for summary judgment and denying BisB's cross-motion for
summary judgment, *see* 628 B.R. 414 (Bankr. S.D.N.Y. 2021) ("SJ Order"); the Bankruptcy Court's decision
dated September 22, 2021, setting the prejudgment interest rate, *see* 633 B.R. 207 (Bankr. S.D.N.Y. 2021)

SPA-4

issues for resolution, which can be summarized briefly as follows.  BisB challenges the Bankruptcy Court's refusal to revisit the issue of personal jurisdiction, raised again in BisB's motion for summary judgment and after the remand from the District Court; the Bankruptcy Court's failure to dismiss on international comity grounds; the Bankruptcy Court's ruling that BisB was not entitled to setoff, as a matter of Bahraini law or under the safe harbor provisions of the Bankruptcy Code and, therefore, was in violation of the automatic stay; and, the Bankruptcy Court's award of prejudgment interest and use of the New York statutory rate.  For the reasons discussed below, I find BisB's arguments without merit, affirm the challenged orders of the Bankruptcy Court, and dismiss the appeal.

## BACKGROUND[3]

Prior to its bankruptcy filing on March 19, 2012, Arcapita was an Islamic wholesale bank licensed by the Central Bank of Bahrain ("CBB") and headquartered in Bahrain. It operated as an investment bank and global manager of Shari'a-compliant investments.  BisB is an Islamic commercial bank licensed and headquartered in Bahrain, but which also maintains and uses correspondent banks in New York.  The CBB is the sole regulator of Bahrain's financial sector and is in charging of licensing, regulation, and supervision of parties carrying out regulated financial services in Bahrain.

Arcapita maintained a pre-Petition business relationship with BisB, through which Arcapita and BisB made Shari'a-compliant investments with each other.  Islamic banking and

---

("Interest Rate Order"); and one order dated September 23, 2021, entering judgment in favor of Appellee, *see* 633 B.R. 215 (Bankr. S.D.N.Y. 2021) ("Final Judgment").

[3]   The following facts are not disputed, and unless otherwise noted, are drawn from the background section of the Bankruptcy Court's order granting the Committee's motion, and denying BisB's motion, for summary judgment.  *See Off'l Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahr. Islamic Bank (In re Arcapita B.S.C.(c))*, 628 B.R. 414 (Bankr. S.D.N.Y. 2021).

finance is a revival of faith-based rules governing how commercial and financial transactions are executed.  One of the religiously mandated rules is a prohibition of interest; thus, a Shari'a-compliant investment cannot technically return interest.  This prohibition impacts the manner in which Islamic banks and investments funds manage liquidity, comply with applicable foreign and domestic regulations, and operate in the financial markets.  It also means that such entities do not borrow or lend in the traditional sense, instead employing Shari'a-compliant investments.

One such Shari'a-compliant investment employed by the parties is the commodity *murabaha* investment.  The commodity *murabaha* is a tool for short-term liquidity management. It works as follows.  A placing party transfers funds to a receiving party (a party in need of funds).  The receiving party, acting as an agent for the placing party, purchases specified commodities on the placing party's behalf.  The receiving party immediately agrees to repurchase those commodities from the placing party on a cost-plus basis to be paid on an agreed future date.  The transactions are documented by form offers, acceptances, and confirmations exchanged by the parties over the course of a day.  As utilized by Arcapita and BisB, the placements were organized so that the placing party would retain title to the commodities for seconds or minutes in order to remove the risk of commodity volatility.[4]  The commodity *murabaha* is Shari'a-compliant because it does not technically provide for interest but nevertheless creates a transparent analogy to principal (the cost price) and interest (the fixed profit added to the cost price), from which one can infer an interest rate and credit margin.  The

---

[4]    The receiving party has no obligation to retain title to the underlying commodities and ordinarily sells them to a buyer other than the original seller.  This allows the receiving party immediate access to the necessary funds. Put another way, the placing party makes a loan to the receiving party, using commodities as a vehicle to transfer the funds.  The loan becomes payable on an agreed deferred date and with an agreed profit margin.

interest rate is not tied to market.  The *murabaha* creates an obligation to repurchase by the receiving party, and the placing party expects to receive the agreed-upon repurchase price.

### BisB's Placements with Arcapita

Starting in April 2002, BisB entered into a Master Placement Agreement (the "BisB Placement Agreement"), pursuant to which BisB would make *murabaha* placements with Arcapita ("BisB Placements").  In July 2003, Arcapita entered into an agreement with BisB, (the "Arcapita Master Agreement"), whose terms mirrored those in the BisB Placement Agreement and under which Arcapita would make placements with BisB ("Arcapita Placements").

The debts owed by Arcapita to BisB, and that form the basis for BisB's purported right to setoff, originated from two investments (BisB Placements) made on December 1, 2011 under the BisB Placement Agreement.  In those related transactions, BisB deposited approximately $9.8 million with Arcapita with the expectation that it would be returned in just over a month.  Those deposits were rolled over continually by agreement, and were set to expire on March 15 and 16, 2012, leaving Arcapita indebted to BisB for approximately $9.8 million.

### Arcapita's Placements with BisB

In addition to investments by BisB with Arcapita, Arcapita made investments with BisB (Arcapita Placements).  Although Arcapita filed for Chapter 11 protection on March 19, 2012, it executed three placements, discussed in greater detail below, with BisB on March 13, 14, and 15, 2012, each in the amount of $10 million, with respective maturity dates of March 27, 29, and 26, 2012.  Arcapita proposed making these placements in U.S. Dollars, which BisB accepted and directed that Arcapita send the funds to BisB's correspondent bank accounts in New York.

5

Although BisB now claims it was unaware of the imminent bankruptcy filing, Arcapita's financial difficulties were known throughout the Bahraini banking community. BisB's internal memoranda confirm that BisB was generally aware of Arcapita's financial difficulties. For example, Arcapita proposed a placement on January 10, 2012, but BisB's then Senior Manager forwarded the proposal to other BisB employees with an accompanying message that recommended: "Outright decline is my response based on execution issues, risky exit avenue, and the general situation with Arcapita." Another employee responded that Arcapita was "just trying their luck. It seems that the fund company is desperate." Additionally, on March 12, 2012, an Arcapita representative called BisB claiming it needed more money from BisB. BisB refused, stating that Arcapita was "unable to repay [its] loans, so how we can increase it to you!" BisB refused to renew any investments, stating, "No. You have to pay," and noted that Arcapita was no longer "bringing good business of large deals."

On March 13, 2012, just before the two BisB Placements were set to expire on March 15 and 16, Arcapita asked BisB to roll over the investments again. BisB was reluctant, citing the absence of good deals. An Arcapita representative promised that Arcapita would "conclude with [BisB] a good deal within this week[] [that] might be over 5 million." BisB stated that it was looking for a good deal, something that exceeded $10 million. That same day, Arcapita made a $10 million placement with BisB, set to mature on March 27, 2012. On March 14, 2012, BisB also agreed to rollover the BisB Placements set to expire on March 15 and 16, 2012, but only for a week. In addition, Arcapita made another $10 million placement on March 14, 2012, set to mature on March 25, 2012. Finally, on March 15, 2012, Arcapita made a third $10 million placement set to mature on March 26, 2012. Thus, just prior to Arcapita's filing for

Chapter 11, it had a total of $30 million in placements with BisB, and was likewise indebted to BisB for approximately $9.8 million.

Arcapita filed for Chapter 11 protection on March 19, 2012, causing an automatic stay on its estate imposed under Section 362 of the Bankruptcy Code.  Also on March 19, 2012, Arcapita called BisB and explained the consequences of the automatic stay—that Arcapita could not withdraw any funds from the estate, and therefore, could not repay its loans.  However, Arcapita also pointed out that the parties had mutual *murabaha* deals, and that BisB's balance with Arcapita was nearly $10 million.  Arcapita suggested that Arcapita withdraw $20 million and keep the remaining balance of $10 million "just for comfort" with BisB, noting that it was more than enough to cover the $9.8 million obligation.

And the parties did just that.  When the March 13 and 15, 2012 placements matured on March 27 and 26, respectively, BisB paid Arcapita the proceeds of $20 million, but when the March 14 placement matured on March 27, 2012, BisB did not pay the proceeds. Arcapita's bankruptcy counsel subsequently made demands for BisB to turn over the remaining $10 million in proceeds, but BisB refused.  Instead, on June 28, 2012, counsel for BisB sent a letter to Arcapita's counsel, asserting that BisB had exercised a right of setoff under Bahraini law of the debts owing between itself and Arcapita.

On July 4, 2012, the CBB issued a Formal Direction—a type of special law that supersedes the general law provisions in the Bahraini Civil Code—in which the CBB instructed BisB either to comply with the requests to release the funds and return the funds immediately to Arcapita, or to seek permission from the U.S. Bankruptcy Court prior to effecting any setoff, and if such permission was not granted, that BisB return the funds that it held for Arcapita.  BisB

7

responded to the Formal Direction and requested that the CBB reconsider and withdraw its Formal Direction.  The CBB did neither, but BisB did not turn over the funds.

On August 26, 2013, the Committee commenced adversary proceedings against BisB in the Bankruptcy Court for the Southern District of New York (Sean Lane, U.S.B.J., presiding), asserting claims for breach of contract under Bahraini law, violation of the automatic stay under Section 362(a) of the Bankruptcy Code, and seeking turnover under Section 542(b) of the Bankruptcy Code and claims disallowance.  BisB immediately moved to dismiss, citing lack of personal jurisdiction, that the claims were barred by the presumption against extraterritoriality, and that the claims were barred by principles of international comity.  On April 17, 2015, the Bankruptcy Court granted BisB's motion, finding that BisB's use of correspondent banks was an insufficient basis upon which to establish personal jurisdiction.  *See* 529 B.R. 57 (Bankr. S.D.N.Y. Apr. 17, 2015).  The Committee appealed to the District Court.  Judge George Daniels reversed and remanded, finding that BisB chose to have the placements in U.S. Dollars and chose to receive Arcapita's funds through BisB's New York correspondent banks, creating the necessary purposeful availment and supporting the Bankruptcy Court's exercise of personal jurisdiction.  *See* 549 B.R. 56 (S.D.N.Y. 2016).

On remand, BisB renewed its motion to dismiss based on international comity. The Bankruptcy Court denied the motion as well as BisB's subsequent motion for reconsideration.  *See* 575 B.R. 229 (Bankr. S.D.N.Y. 2017); 2018 Bankr. LEXIS 295 (Bankr. S.D.N.Y. Feb. 5, 2018).  The parties proceeded to discovery and ultimately cross-moved for summary judgment.  In its cross-motion, BisB renewed its challenge to personal jurisdiction, arguing that new evidence unearthed in discovery revealed that Arcapita chose to make placements in U.S. Dollars, upending the premise of Judge Daniels's ruling.  It also argued that it

8

was entitled to setoff under applicable Bahraini law, and that the CBB Formal Direction could not apply retroactively to invalidate the already-exercised right. In addition, BisB argued that the *murabaha* transactions were protected under the so-called safe harbor provisions of the Bankruptcy Code, either as securities contracts, forward contracts, swap agreements, or contractual rights under the law merchant or by reason of normal business practice. The Bankruptcy Court rejected BisB's arguments, denied its motion for summary judgment, and granted the Committee's motion as to its claims for breach of contract under Bahraini law, turnover under Section 542(b) of the Bankruptcy Code, and violation of the automatic stay under Section 362(a) of the Bankruptcy Code (but denied damages as to the stay violation). *See generally* 628 B.R. 414 (Bankr. S.D.N.Y. 2021); *id.* at 476–81. The Bankruptcy Court also granted the Committee's request for prejudgment interest, notwithstanding BisB's objection based on the prohibition of interest under Bahraini law, awarded interest at the New York statutory rate of 9 percent, over BisB's objection that interest should be set at the federal rate under 28 U.S.C. § 1961(a), which BisB calculated to be 0.738%, *see* 633 B.R. 207 (Bankr. S.D.N.Y. 2021), and entered judgment for the Committee, *see* 633 B.R. 215 (Bankr. S.D.N.Y 2021). This appeal followed.

BisB identifies 14 issues for appeal, which can be summarized as follows: (i) the Bankruptcy Court's refusal to revisit the issue of personal jurisdiction; (ii) the denial of BisB's motion to dismiss based on principles of international comity, and its subsequent motion for reconsideration; (iii) the Bankruptcy Court's finding that BisB did not have a valid right of setoff under Bahraini law; (iv) the Bankruptcy Court's finding that none of the safe harbor provisions applied; (v) the Bankruptcy Court's finding that the setoff was disallowed under Section 553(a)(3)(C) because BisB obtained debts for the purpose of exercising setoff; (vi) the

Bankruptcy Court's finding that BisB violated the automatic stay; and, (vii) the Bankruptcy

Court's award of prejudgment interest at the New York statutory rate.

## DISCUSSION

I.    Legal Standard

District courts have jurisdiction over appeals of "final judgments, orders, and

decrees" of the bankruptcy courts.  28 U.S.C. § 158(a)(1).  A bankruptcy court's conclusions of

law, including grants of summary judgment, are reviewed *de novo*, *see In re Cody, Inc.*, 338 F.3d

89, 94 (2d Cir. 2004), and a bankruptcy court's factual conclusions are examined for clear error.

See Fed. R. Bankr. P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous,

and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility

of the witnesses.") *accord In re Cody, Inc.*, 338 F.3d at 94.  A finding of fact is clearly erroneous

if the district court "when, although there is evidence to support it, the reviewing court on the

entire record is left with the definite and firm conviction that a mistake has been committed."

*Off'l Comm. of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re Bennett*

*Funding Grp.)*, 212 B.R. 206, 211 (2d B.A.P. 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998); *accord.*

*In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (quoting *United States v.*

*United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  In addition, the extension or denial of

comity is reviewed for abuse of discretion.  *See Secs. Investor Prot. Corp. v. Bernard L. Madoff*

*Inv. Secs. LLC*, 474 B.R. 76, 81 (S.D.N.Y. 2012) (citing *Finanz AG Zurich v. Bianco Economico*

*S.A.*, 192 F.3d 240, 246 (2d Cir. 1999)).

II.   Analysis

A.    The Bankruptcy Court Did Not Err in Exercising Personal Jurisdiction Over BisB

BisB argues that the Bankruptcy Court erred in concluding that it could exercise

10

personal jurisdiction over BisB.  In its motion for summary judgment, notwithstanding the prior

appeal and ruling by Judge Daniels, BisB renewed its personal jurisdiction challenge, arguing

that new evidence unearthed in discovery showed that it was Arcapita who chose to use U.S.

Dollars to effectuate the investments, upending the premise of the district court's ruling that

BisB purposefully availed itself of New York by choosing to use U.S. Dollars.  BisB argued that

the Bankruptcy Court could reconsider the issue of personal jurisdiction (and the district court's

ruling) on a motion for summary judgment because of the new evidence, citing *Bank Leumi USA*

*v. Ehrlich*, 98 F. Supp. 3d 637 (S.D.N.Y. 2015), for the proposition that a court may reconsider a

prior ruling at summary judgment when new evidence comes to light after a ruling on a Rule

12(b) motion.

   Under the law of the case doctrine, a decision on an issue of law made at one

stage of a case becomes binding precedent to be followed in subsequent stages of the same

litigation.  *See In re PCH Assocs.*, 924 F.2d 585, 592 (2d Cir. 1991).  The mandate rule is a

subspecies of this rule and applies when an appellate court decides an issue and remands to a

lower court.  A "lower court 'must follow the mandate issued by an appellate court.'"  *See In re*

*Coudert Bros. LLP*, 809 F.3d 94, 98 (2d Cir. 2015) (quoting *Puricelli v. Republic of Argentina*,

797 F.3d 213, 218 (2d Cir. 2015)).

   The Bankruptcy Court did not err in rejecting BisB's request for reconsideration.

BisB did not appeal from Judge Daniels's ruling, and as such, the ruling constituted the law of

the case.  *See United States v. Ben Zvi*, 242 F.3d 89, 96 (2d Cir. 2001) (quoting *County of Suffolk*

*v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997) ("Under [the second rule of

the law of the case doctrine, a decision made at a previous stage of litigation, which could have

been challenged in the ensuing appeal but was not, becomes the law of the case; the parties are

deemed to have waived the right to challenge that decision . . . ."). The Bankruptcy Court had no power to reject the express holding of the appellate court, and necessarily, could not have abused its discretion by declining to entertain BisB's renewed but previously litigated personal jurisdiction challenge.

The Bankruptcy Court also properly distinguished *Bank Leumi* as a case involving a district court's reconsideration of its own prior ruling rather than that of an appellate court. Were the Bankruptcy Court to have adopted BisB's argument, it effectively would have been adhering to its original ruling that it lacked personal jurisdiction over BisB. However, the Bankruptcy Court would have committed error. The discretionary rule permitting a court to reconsider its own prior rulings operates only in the absence of an intervening ruling on the issue by a higher court. *See In re Coudert Bros. LLP*, 809 F.3d at 101 (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)).

Although BisB complains that the Bankruptcy Court erred in declining to entertain its personal jurisdiction challenge based on the new evidence, it also complains that the Bankruptcy Court erred in rejecting its new evidence as "more of the same." Implicit in this argument is that the Bankruptcy Court found both that it was not free to re-decide the issue but also, even if it were, that BisB "had not shown that [its] new evidence compels a different conclusion." 628 B.R. at 433. I find no error in the Bankruptcy Court's analysis as to the new evidence because the new evidence neither "upended the premise" of Judge Daniels's decision nor compelled a finding that the Bankruptcy Court lacked personal jurisdiction.

Judge Daniels ruled that the Bankruptcy Court could exercise personal jurisdiction based on BisB's use of New York correspondent accounts because BisB purposefully availed itself of carrying on activities in New York by using those accounts to

12

effectuate Arcapita's placements.  *See Off'l Comm. of Unsecured Creditors of Arcapita, Bank.*

*B.S.C. v. Bahr. Islamic Bank*, 549 B.R. 56, 71 (S.D.N.Y. 2016).  Judge Daniels stated that BisB

"deliberately chose to effectuate the Placements by directing the transfer of millions of dollars

through New York."  *Id.*  He further noted that if the record had demonstrated that Arcapita, and

not BisB, selected the U.S. Dollar and chose to use the New York accounts to effectuate the

placements, BisB's contacts with the United States would have been adventitious, and that

jurisdiction would not have lied.  *Id.*  It is the last statement on which BisB relies in the instant

motion.  BisB claims that evidence unearthed in discovery revealed that it was Arcapita who

chose to invest in U.S. Dollars, and that this new evidence placed this case squarely within the

counterfactual posited by Judge Daniels, thereby upending the premise for Judge Daniels's

ruling.

          Contrary to BisB's assertions, the evidence showing that Arcapita chose to invest

in U.S. Dollars does not upend the premise of the district court's ruling.  While Arcapita may

have indicated its desire to invest in U.S. Dollars, BisB chose to accept those terms and then

designated correspondent bank accounts in New York to receive the fund transfers.  The fact that

Arcapita *wanted* to invest in U.S. Dollars does not render BisB's use of New York correspondent

banks adventitious.  *Cf. id.*  As BisB's own witness conceded, BisB was free to accept or reject

the proposed terms.  App. 834 (Jarrar Depo Tr.) at 886 (204:23-205:6).  And as Judge Daniels

explicitly noted, BisB could have avoided the United States entirely by routing the placements

through correspondent accounts anywhere in the world.  549 B.R. at 71; *see also* App. 834

(Jarrar Depo Tr.) at 886–87 (205:7-206:7) (affirming that Arcapita would not have known where

to send the funds unless BisB identified the bank).  BisB's new evidence therefore does not bring

this case within Judge Daniels's counterfactual. I find no clear error and affirm the finding of personal jurisdiction.

>  B.  The Bankruptcy Court Did Not Abuse Its Discretion in Failing to Abstain Based on International Comity

BisB contends that the Bankruptcy Court improperly focused on Appellee's preference claims as the basis for retaining jurisdiction, failed to factor Appellee's breach of contract claim into the analysis, and wrongly concluded that the U.S., rather than Bahrain, is the proper regulating state. BisB argues that if the Bankruptcy Court had analyzed the breach of contract claim, which BisB contends was based on conduct in Bahrain, the Bankruptcy Court would (or should) have concluded that abstention was appropriate because the Bahraini government has a stronger interest in regulating such conduct. Having reviewed the Bankruptcy Court's reasoned analysis, I find no abuse of discretion and therefore affirm its decision, declining to abstain on international comity grounds.

Under international comity, "states normally refrain from prescribing laws that govern activities connected with another state when the exercise of such jurisdiction is unreasonable." *Maxwell Commc'n Corp. ex rel. Homan v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1047–48 (2d Cir. 1996) (quoting Rest. 3d Foreign Relations § 403 (1986)). Abstention may be based on adjudicatory comity—applicable when there is a parallel judicial proceeding—or prescriptive comity—a discretionary doctrine under which courts limit the extraterritorial reach of U.S. laws through statutory construction. In the context of transnational insolvencies, prescriptive comity is an appropriate and often invoked doctrine, *see Allstate Life Ins., Co. v. Linter Group Ltd.*, 994 F.2d at 996, 999 (2d Cir. 1993), especially where a U.S. court is confronted with a foreign bankruptcy proceeding. *See, e.g., Linder Fund, Inc. v. Polly Peck Int'l plc*, 143 B.R. 807, 810 (Bankr. S.D.N.Y. 1992) (dismissing on comity

14

grounds U.S. action against debtor who was involved in English insolvency proceedings); *see also In re Axona Int'l Credit & Commerce, Ltd.*, 88 B.R. 597 (Bankr. S.D.N.Y. 1988), *aff'd*, 115 B.R. 442 (S.D.N.Y. 1990), *appeal dismissed*, 924 F.2d 31 (2d Cir. 1991).

International comity comes into play, however, only when there is a true conflict between domestic and foreign law.  A true conflict exists if "compliance with the regulatory laws of both countries would be impossible."  *See In re Picard*, 917 F.3d 85, 102 (2d Cir. 2019) (citing *In re Maxwell*, 93 F.3d at 1050); *accord Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993).  If a true conflict does exist, a court must consider whether abstention is appropriate.  In so doing, courts apply the factors listed in the Restatement Third of Foreign Relations: (a) the link of the activity to the territory of the regulating state; (b) the connections between the regulating state and the person principally responsible for the activity; (c) the character of the activity to be regulated and the importance of regulation to the regulating state; and (d) the likelihood of conflict with the regulation by another state.  § 403; *see also F. Hoffman-La Roche v. Empagran S.A.*, 542 U.S. 155, 165 (2004).  The proponent of comity bears the burden of proving abstention is appropriate.  *See, e.g., Attestor Cap. LLP v. Lehman Bros. Hldgs. Inc. (In re Lehman Bros. Hldgs. Inc.)*, No. 18-cv-7682, 2019 U.S. Dist. LEXIS 139185, at *23–24 (S.D.N.Y. Aug. 16, 2019), *aff'd sub nom. Attestor Ltd. v. Lehman Bros. Hldgs. Inc. (In re Lehman Bros. Hldgs. Inc.)*, 821 F. App'x 66 (2d Cir. 2020), *modified by* 829 F. App'x 567 (2d Cir. 2020) ("'[S]ince comity is an affirmative defense,' its proponent carries 'the burden of proving that comity was appropriate.'") (quoting *Allstate Life Ins. Co.*, 994 F.2d at 999).  I hold that the Bankruptcy Court did not abuse its discretion in declining to abstain on grounds of comity.

SPA-17

BisB argues that the Bankruptcy Court focused its analysis on the Committee's preference claims and failed to factor the Committee's breach of contract claim into its analysis yet granted summary judgment on this claim. The failure to properly consider the breach of contract claim, BisB argues, lead the Bankruptcy Court to conclude that the U.S. has a stronger regulatory interest. This argument misconstrues both the facts and the Bankruptcy Court's opinion. Contrary to BisB's assertion, the conduct at the heart of this action is the wire transfers routed through the New York correspondent banks. As the Committee correctly notes, those transfers gave rise to *all* of its claims. Indeed, if the transfers had never been effectuated, the Committee would not have had reason to institute the adversary proceedings against BisB. The fact that BisB asserted its setoff rights in Bahrain, which the Bankruptcy Court concluded was a breach of the placement agreements, does not render BisB's conduct extraterritorial, nor does it give the Bahraini government a greater regulatory interest. The record evidence suggests just the contrary. The CBB's Formal Direction instructed BisB to return the funds or to appeal to the Bankruptcy Court to seek relief from the automatic stay. If the Bahraini government had an interest in regulating the conduct itself, one might expect that it would only have instructed BisB return the funds and not mentioned possible avenues for relief in the Bankruptcy Court.

I further find no abuse of discretion because there appears to be no true conflict of law, and therefore, principles of international comity simply are not implicated. The CBB's Formal Direction instructed BisB to comply with U.S. law—either by returning the funds or seeking relief from the automatic stay. To be sure, BisB disputes that the CBB's Formal Direction constituted binding Bahraini law, but as I address below, the CBB Formal Direction became the operative law when issued, and therefore, once in effect, eviscerated any conflict that might have existed between the Bahraini Civil Code and the U.S. Bankruptcy laws. The

16

Bankruptcy Court did not abuse its discretion by failing to abstain on international comity grounds. Accordingly, I affirm the judgment of the Comity Order, 575 B.R. 229 (Bankr. S.D.N.Y. 2017).

In addition, although BisB purports to challenge the Bankruptcy Court's subsequent order, dated February 5, 2018, denying BisB's motion to reconsider the Comity Order, BisB has not advanced any arguments as to why the February 5 order was erroneous. The issue is deemed waived, and I therefore also affirm the denial of reconsideration. *See Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009) (quoting *Frank v. United States*, 78 F.3d 815, 833 (2d Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997)) ("Merely mentioning the relevant issue in an opening brief is not enough; '[i]ssues not sufficiently argued are in general deemed waived and will not be considered on appeal.").

C.   The Bankruptcy Court Did Not Err in Concluding that BisB Was Not Entitled to a Right of Setoff Under Either Section 553 or the Safe-Harbor Provisions of the Bankruptcy Code

Section 553 of the Bankruptcy Code does not create a creditor's right of setoff, but merely preserves the right if it otherwise exists under applicable non-bankruptcy law. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995). Section 553 imposes several criteria, not at issue here, that must be met be met to establish a right of setoff. But even if a right of setoff is technically established, that right is not absolute. A creditor may be precluded from exercising that right if one of the statutory exceptions to the right of setoff apply, *see* 11 U.S.C. § 553(a)(3), or if the bankruptcy court, having "scrutinize[d] the right of setoff in light of the Bankruptcy Code's goals and objectives[,] . . . [including] equitable treatment of all creditors," believes it necessary to exercise its discretion to "invoke equity to bend the rules, if required to avert injustice." *In re Bennett Funding Grp.*, 212 B.R. at 212 (citations and quotations omitted).

17

In sum, a creditor must first prove that a right of setoff exists under applicable law; that right must not be subject to the exceptions listed in Section 553(a)(3); and, the Bankruptcy Court must find that principles of equity do not otherwise disfavor allowing the setoff.

A setoff may also be upheld if the transactions fall within one of the so-called safe harbor provisions of the Bankruptcy Code.  These provisions protect transactions involving, as relevant here, securities contracts, forward contracts, swap agreements, and other contractual rights under the law merchant or by reason of normal business practice.  *See* 11 U.S.C. §§ 362(b), 362(b)(17), 362(o), 555, 556, 560, 561(a).

Before the Bankruptcy Court, BisB argued that it had a right to setoff under Bahraini Law and Shari`a Principles, and that the setoff was protected under the safe-harbor provisions because the *murahabas* were securities contracts, forward contracts, swap agreements, or contractual rights protected under the law merchant or by reason of normal business practice.  The Bankruptcy Court disagreed, finding no right to setoff under Bahraini law; that none of the safe harbor provisions apply to the *murabahas*; and, that any setoff was disallowed under Section 353(a)(3)(C) because BisB incurred the debts for the purpose of obtaining a right of setoff.  Finding no valid basis for setoff, and that BisB nevertheless retained in possession of property of the estate, the Bankruptcy Court concluded that BisB was in violation of the automatic stay and ordered turnover of the proceeds, with prejudgment interest. Having reviewed the record, the Bankruptcy Court's findings and conclusions, and the instant briefing, I find no error, and for reasons discussed in detail below, affirm the judgment of the Bankruptcy Court.

SPA-20

    i.      Rights Under Applicable Law

      a.      Setoff Under Bahraini Law and Shari'a Principles

BisB argues that under Bahraini Law and Shari'a principles that it had a right of setoff at the time it exercised that right. It contends that the CBB Formal Direction could not be applied retroactively to nullify that right, and that the Bankruptcy Court's contrary finding was error.[5]

The Bankruptcy Court did not err in finding that BisB did not have a right of setoff under Bahraini Law or Shari'a principles. Although BisB may have had a right of setoff when asserted on June 28, 2012, that right was abrogated when the CBB issued the Formal Direction on July 4, 2012, instructing BisB to return the funds or seek relief from the Bankruptcy Court. The "applicable law" under Section 553 was established in the Formal Direction because, as the Bankruptcy Court noted, special laws applicable in specific circumstances supersede the general law set forth in the Bahraini Civil Code. Thus, the Bankruptcy Court properly considered whether the right existed, or continued to exist, at the time (and after) the CBB issued the Formal Direction. Moreover, the Formal Direction plainly indicates that BisB did not have a right to setoff. Therefore, the Bankruptcy Court did not err in so finding.

BisB's efforts to contest the retroactive application of the Formal Direction are unpersuasive. To begin, one need not view the application as retroactive. Assuming the setoff itself was valid when exercised, the CBB Formal Direction can simply be viewed as making

---

[5] The Bankruptcy Court considered, in the alternative, whether BisB was presenting an equitable argument in favor of setoff, and if so, whether to exercise its discretion to invoke equity to bend the rules to allow the setoff. *See* 628 B.R. at 444. The Bankruptcy Court declined to do so, finding that BisB had advance knowledge of the CBB's intention to issue the Formal Direction and was able to inform the CBB as to its legal position before the Formal Direction were issued, and also that BisB was able to, and did, request that the CBB withdraw the Formal Direction after it were issued. *See id.* BisB does not specifically challenge the Bankruptcy Court's decision not to exercise its discretion to invoke equity and allow setoff.

unlawful BisB's continued retention of the proceeds.  But even if the CBB Formal Direction

were deemed a retroactive application, BisB cites no authority for its contention that CBB

Formal Directions cannot supersede existing law and make previously lawful conduct unlawful

once issued.  Instead, BisB points to the report of its Bahraini Law expert, which stated, again

without relevant citation to any provision of Bahraini law, that the CBB Formal Direction would

not rescind or invalidate a previously exercised setoff right.  *See* App. 1494 at 1517–18.  In

contrast, the Committee's expert noted that BisB's expert's opinion contradicted the texts of

Article 38(c) of the CBB Law and Rule UG-1.1.7, EN-3.1.1 and EN-3.1.2 of Volume 2 of the

CBB Rulebook, all of which were cited in BisB's expert's report.  The Committee contends that

the texts confirm the binding nature of Formal Direction issued by the CBB.  In addition, the

Committee notes that BisB's arguments stand in contradiction to BisB's own conduct after the

CBB issued the Formal Direction.  BisB spent three weeks attempting to have the CBB retract

the Formal Direction, to no avail.  If BisB is correct that the CBB's Formal Direction could not

be applied retroactively to invalidate the set-off right previously exercised, then it would have

had no reason to challenge the Formal Direction at all.  And as an additional matter, the CBB

would have had no reason to issue the Formal Direction, if in fact, it could not apply

retroactively.

        However, the question of whether enforcing the CBB's Formal Direction amounts

to a retroactive application is ultimately moot based on both Bahraini statutory law and judicial

interpretation.  Both parties' experts agree that the Bahraini Civil Code is a form of general law

whose provisions do not supersede any special law dealing with a specific issue.  *See* 628 B.R. at

439.  To wit, the Bahraini Civil Code states that "[t]he provisions of the attached code shall not

prejudice the provisions set forth in any special legislation."  *Id.*  In addition, the Court of

Cassation in Bahrain also has recognized that special laws take precedence over the general law:
"It is established that the existence of a special law stops resorting to the provisions of a general
law except for matters not covered by a special law.  A special law cannot be undermined by a
general law as such undermining contradicts the purpose for which the special law was enacted."
*Id.*  I find no error in the Bankruptcy Court's conclusion that the CBB Formal Direction
constituted controlling and applicable law, and that the setoff was not valid thereunder.

In addition, I note the tension between BisB's argument here and its argument as
to the Bankruptcy Court's purported error in declining to abstain on grounds of international
comity.  As to international comity, BisB argues that the Bankruptcy Court should have declined
to exercise jurisdiction because the Bahraini government (and by implication the CBB as its
primary regulator) had a greater interest in regulating BisB's conduct.  Here, in contrast, BisB
argues that the Bankruptcy Court erred in giving full effect to the CBB's Formal Direction as an
expression of Bahraini law.  BisB cannot have it both ways—that is, the Bankruptcy Court could
not both be required to defer to the regulatory authority of the Bahraini government but also,
while retaining jurisdiction, to flout the Bahraini government's authority.  The Bankruptcy Court
did not err in refusing to abstain on international comity grounds, and in exercising its
jurisdiction, it rightly afforded deference to the Bahraini government by enforcing the laws
enacted, including the CBB's Formal Direction, instructing BisB to return the proceeds or seek
relief in the Bankruptcy Court.  *See* 628 B.R. at 444–45 (citing *Hilton v. Guyot*, 159 U.S. 113,
163–64 (1895)) (rejecting BisB's "invitation" for the Bankruptcy Court "to second guess the
wisdom of the CBB's actions as unwise or poor policy).

I find no clear error in the Bankruptcy Court's ruling that the setoff was not valid
under Bahraini Law, nor do I find any abuse of discretion in its refusal to allow setoff as a matter

of equity, and therefore, affirm the factual findings and conclusion.

    b.  Setoff as Performance of a Contract Under Bahraini Law

    BisB contends that the Bankruptcy Court erred in declining to consider its argument that setoff constituted performance of contract under Bahraini law.  This argument is without merit because BisB relies on the general law, which the Bankruptcy Court found was superseded by the special law embodied in the CBB's Formal Direction.  Thus, even assuming that the Bahraini Civil Code permitted setoff as performance of a contract, the lawfulness of BisB's conduct was to be adjudged according to the special law (the Formal Direction) enacted to cover the specific issue (BisB's refusal to turn over the proceeds).  In short, the Bankruptcy Court could not err in failing to consider whether BisB's conduct was lawful under a nongoverning general statutory provision.  Rather, the Bankruptcy Court properly considered whether BisB's conduct was lawful under the CBB's Formal Direction—the special law expressly applicable to the present circumstances.

    ii.  Setoff Protected by the Safe Harbor Provisions

    In addition to the right of setoff preserved under Section 553, the Bankruptcy Code includes a number of "safe harbor" provisions that also protect transactions from challenge. The safe harbors were designed to "minimi[ze] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries . . . . If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk." *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011) (citations and quotations omitted). As relevant here, the safe harbor provisions apply to securities contracts, forward contracts, swap

agreements, and other contractual rights.  *See* 11 U.S.C. §§ 362(b)(6), 362(b)(17), 362(o), 555,

556, 560, 561(a).

> a.    Securities Under Sections 362(b)(6), 556, and 561(a) of the
> Bankruptcy Code

BisB contends that the Bankruptcy Court erred in finding that the setoff was not

protected as a securities contract.  BisB argues that the *murahaba* agreements are securities

within the meaning of Section 101(49)(A), which lists various types of debt instruments as

examples of "securities" and "clearly encompasses both equity *and* debt instruments."  A.B. at

79.  BisB also argues that the *murabahas* fall within the residual clause of Section 101(49),

which defines a security as including "any claim or interest commonly known as a security."

11 U.S.C. § 101(49)(A)(xiv).

The Bankruptcy Court rejected both of these arguments.  It found that the

agreements were not "securities" within the principal definition because they did not bear the

"hallmark characteristics" of securities and lacked equity-like features.  The Bankruptcy Court

looked to the Second Circuit's decision in *In re Lehman Brothers Holdings Inc.*, 855 F.3d 459,

474–75 (2d Cir. 2017), for guidance.  *See* 628 B.R. at 463–64.  It found that the *murabaha*

agreements did not bear the "hallmark characteristics" of securities because neither party bore

the same risk and benefit expectations as shareholders, and the only risk assumed was that of

nonpayment by the counterparty.  *See id.* at 464–65.  Instead, the Bankruptcy Court found that

the agreements were loan-like, based on the parties' own descriptions of the transactions, *see id.*

at 462, and based on the fact that the parties agreed on the rate of return and structured the

transaction to avoid risk—a point on which which BisB's expert agreed.  In essence, the

*murabahas* were not contracts for investment in an agreed-upon commodity; rather, the

commodity was a convenient vehicle for effectuating a loan and providing for an interest-like

return without calling it such.  The Bankruptcy Court also distinguished the *murabahas* from other debt securities because the agreements were not publicly tradeable as deployed (and were not traded at all), nor were they fungible, listed on an exchange, or liquid.  *See id.* at 462–63. The Bankruptcy Court further noted that the *murabahas* do not resemble securities because neither party obtained any typical shareholder rights—*i.e.*, voting rights or dividends.  *See id.* at 464.  Rather, the Bankruptcy Court found that it was "particularly easy" to conclude that the *murabahas* at issue were not securities because they essentially were commodity a credit financing arrangement between two parties, and not a liquid, fungible, tradeable instrument.  *Id.* at 463.

BisB disagrees with the Bankruptcy Court's analysis and argues that the *murabaha* contracts replicated the effect of certain securities because they involved the purchasing of commodities, and the purchaser of the commodities bore risks associated with the purchase and disposal of said commodities.  This argument fails because the *murabaha* agreements here had nothing to do with the underlying commodities themselves, and everything to do with structuring a loan-like or credit-financing agreement, structured so as not to run afoul of Shari'a law's outlawing of interest.

BisB also argues that the Bankruptcy Court erred in finding that the *murabahas* did not fall with the residual clause of the definition of securities contracts, which encompasses both equity and debt instruments.  BisB points to the testimony of the Committee's own expert, who stated that the market treats *murabaha* investments as deposit-like instruments.  *See A.B.* at 79–80.  BisB further notes that the Bankruptcy Code's definition of "security" expressly includes a "certificate of deposit" or "note."  *Id.* at 80 n.37 (quoting 11 U.S.C. 101(49)(A)).  It concedes that the Bankruptcy Code does not define either a "certificate of deposit" or a "note" but states

these terms are defined in the United States Uniform Commercial Code.  BisB curiously seems to suggest that federal Bankruptcy Law should be construed according to U.S. commercial law; however, this plainly is at odds with its contention (and a point on which all parties seem to agree) that the contracts should be construed according to Bahraini law.  Indeed, BisB advanced that argument before the Bankruptcy Court, claiming that the agreements are considered securities in the Bahraini and Islamic funding markets, and should therefore be treated as such under the residual clause.  The Bankruptcy Court rejected this argument, noting that the Committee's expert testified that traders in the Islamic funding market treat the agreements as loan-like, which was consistent with the parties' characterizations and the language of the agreements themselves.  The Bankruptcy Court further noted the problems that would be created by adopting BisB's argument and construing the U.S. Bankruptcy Code according to the views of a foreign country—namely, that it would promote inconsistency in interpretation of the residual clause and stretch the definition beyond recognition.  *See* 628 B.R. at 467.

I find no error in the Bankruptcy Court's analysis and deferral to the parties' own characterizations of the transactions as loan-like.  This is wholly consistent with BisB's contention that commodity *murabahas* are liquidity management tools, designed to allow the equivalent of interest to be paid on loans, rather than investments.  In addition, and as the Bankruptcy Court noted, the *murabahas*, by their own terms, do not qualify as securities because Section 101(49)(B)(vii) specifically excludes a "debt or evidence of indebtedness for goods sold and delivered or services rendered."  *See* 628 B.R. at 464 n.52.  The *murabaha* transactions fall within this exclusion for debts, for they provide for the purchase, and repurchase, of the same commodities, plus an increase.  Accordingly, the findings and judgment of the Bankruptcy Court are affirmed.

     b.     Forward Contracts Under Sections 362(b)(6), 556, and 561(a) of the Bankruptcy Code or Swap Agreements Under Sections 362(b)(6), 560, and 561(a) of the Bankruptcy Code

BisB also contends that the Bankruptcy Court erred in finding that the *murabahas* were not forward contracts or swap agreements. Section 101(25)(A) of the Bankruptcy Code defines a forward contract as "a contract . . . for the purchase, sale, or transfer of a commodity . . . with a maturity date more than two days after the date the contract is entered into . . . ." Section 101(53B)(A)(i)(VII) defines "swap agreements" to include "commodity forward agreements."[6]

Applying the four-factor test originally set out by *In re National Gas Distributors, LLC*, 556 F.3d 247 (4th Cir. 2009), the Bankruptcy Court concluded that the *murabahas* were neither forward contracts nor swap agreements. Under *Natural Gas*, a contract is considered a forward contract where: (1) substantially all expected costs of performance are attributable to the underlying commodity; (2) the contract has a maturity date of more than two days after the contract was entered into; (3) the price, quantity, and time elements must be fixed at the time of contracting; and (4) the contract has a relationship to the financial markets. *See id.* at 256–57. The Bankruptcy Court found that the *murabaha* agreements did not satisfy the second or fourth factors and thus held that the agreements did not qualify as forward contracts or as swap agreements, defined to include commodity forward agreements.

As to the second factor, the Bankruptcy Court noted that the *murabahas* did not have a delivery date of more than two days after the contract was entered into. *See* 628 B.R. at 469. The Bankruptcy Court reasoned that the 2003 Investment Agreement, and the investment

---

[6]    Before the Bankruptcy Court, BisB also argued that the *murabahas* were "swap agreements" within the meaning of the residual clause under Section 101(53B)(A)(ii). BisB does not mention the catch-all definition in its opening brief. The issue is deemed waived. *See Gross*, 585 F.3d at 95 (quoting *Frank*, 78 F.3d at 833).

26

transactions on March 8 and 9, 2012, provided for "immediate delivery" of the commodities on "deferred payment terms." *Id.* at 470. Because courts link the maturity date to the contract delivery date, *see, e.g.*, *Buchwald v. Williams Energy Mktg. & Trading Co. (In re Magnesium Corp. of Am.)*, 460 B.R. 360, 373 (Bankr. S.D.N.Y. 2011), the Bankruptcy Court concluded that the *murabaha* contracts at issue had maturity dates that were not more than two days later than the dates on which the parties entered the transactions. *See* 628 B.R. at 470.

      As to the fourth factor, the Bankruptcy Court found that the *murabahas* lacked a relationship to the financial markets because the primary purpose of the agreements was not financial or risk-shifting in nature. *See* 628 B.R. at 468. Whereas ordinary commodity contracts have the primary purpose of arranging for the purchase and sale of the underlying commodity, a forward contract aims to protect and hedge against fluctuations in the price of a commodity. For the same reasons discussed in connection with BisB's arguments in favor of treating the *murabaha* as securities, the Bankruptcy Court found that the primary purpose of the agreements at issue was not risk-shifting in nature because they provided for immediate delivery and did not expose either party to the risk of price fluctuations. *See id.* at 469.

      Again, I find no clear error in the Bankruptcy Court's analysis. The *murabaha* agreements were not akin to forward contracts. The purchase of the underlying commodity was a vehicle to provide a rate of return on a loan, agreed upon in advance. Nothing in the record indicates that the *murabahas* involved speculation on the price of the underlying commodities, which might have brought the transactions within the safe harbor provisions. I agree with the Bankruptcy Court that the *murabaha* agreements do not satisfy the second or fourth factors of the *National Gas* test, and therefore, are not forward contracts within the meaning of Section 101(25)(A) of the Bankruptcy Code.

BisB also argues that the Bankruptcy Court erred in treating the transactions as ordinary commodities contracts when the parties' experts agreed that commodity *murabahas* are used for liquidity management and not for the purchase of commodities. *See* A.B. 84, 84 n.41. BisB misreads the Bankruptcy Court's analysis. The Bankruptcy Court analogized the agreements to ordinary commodity contracts to underscore that the purpose was not to hedge against price fluctuations in the market but rather to use the commodity as a vehicle for transferring the funds in a manner that was compliant with Shari'a investment principles and also allowed for a return, without expressly charging interest. The Bankruptcy Court's conclusion that the *murabahas* are not risk-shifting in nature is further supported by the fact that the parties agreed on the rate of return at the outset. The only risk was that of default or nonpayment by the counterparty, but that risk had no connection whatever to changes in the price of the commodity because neither party retained the commodities for any prolonged period of time. And this finding is fully consistent with BisB's contention that the *murabaha* agreements were not ordinary commodity contracts, and instead, vehicles for liquidity management.

BisB also argues that the Bankruptcy Court in failing to adopt the universal usage for what "maturity date" means—purportedly, the deferred payment date at the end of the contract, and not as the Bankruptcy found, the contracts' initial execution date. BisB argues that this reflects "the common-sense notion of how *murabahas* work financially" because although the parties agree to a fixed return at the outset, "the final result of who 'won' or 'lost' the terms of the contract – *i.e.*, who made the right guess about whether the fixed return is a good price – is not determinable until the end of the contract period . . . ." A.B. at 85.

Again, I find no error in the Bankruptcy Court's analysis here. BisB's argument is based on the assumption that the parties entered into the *murabaha* agreements to speculate on

the price of the underlying commodity.  Not only does this misconstrue nature of the agreements, but it also stands at odd with BisB's other argument—that the purpose was not to acquire the commodities.  *See, e.g., id.* at 83–84 (arguing that interbank *murabahas* are used for short-term liquidity management . . . *not* for investment in commodities) (emphases in original); *id.* at 84 (emphasizing that the committee conceded that the *murabahas* did not involve physical delivery of the commodities purchased, and that the parties' experts agree that *murabahas* are used for cash management, not commodities purchases).  If that were, in fact, the purpose, one would expect that at least one party would retain control of the commodity, but as the record here shows, neither party did.  BisB immediately delivered the commodities to Arcapita, and Arcapita was obligated to pay BisB on the deferred payment date, the price of the commodities plus the fixed rate of return.  Thus, BisB's efforts to characterize the agreements in terms of wins and losses are unavailing.  The parties were not making guesses about whether the fixed return was a good price.  Arcapita accepted the fixed return and agreed to pay it on a deferred basis.  The "guess" that BisB presumably made was that Arcapita would pay up on the specified deferred date, and assuming that it guessed correctly, BisB knew precisely the amount that it would receive, regardless of any price fluctuations or other interim changes the underlying commodity market.  I agree with the Bankruptcy Court that the *murabahas* were not protected as forward contracts or swap agreements under the safe harbor provisions.

As an additional matter, I would note that allowing BisB to take advantage of the safe harbor provisions would be inconsistent with the statutory purpose.  The Second Circuit has explained in the context of swap agreements, for example, that Section 560 "shields swap participants from some of the risks associated with a counterparty's bankruptcy and enables them to unwind the transactions."  *See Lehman Bros. Special Fin. Inc. v. Branch Banking & Trust Co.*

*(In re Lehman Bros. Holdings Inc.)*, 970 F.3d 91, 102 (2d Cir. 2020). Here, BisB does not seek to unwind any transaction. BisB seeks to retain funds to which it purports to be entitled. It is the Committee who effectively seeks to unwind the transaction. Thus, even assuming that the transactions at issue were swap agreements, for example, BisB cannot claim protection under the safe harbor provision in Section 560 because it does not claim, nor seek to enforce, a right to liquidation. BisB's claim to relief under Section 556, which allows the liquidation, termination and acceleration of certain securities and forwards contracts is likewise misplaced because here again, BisB does not seek to liquidate or accelerate any contract. Rather, it seeks to enforce pre-Petition transactions and to retain the proceeds. The safe harbor provisions are inapplicable not only because the *murabahas* are neither forward contracts nor swap agreements, but also because BisB does not seek protection under those provisions in a manner that is consistent with the statutory purpose. Accordingly, I affirm the finding and judgment of the Bankruptcy Court.

        c.     "Law Merchant" or "Normal Business Practice" Under Sections 362(b)(6), 362(b)(17), 362(o), 555, 556, 560, and 561 of the Bankruptcy Code

        BisB cites as error the Bankruptcy Court's finding that its purported setoffs were not contractual rights protected under the safe harbors under the law merchant or by reason of normal business practice. BisB does not argue this point separately but makes passing reference to "the law merchant" and "normal business practice" in connection with its argument for why the Bankruptcy Court erred in applying the CBB's Formal Direction retroactively. Because BisB offers no arguments as to why the contracts *should* be protected as part of "the law merchant" or "normal business practice," the issue is deemed waived, and the judgment of the Bankruptcy Court is affirmed. *See Gross*, 585 F.3d at 95 (quoting *Frank*, 78 F.3d at 833).

     iii.    Setoff Disallowed Under Section 553(a)(3)(C) – Debts Obtained for the
            Purpose of Obtaining a Right of Setoff

BisB contends that the Bankruptcy Court erred in finding that the *murabaha* debts

were obtained "for the purpose of obtaining a right of setoff" and invalid under Section 553.

However, as the Bankruptcy Court found and I affirmed, BisB did not have a right to setoff

under Bahraini law, and the transactions were not protected under the safe harbor provisions of

the Bankruptcy law.  The question of whether a setoff is disallowed under Section 553(a)(3)(C)

only arises once a right of setoff is established, and here there is none.  Nevertheless, in the

interest of completeness, I address BisB's arguments below.

     "The doctrine of setoff has long occupied a favored position in our history of

jurisprudence." *Bohack Corp. v. Borden Inc.*, 599 F.2d 1160, 1164 (2d Cir. 1979) (construing

§ 68 of the previous Bankruptcy Act, which is now embodied in Section 553).  Although setoff

can have the effect of paying one creditor more than another, in derogation of the general policy

of the Bankruptcy Code to afford equal treatment to creditors, setoffs are accepted and approved

because they are based on long-recognized rights of mutuality.  *See id.* at 1165.  However,

Section 553 protects against an undue preference, by prohibiting debts incurred for the purpose

of obtaining a right of setoff.  *See* 11 U.S.C. § 553(a)(3)(C).  The Eleventh Circuit has provided

this guidance:

> Although the conduct may occur in many forms, the archetypal situation is the
> case where a debtor has a preexisting obligation to the creditor, and, in the months
> prior to debtor's filing for bankruptcy, the debtor pays back the creditor by
> "loaning" him money. Later the parties notice the two debts and engage in setoff,
> canceling both of them. In this archetypal situation, the creditor obtains the debt
> only to engage in setoff, thus this "loan" is disfavored by the setoff rules.

*In re Dillard Ford, Inc.*, 940 F.2d 1507, 1513 (11th Cir. 1991).  Generally, courts examine

whether the debts were incurred in good faith and in the ordinary course of business.  *See Clean*

*Burn Fuels, LLC v. Purdue BioEnergy, LLC (In re Clean Burn Fuels, LLC)*, 492 B.R. 445, 467

(Bankr. M.D. N.C. 2013); *see also In re Automatic Voting Mach. Corp.*, 26 B.R. 970, 973

(Bankr. W.D.N.Y. 1983) (holding that debt was not incurred for purpose of obtaining setoff

where deposit was made in the ordinary course of the debtor's business and made in an

unrestricted checking account maintained for the operation of the debtor's business).  A

creditor's awareness of the debtor's financial difficulties may also contribute to the conclusion

that a creditor incurred the debt for the purpose of setoff.  *See Union Cartage Co. v. Dollar*

*Savings & Trust Co. (In re Union Cartage Co.)*, 38 B.R. 134, 138–40 (Bankr. N.D. Ohio 1984).

       The Bankruptcy Court found that BisB obtained the pre-Petition debt for the

purpose of obtaining a setoff.  In so finding, it considered all the relevant circumstances of the

transaction.  First, the Bankruptcy Court found that the transactions were outside the regular

course of business of the parties, noting that Arcapita made no placements in 2012 and only one

in March 2011, which was then rolled over several times.  *See* 628 B.R. at 447.  It also noted the

questionable timing of Arcapita's placements—that the placements occurred on March 13 and

15, 2012, just days prior to the Petition Date on March 19, 2011, and at a time when BisB was

generally aware that Arcapita was in financial difficulty, and reluctant to extend any more credit

in light of Arcapita's inability to pay.  *See id.* at 447–48.  The Bankruptcy Court also remarked

on the curious amount of the placements.  Although the placements totaled $30 million, BisB

retained only the March 14, 2012 Placement of $10 million, which was conveniently just over

the $9.8 million owing.  *See id.* at 447.  Further, the Bankruptcy Court noted that it was even

unusual for the parties to maintain placements of this magnitude—totaling $30 million—with

one another at any one time.  *See id.*  This was evidence of the archetypal situation, described by

the Eleventh Circuit, in which a debtor builds up debt to afford a later setoff.

In addition, the Bankruptcy Court pointed to conversations between Arcapita and BisB, before and after the Petition Date, as well as the day of. *See id.* at 448–51. These conversations revealed that BisB was aware of Arcapita's financial difficulties, and that BisB was concerned with recovering the monies owed it. The Bankruptcy Court found that the discussions appeared to choreograph BisB's ultimate withholding of the funds at issue, notwithstanding the fact that Arcapita advised BisB that the estate was frozen, and BisB clearly understood the effect of the stay. Based on the direct and circumstantial evidence of collusive conduct, that had the coincidental and convenient effect of making BisB whole, the Bankruptcy Court concluded that BisB obtained the pre-Petition debt for the purpose of obtaining a setoff, thereby invalidating any right that might have existed. *See id.* at 457.

BisB argues that the Bankruptcy Court's finding that BisB purposely received Arcapita's pre-Petition investments to obtain setoff rights is "contradicted by the extensive evidence in the record." First, BisB argues that Arcapita initiated the pre-Petition placements without stating the purpose. Second, it claims that it did not link any pre-Petition investment with securing setoff rights, let alone to secure preferential treatment in Arcapita's bankruptcy case, of which it had no expectation would be filed. Finally, it points to post-Petition conversations, which BisB claims were aimed at resolving the dispute, but which resulted in mutual demands after the discussions broke down—with Arcapita demanding repayment and BisB asserting setoff. Accordingly, BisB argues that it only began considering its setoff options after Arcapita's bankruptcy filing. BisB argues that the Bankruptcy Court's finding, that BisB sought to build up a debt pre-Petition to preserve a later right to setoff, was clear error.

Having reviewed the record and the Bankruptcy Court's factual findings, I find no clear error. Contrary to BisB's assertions, the Bankruptcy Court did not rely solely on post-

Petition conversations.  In fact, the Bankruptcy Court discussed, at length, the unusual nature of

the transactions at the time they were entered into, including BisB's curious demand for an

investment over $10 million—just enough to cover Arcapita's debt.  Although Arcapita

requested the placements, it did so in an effort to entice BisB to roll over the BisB placements

coming due on March 15 and 16, 2012.  In addition, it was BisB that demanded an amount over

$10 million, again just over the amount Arcapita allegedly owed.  Finally, as to BisB's argument

that it only entertained a setoff after discussions broke down, the Bankruptcy Court properly

considered these facts as part of the continuum of conduct and under the totality of

circumstances.

        Moreover, as the Creditors' Committee points out, the timing for BisB's exercise

of its setoff rights was particularly curious.  Although the March 14 Placement's maturity date

was March 29, 2012, BisB did not exercise a right of setoff until three months later, on June 28,

2012, and only days before the CBB issued its Formal Direction.  This tends to undermine

BisB's argument that it was unaware that setoff was not lawful, or that the CBB intended to

provide otherwise.  Rather, BisB's conduct suggests that it intended to preempt the CBB's

Formal Direction and thereby preserve a right to setoff.

        The evidence, taken as a whole, supports the finding that BisB entered into the

transaction to gain a setoff.  Because I am not left with the "firm conviction that a mistake has

been committed," I affirm.  *See In re Bennett Funding Grp.*, 212 B.R. at 211.

      D.    The Bankruptcy Court Did Not Err in Ruling that BisB's Exercise of Setoff
             Violated the Automatic Stay Provisions of Sections 362(a)(3) and 362(a)(7) of the
             Bankruptcy Code.

        BisB cites as error the Bankruptcy Court's ruling that BisB's exercise of its setoff

rights under Bahraini Law and Shari'a principles violated the automatic stay provisions of

Section 362(a)(3) and 362(a)(7). However, it fails to advance any specific arguments as to why the Bankruptcy Court's findings were erroneous. Rather, the purported error appears to be based on other purported errors—namely, that the Bankruptcy Court erred in finding that BisB's exercise of right to setoff was not protected under the various safe harbor provisions. A.B. at 90–91 (arguing that BisB's setoff rights were contractual rights that fall within the safe harbor provisions, and were therefore, rights that BisB could exercise "*regardless* of the Bankruptcy Code's automatic stay . . . and *outside* of the bankruptcy process (instead of getting . . . permission that would otherwise be required under Section 553 . . . ") (emphasis in original). As discussed above, the Bankruptcy Court did not commit error in finding that none of the asserted safe harbor provisions applied. Thus, BisB was not entitled to retain the funds, and therefore, in so doing, BisB violated the automatic stay. The findings and judgment of the Bankruptcy Court are affirmed.

> E.     The Bankruptcy Court Did Not Abuse its Discretion in Ruling that Prejudgment Interest Should Accrue on Amounts Owed to The Committee

BisB argues that the Bankruptcy Court erred in awarding prejudgment interest because the payment of interest violates Islamic Shari'a law. The award of prejudgment interest is a matter confided to the court's broad discretion. *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071–72 (2d Cir. 1995). Ordinarily, a request for such interest should be granted, absent a sound reason to deny it. *Savage & Assocs. v. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 344 (Bankr. S.D.N.Y. 2008). When determining whether to award prejudgment interest, courts in this Circuit look to the source of law underlying the plaintiff's claims. *See Kittay v. Korff (In re Palermo)*, 739 F.3d 99, 107 (2d Cir. 2014). In a contract action, where the governing law is established through a choice of law provision, the substantive law of the chosen jurisdiction controls the award of prejudgment interest. *See PNCEF, LLC v.*

35

*Omni Watch & Clock Co.*, No. 09-CV-0975, 2010 U.S. Dist. LEXIS 102910, at *19 (E.D.N.Y. Sept. 24, 2010) (citing *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 614 (2d Cir. 1996)). In determining whether to award prejudgment interest, courts consider "(i) the need to fully compensate the wronged party for actual damages suffered; (ii) considerations of fairness and the relative equities of the award; (iii) the remedial purpose of the statute involved; and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992). Prejudgment interest is not a penalty, but rather is viewed as delayed damages to be awarded as a component of compensation to the prevailing party. *See General Motors Corp. v Devex Corp.*, 461 U.S. 648, 654 n.10 (1983); *see also West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987).

The Bankruptcy Court did not abuse its discretion in awarding prejudgment interest. The Bankruptcy Court granted summary judgment to the Committee on its claim for breach of contract under Bahraini law and for turnover under Section 542(b) of the Bankruptcy Code. Because the Committee's claim for breach of contract was governed by Bahraini law, the Bankruptcy Court looked to Bahraini law for guidance. *See* Prejudgment Interest Decision, 633 B.R. 207, 211 (S.D.N.Y. 2021). Although Shari'a, and therefore Bahraini, law forbids payment of interest, the Bankruptcy Court found that a prejudgment interest award was consistent with other provisions of the Bahraini Civil Code governing the remedies for breach of contract and also consistent with the compensatory purpose of prejudgment interest under American law. The Bankruptcy Court cited the following provisions in the Bahraini Civil Code. First, Article 223 allows a party to recover, as a component of damages, "losses suffered by the creditor and profits of which he has been deprived" upon the breach of contract. *Id.* Next, 140(a) of the Bahraini

Case 22-1222, Document 57, 09/16/2022, 3384089, Page111 of 180

Civil Code provides that "[i]n bilateral binding contracts if one of the parties does not perform his obligation, the other party may . . . demand from the judge the performance . . . of the contract, with damages[.]" *Id.* Finally, Article 188 provides that a party that has received "that which is not due to him" in bad faith must "restitute in addition the interest and profit that he has gained or that he has failed to gain by neglect on the thing unduly received[.]" *Id.* Declining to elevate form over substance, the Bankruptcy Court found that awarding prejudgment interest was not inconsistent with or forbidden by Bahraini law because the above-cited provisions have a compensatory purpose.

Finding that prejudgment interest was consistent with Bahraini law, the Bankruptcy Court next considered whether an award was warranted. It noted that BisB had wrongfully withheld (and continued to do so) the monies owed for close to a decade, despite the CBB's clear directive instructing BisB to return the funds or seek the approval of the Bankruptcy Court. As a result, Arcapita's estate was deprived of the use of those funds, both for distributions to creditors and equity holders as well as for the administration of the bankruptcy case. *See id.* at 212 (noting that Appellee was forced to borrow funds to administer the cases under a debtor-in-possession financing facility). Based on these circumstances, the Bankruptcy Court found prejudgment interest appropriate. *See id.*

I find no error in the Bankruptcy Court's interpretation of the plain statutory text of the Bahraini Civil Code nor its discretionary decision to award prejudgment interest in light of the circumstances. While Shari'a law may forbid interest, as a general matter, and in the conventional sense, the Bahraini Civil Code expressly provides for a full recovery of damages, including "interest and profit." Here, prejudgment interest serves a proxy for the "profits of which [the Committee] has been deprived[.]" Bahraini law plainly and expressly provides for

37

full compensation for breaches of contract as well as restitution for ill-gotten gains. BisB wrongfully withheld funds owed to Arcapita's estate and benefitted from retaining them. The prejudgment interest award thus transferred back to the estate "the interest and profit . . . unduly received." Given the sound reasons underlying the Bankruptcy Court's decision, I can find no abuse of discretion in its decision to follow the general rule that prejudgment interest should be awarded except when there is sound reason to deny it. Accordingly, the decision awarding prejudgment interest, 633 B.R. 207, is affirmed.

F.   The Bankruptcy Court Did Not Abuse Its Discretion in Setting the Prejudgment Interest Rate at New York's Statutory Prejudgment Interest Rate of 9% Per Annum.

BisB argues that even assuming that prejudgment interest was permissible, the Bankruptcy Court erred in setting the rate according to New York's statutory rate, rather than using the federal treasury rate under 28 U.S.C. § 1961(a), which BisB calculated at 0.738% for the applicable period of time.

As is true with respect to a court's decision to award prejudgment interest, its decision as to the appropriate prejudgment interest rate also is a matter committed to the sound discretion of the court. *See Endico Potatoes*, 67 F.3d at 1071–72. In breaches of contract claims, courts ordinarily look to the underlying state law for the appropriate rate. *See Adrian v. Town of Yorktown*, 620 F.3d 104, 107 (2d Cir. 2010). Although turnover claims arise out of federal law, the claims are based on property rights governed by state law, and so courts also look to the relevant state law when calculating prejudgment interest on turnover claims. *See Tapmasters Hoboken, LLC v. Blackrock Millwork Co., LLC (In re Tapmasters Chelsea, LLC)*, 621 B.R. 580, 584 (Bankr. S.D.N.Y. 2020). The appropriate prejudgment interest rate depends on the circumstances of an individual case, and courts in this Circuit are free to consider several

SPA-40

alternative means of calculating the measure of damages (or to estimate the right percent to return the right amount of damages).

In determining what interest rate should apply, the Bankruptcy Court looked to applicable Bahraini law, notwithstanding the prohibition on interest generally, and the concept of compensation incorporated thereunder. *See* Interest Order at 214. The Bankruptcy Court considered the specific facts of the case and the lost profit opportunities to the Arcapita estate and costs suffered as a result of being deprived of the funds. *See id.* The Bankruptcy Court also considered three interest rates identified by the Committee—the rate of return available in the Bahraini investment market over the decade during which BisB had withheld the funds (approximately 8.08%); the cost of debtor-in-possession financing (not less than 12%); and, the rate of return that could have been achieved if the funds had been invested elsewhere (11.072 – 13.13% in the U.S stock market). Finally, the Bankruptcy Court noted the importance of the suit's connections to New York, citing to Judge Daniel's observation that BisB deliberately chose to utilize New York correspondent back accounts, and more generally, New York's and the United States's banking system. *See id.* (citing 549 B.R. at 70). Although the Bankruptcy Court ultimately set the prejudgment interest rate at 9%, the New York statutory rate, the Bankruptcy Court stated that its decision was based on the unique factors in the case, including the rate of return available in the Bahraini investment market, the cost of debtor-in-possession financing, and the rate of return generally available during the time, as well as the suits connections to New York. *See id.* at 213–14. It rejected BisB's argument in favor of the federal statutory rate because the 0.783% rate calculated and proposed by BisB would "severely undercompensate the estate." *Id.* at 213.

39

Case 22-1222, Document 57, 09/16/2022, 3384089, Page114 of 180

**SPA-41**

The Bankruptcy Court did not abuse its discretion in awarding prejudgment interest at the New York statutory rate of 9%.  It made "specific findings regarding the matter" and articulated the reasons for its decision.  *Cf. Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 138, 140 (2d Cir. 2000) (finding abuse of discretion where district court gave no reasons for applying the § 1961 rate and made no findings as to why the § 1961 rate would adequately compensate the prevailing party).  The Bankruptcy Court considered what amount of compensation was necessary, looking to the losses in profits and costs incurred.  It attempted to set a rate that would approximate that amount that would compensate the estate, consistent with the provisions under the U.S. Bankruptcy Code and Bahraini law.  The Bankruptcy Court's finding that BisB's proposed rate would severely undercompensate the estate also is amply supported.  Because the Bankruptcy Court made specific findings and provided cogent and well-founded reasons for its decision, I find no abuse of discretion and affirm the judgment.

## CONCLUSION

For reasons provided above, the challenged orders of the Bankruptcy Court are affirmed, and the appeal dismissed.  Oral argument scheduled for June 7, 2022 is canceled.  The Clerk of Court shall enter judgment in favor of the Committee and close the case.

SO ORDERED.

Dated:     May 23, 2022                            _____/s/ Alvin K. Hellerstein_____
           New York, New York                      ALVIN K. HELLERSTEIN
                                                   United States District Judge

SPA-42

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA, BANK B.S.C. (c),
et al.,

                    Appellant,

       against

BAHRAIN ISLAMIC BANK,

                    Appellee.

**MEMORANDUM DECISION AND ORDER**

15-cv-03828 (GBD)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA, BANK B.S.C. (c),
et al.

                    Appellant,

       against

TADHAMON CAPITAL B.S.C.,

                    Appellee.

15-cv-03829 (GBD)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, District Judge:

    Plaintiff-Appellant, the official committee of unsecured creditors for the above-captioned

chapter 11 action ("Committee"), began adversary proceedings in the United States Bankruptcy

Court for the Southern District of New York against Defendants-Appellees Bahrain Islamic Bank

("BisB"), and Tadhamon Capital B.S.C. ("Tadhamon," and together with BisB, "Banks"),

respectively, seeking, *inter alia*, the avoidance of a preferential transfer. In a single decision, the

SPA-43

Bankruptcy Court dismissed the adversary proceedings with prejudice, finding that it lacked personal jurisdiction over the Banks. It also denied the Committee's request to engage in jurisdictional discovery. The Committee appeals the dismissal, the decision to dismiss with (as opposed to without) prejudice, and the decision to deny the Committee's request to engage in jurisdictional discovery.[1] After carefully reviewing the record and the parties' briefs, and with the benefit of oral argument, this Court has concluded that the Bankruptcy Court erred when it held that it lacked personal jurisdiction over the Banks. Therefore, this Court vacates the Bankruptcy Court's orders dismissing with prejudice the underlying adversary proceedings for lack of personal jurisdiction, and remands the adversary proceedings to the Bankruptcy Court.[2]

I.   **Background Facts**[3]

Before filing for chapter 11 bankruptcy on March 19, 2012, Arcapita Bank B.S.C.(c) was licensed as an Islamic wholesale bank by the Central Bank of Bahrain, and was headquartered in Bahrain. (BisB Complaint, included in Joint Appendix Vol. 1, attached to Brief for Appellant, (Case No. 15-cv-03828, ECF No. 16-1), at APP005 ¶ 12.[4])

---

[1] Because each of the Banks' underlying motions to dismiss and the Committee's instant appeals raise the same issues, and because the Bankruptcy Court addressed both of the Banks' motions to dismiss in a single opinion, this Court likewise addresses both appeals together.

[2] Because this Court has determined that the Bankruptcy Court may exercise personal jurisdiction over the Banks, it does not opine on the Committee's appeals of the Bankruptcy Court's decisions to dismiss the actions with (as opposed to without) prejudice, or to deny the Committee's alternative request to engage in jurisdictional discovery.

[3] The parties agree that the facts are not in dispute. (Reply Brief for Appellant, (ECF No. 20), at 1 ("As the Banks acknowledge, the facts in this case are not in dispute." (Brackets and citation omitted)); Brief for Appellees, (ECF No. 17), at 1 ("The facts in this case are not in dispute.").)

[4] All citations are to the record in Case No. 15-cv-03828 unless otherwise noted. Additionally, because the ECF bates stamp numbers printed on the documents included in this record are often unreadable, this opinion often cites to the Appendix page designation found in the lower-right corner of each page.

BisB is an Islamic commercial bank also headquartered in Bahrain. (*Id.* at APP005 ¶ 13.) BisB maintains correspondent bank accounts[5] in the United States at Deutsche Bank, Standard Chartered Bank, and JP Morgan Chase Bank. (*Id.* at APP005 ¶ 14.)

Tadhamon is also a Bahraini corporation. (Tadhamon Complaint, included in Joint Appendix Vol. 1, attached to Brief for Appellant, (ECF No. 16-1), APP019 ¶ 13.) Tadhamon does not maintain any correspondent bank accounts in the United States. (*See* Transcript Regarding Hearing Held on March 9, 2014 re: Motion to Dismiss Adversary Proceeding, (ECF No. 16-2), at APP154:19-21.).

In March 2012, Arcapita hired BisB to make one investment, and Tadhamon to make two investments, respectively, on its behalf. (*See* BisB Complaint at APP008 ¶¶ 27-31; Tadhamon Complaint at APP022-023 ¶¶ 27-34.) Each transaction was executed in accordance with an agreement ("Placement Agreement") that Arcapita had entered into with each Bank.[6] (*See* BisB Complaint at APP007 ¶¶ 23-26; Tadhamon Complaint at APP021-022 ¶¶ 22-26.) The Placement Agreements provided that the Banks to which the agreement applied would formally initiate each investment transaction by submitting an offer to Arcapita to purchase commodities or securities on Arcapita's behalf. The Banks' offer set forth: (1) the amount, in a specific currency, of the funds Arcapita would transfer to the Bank if it accepted the Bank's offer (the "Placement"); (2) the specific bank account into which Arcapita would transfer, and the Bank would receive, the funds; (3) the

---

[5] "A correspondent bank account is a domestic account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds. Correspondent accounts facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to . . . the United States." *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 n.3 (2d Cir. 2013) ("*Licci IV*") (internal citations and quotation marks omitted).

[6] Arcapita and BisB executed their Placement Agreement on or about July 10, 2003. (BisB Complaint at APP007 ¶ 23.) Arcapita and Tadhamon, on the other hand, executed their Placement Agreement on March 15, 2012, the same day on which Arcapita and Tadhamon entered into the specific placement transactions at the heart of the litigation between the Committee and Tadhamon. (Tadhamon Complaint at APP021-022 ¶¶ 22-23, 27.)

commodity or securities that the Bank would purchase with the funds on Arcapita's behalf; (4) a pre-determined rate of return that Arcapita would earn on its investment; and (5) a maturity date—i.e., the date on which the Bank would transfer back to Arcapita its initial investment plus an agreed upon profit rate, minus a fee. (*See* Declaration of Mohammed Ebraim Mohammed in Support of Motion to Dismiss [] Defendant Bahrain Islamic Bank ("Mohammed Decl."), (ECF No. 16-1), Exhibit A, at APP040 ¶ 4.1, *id.* at APP043; Declaration of Waleed Rashdan in Support of Motion to Dismiss [] Defendant Tadhamon Capital B.S.C. ("Rashdan Decl."), (ECF No. 16-1), Exhibit A, at APP063, Exhibit B, at APP069.)

On or around March 14, 2012, Arcapita accepted an investment offer from BisB. Pursuant to the terms of the offer, Arcapita transferred $10 million to a BisB-designated account, specifically, BisB's JP Morgan Chase correspondent bank account located in New York. (BisB Complaint at APP008 ¶¶ 27-28.) The same day that it received the money in its New York correspondent bank account, BisB purchased 14,245 troy ounces of palladium on Arcapita's behalf through a broker in London. (Mohammed Decl. at APP035 ¶ 10; Declaration of Nicholas A. Bassett in Support of the Objection of the Official Committee of Unsecured Creditors to Bahrain Islamic Bank's Motion to Dismiss the Complaint ("Bassett Decl."), (ECF No. 16-1), Exhibits A-C, at APP081-086.) The investment was set to mature on March 29, 2012. (BisB Complaint at APP008 ¶ 31.) Before Arcapita made the $10 million Placement, it was already indebted to BisB in the amount of $9,774,096.15. (*Id.* at APP006 ¶¶ 20, 22.)

On or about March 15, 2012, Arcapita accepted two investment offers from Tadhamon. (Tadhamon Complaint at APP022 ¶ 27.) Pursuant to the terms of the offers, Arcapita made two $10 million transfers to a Tadhamon-designated New York HSBC correspondent bank account maintained by Khaleeji Commercial Bank B.S.C. ("Khaleeji"), Tadhamon's bank in Bahrain. (*Id.* at APP022 ¶ 28.) After receiving the funds, Khaleeji transferred the funds to Tadhamon's account

4

at Khaleeji in Bahrain.  (*Id.*)  Tadhamon then used the funds to purchase Bahranian securities on

Arcapita's behalf. (Rashdan Decl. at APP054 ¶ 13.)  The investments were set to mature on March

30, 2012 and April 16, 2012, respectively.[7]  (Tadhamon Complaint at APP 022-023 ¶¶ 32-33.)

Before Arcapita made the two Placements totaling $20 million, it was already indebted to Tadhamon

in the amount of $18,497,734.48. (*Id.* at APP020-021 ¶¶ 19, 21.)

On March 19, 2012, less than a week after executing all three Placements, Arcapita filed for

bankruptcy. (BisB Complaint at APP008 ¶ 30; Tadhamon Complaint at APP022 ¶ 31.)

On each of the applicable maturity dates, the Banks failed to remit any of the proceeds owed

to Arcapita. (BisB Complaint at APP008 ¶ 32; Tadhamon Complaint at APP022-023 ¶¶ 32-35.)

On April 30, 2012, Arcapita delivered demand letters to the Banks, informing the Banks that the

funds were property of the bankruptcy estate of Arcapita. (BisB Complaint at APP008-009 ¶ 33;

Tadhamon Complaint at APP023-024 ¶ 37.)  In response, each Bank asserted that it was withholding

all or nearly all of the funds as a setoff against the existing debts owed by Arcapita to each Bank.

(BisB Complaint at APP009 ¶ 34; Tadhamon Complaint at APP024 ¶ 38.)  In December 2012,

Tadhamon returned to Arcapita approximately $2 million, the difference between the antecedent

debt Arcapita owed Tadhamon and the total amount that Arcapita had transferred to Tadhamon in

connection with the Tadhamon Placements.  (Tadhamon Complaint at APP024 ¶ 40.)  BisB has

failed to return any portion of the funds Arcapita transferred in connection with the Placement it

made with BisB. (BisB Complaint at APP 009 ¶ 36.)

---

[7] Shortly before each of these dates, Tadhamon "roll[ed]-over" each of the $10 million Placements for an
additional one-month term. The Placements' maturity dates then became April 30, 2012 and May 16, 2012,
respectively. (Tadhamon Complaint at APP023 ¶ 36.)

## II.   Procedural History

In June 2013, the Bankruptcy Court confirmed the proposed plan of reorganization in Arcapita's bankruptcy.  (*See* Memorandum of Decision ("Decision"), included in Joint Appendix Vol. 2, attached to Brief for Appellant, (ECF No. 16-2), at APP273.)  The Bankruptcy Court subsequently entered an order granting the Committee leave, standing, and the authority to pursue claims against the Banks.  (*Id.*)

On August 26, 2013, pursuant to the authority granted by the Bankruptcy Court, the Committee commenced these adversary proceedings against the Banks to recover the funds transferred by Arcapita and received by the Banks.  (*See* BisB Complaint; Tadhamon Complaint.) The adversary proceedings asserted that at the time Arcapita and the Banks entered into the Placements, Arcapita was insolvent, the Placements occurred less than ninety days before it filed for bankruptcy, and that the Placements were improperly made to pay off the debts Arcapita owed each Bank.[8]  (BisB Complaint at APP011-012 ¶¶ 49-57; Tadhamon Complaint at APP026-027 ¶¶ 54-62.)

On November 18, 2013, the Banks moved to dismiss the adversary complaints asserting that (i) the Bankruptcy Court lacked personal jurisdiction over the Banks; (ii) the Committee's claims were barred by the presumption against extraterritoriality; and (iii) the claims were barred by principles of international comity. (*See generally*, Motions to Dismiss the Complaint, (ECF No. 16-1), at APP031-076.)

On April 17, 2015, the Bankruptcy Court issued its decision concluding that the transfers to the New York correspondent bank accounts designated by each of the Banks was an insufficient basis on which to establish specific personal jurisdiction over the Banks.  The Bankruptcy Court

---

[8] The Committee also asserted claims for breach of contract, turnover, violation of the automatic stay, and claim disallowance. (BisB Complaint at APP003 ¶ 1; Tadhamon Complaint at APP017 ¶ 1.)

held that "while the use of the [correspondent bank] account[s were] admittedly a contact [with the United States,] it [was] too weak to satisfy due process requirements," because the use of the correspondent bank accounts was "neither the beginning nor the end of the Placement, but rather a transitory step." (Decision at APP278-279.) The Bankruptcy Court also emphasized that "the use of the accounts was not central to the alleged wrong" because the causes of action were all "based upon the alleged setoff by the [Banks]," and the receipt of the transfers themselves were not themselves improper at the time they occurred. (*Id.* at APP287-288, 288 n.12.)

### III.   Standard of Review

This Court reviews *de novo* the dismissal of a case for lack of personal jurisdiction over the defendant. *See Licci IV*, 732 F.3d at 167. "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006). In a Rule 12(b)(2) motion, "a court may consider materials outside the pleadings, but must credit plaintiffs' averments of jurisdictional facts as true." *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2012). Furthermore, all pleadings and affidavits are to be construed in the light most favorable to the plaintiff and all doubts resolved in the plaintiff's favor. *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).

Determining whether a bankruptcy court may exercise personal jurisdiction over a foreign defendant is a two-prong inquiry. First, the bankruptcy court must determine whether the defendant has "the requisite minimum contacts with the United States at large." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (citation omitted). Where the plaintiffs ask the court to assert specific jurisdiction over the defendants, the inquiry focuses on the "affiliation between the forum and the underlying controversy . . . ." *Goodyear Dunlop Tires Operations S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (alterations

7

and citation omitted).[9]  Thus, the defendant must have contact with the forum, and the underlying

cause of action must "arise out of or relate to" that contact.  *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 472 (1985) (citation omitted).

Second, the court must determine whether exercising personal jurisdiction over the

defendant will offend "traditional notions of fair play and substantial justice." *Asahi Metal Indus.*

*Co., Ltd. v. Super Ct. Cal.*, 480 U.S. 102, 113 (1987) (citation omitted).  Factors relevant to the

analysis include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2)

the interests of the forum . . . in adjudicating the case; and (3) the plaintiff's interest in obtaining

convenient and effective relief." *Licci IV*, 732 F.3d at 170 (citations, quotation marks and alterations

omitted).

## IV.    Personal Jurisdiction and Correspondent Bank Accounts

### A.  The *Licci* Case

In a series of opinions, this Court, the Second Circuit, and the New York Court of Appeals

all confronted a jurisdictional dispute similar to the one now before this Court on appeal: whether

the use of a correspondent bank account provides a sufficient basis to exercise personal jurisdiction

over a foreign bank.  *See generally*, *Licci v. Am. Express Bank, Ltd.*, 704 F. Supp. 2d 403 (S.D.N.Y.

2010) ("*Licci I*"); *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ("*Licci II*");

*Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 984 N.E.2d 893, 960 N.Y.S.2d 695 (2012)

(*Licci III*); *Licci IV*, 732 F.3d 161.  Although the factual circumstances of the instant actions are not

identical, the reasoning contained within the opinions guides the resolution of the instant appeal.

---

[9] In addition to asserting specific jurisdiction, "[a] court may assert general jurisdiction over foreign (sister-
state or foreign country) corporations to hear any and all claims against them when their affiliations with the
State are so "continuous and systematic" as to render them essentially at home in the forum State." *Licci
IV*, 732 F.3d at 169 n.6 (quoting *Goodyear*, 131 S. Ct. at 2851).  From the outset of the adversary
proceedings, the Committee acknowledged that the Complaint failed to plead a prima facie case with regard
to general jurisdiction. (*See* Decision at APP277 n.4.)

In *Licci*, the plaintiffs alleged that Lebanese Canadian Bank, SAL ("LCB"), which was headquartered in Beirut, "intentionally and/or negligently provided Hizbollah with wire transfer services involving millions of dollars, and such transferred funds enabled and assisted Hizbollah to carry out terrorist attacks, including . . . rocket attacks that harmed plaintiffs [in Israel]." *Licci I*, 704 F. Supp. 2d at 405. The causes of action against LCB were dismissed for lack of personal jurisdiction, *id.* at 407-08, and the plaintiffs appealed.

When the case first reached the second circuit, it undertook a fairly comprehensive review of New York case law to determine "whether a foreign bank's frequent use of a correspondent account in New York to effect international wire transfers on behalf of an overseas client is an act directed with sufficient purposefulness at New York to constitute a transaction of business in that state under the long-arm statute."[10] *Licci II*, 673 F.3d at 63. It concluded, however, that the scope and application of the long-arm statute's "transaction of business" test was uncertain in this context. *See id.* at 65-66. It also attempted to discern "whether, as a matter of New York law, the plaintiffs' . . . claims, as they are alleged by the plaintiffs, 'arise from' the defendants' transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)." *Id.* at 70. It found that ambiguities in the New York Court of Appeals articulation of the applicable standard also undermined the court's confidence to correctly determine whether the plaintiffs had satisfied the second prong of the test under § 302(a)(1). *Id.* at 70-74. Given this uncertainty, the court certified two questions to the New York Court of Appeals:

> (1) Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect "dozens" of wire transfers on behalf of a foreign client, constitute a "transaction" of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

---

[10] "Determining personal jurisdiction over a foreign defendant in a federal-question case . . . requires [a court to first] look to the law of the forum state to determine whether personal jurisdiction will lie." *Licci IV*, 732 F.3d at 168.

> (2) If so, do the plaintiffs' claims under the Anti-Terrorism Act, the
> [Alien Tort Statute], or for negligence or breach of statutory duty
> in violation of Israeli law, "arise from" LCB's transaction of
> business in New York within the meaning of N.Y. C.P.L.R. §
> 302(a)(1)?

*Id.* at 74-75 (brackets omitted).

The New York Court of Appeals accepted the questions, and addressed each in turn. With regard to the first "transaction of business" question, the court engaged in an extensive analysis of *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391, 384 N.Y.S.2d 124 (1976).[11] *Licci III*, 20 N.Y.3d at 335-38, 960 N.Y.S.2d 695. *Amigo Foods* involved the unknowing—and, therefore, unauthorized—one-time receipt of funds by a defendant's New York correspondent bank. *See id.* at 335-37 (summarizing the facts in *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 61 A.D.2d 896 (1st Dep't 1978), *aff'd* 46 N.Y.2d 855 (1979)). Because the defendant had "passively and unilaterally been made the recipient of funds" by another actor, the *Amigo Foods* court concluded that the defendant had "not purposely availed itself of the privilege of conducting activities in New York . . . ." *Id.* at 337, 960 N.Y.S.2d 695 (quoting *Amigo Foods*, 61 A.D.2d at 897 (emphasis and internal quotation marks omitted)). In other words, the defendant had not "transacted business" within the meaning of the first prong of New York's long-arm statute. *See id.* at 337-389, 60 N.Y.S.2d 695. Significantly, *Amigo Foods* did not hold that jurisdiction did not lie simply because the defendant's use of the correspondent account was limited to a single instance;[12]

---

[11] The Second Circuit had also focused on *Amigo Foods* and its progeny in its initial attempt to discern how to apply the "transaction of business" prong. *Licci II*, 673 F.3d at 63-66.

[12] Indeed, it has long been recognized that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's [New York] activities . . . were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (discussing application of § 302(a)(1)) (citation omitted).

nor did it hold that jurisdiction did not lie because the defendant had received, rather than transferred, the funds at issue.

After summarizing the holding in *Amigo Foods*, the court stated that the first prong of the long-arm statute is satisfied by a "defendant's use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful." *Id.* at 338, 960 N.Y.S.2d 695. The court cautioned, however, that the "jurisdictional inquiry under C.P.L.R. 302 (a) (1) necessarily requires examination of the particular facts in each case." *Id.* It reiterated that the defendant in *Amigo Foods* had not "transacted business" within the meaning of the first prong of N.Y. C.P.L.R. § 302(a)(1) because its "use of the account . . . was essentially adventitious—i.e., it was not even [its own] doing." *Id.*, 960 N.Y.S.2d 695.

The court then applied the proposition *Amigo Foods* stood for to the first certified question: whether use of a correspondent bank account "dozens" of times constitutes a "transaction of business" under New York's long-arm statute. The court held that "the repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 339, 960 N.Y.S.2d 695 (internal citation omitted). The court relied on LCB's repeated use to determine "whether [the] maintenance and use of a correspondent account [was] *purposeful* or *coincidental*," *id.* at 339, 960 N.Y.S.2d 695 (emphasis added), in other words, to ensure that the use was not "adventitious," *id.* at 338, 960 N.Y.S.2d 695. It did not hold that repeated use of a correspondent account was a requisite to satisfy the first prong of § 302(a)(1).

Addressing what "arises from" means, the New York Court of Appeals first stated that the defendant's transaction of business need not have caused the plaintiff's injury, and that "the inquiry

11

under the statute is relatively permissive." *Id.* at 339, 960 N.Y.S.2d 695. It went on to state that so long as there is "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim," jurisdiction will lie. *Id.* at 340, 960 N.Y.S.2d 695. Furthermore, the court clarified that even if only "one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction . . . ." *Id.* at 341, 960 N.Y.S.2d 695. Finally, the court stated the inquiry logically focuses on the defendant's conduct, rather than the plaintiff's injuries, since "personal jurisdiction is fundamentally about a court's control over the person of the defendant . . . ." *Id.* at 340, 960 N.Y.S.2d 695.

The court then applied these principles to the second certified question: whether the plaintiffs' claims in *Licci* "ar[o]se from LCB's transaction of business in New York." The court held that they did: "the complaint alleges that LCB engaged in terrorist financing by using its correspondent account in New York to move the necessary dollars. Taken as true, LCB arguably thereby violated duties owed to plaintiffs under the various statutes asserted as a basis for subject matter jurisdiction." *Id.* Although "[n]ot all elements of the causes of action pleaded [we]re related to LCB's use of the correspondent account," "[a]nd the specific harms suffered by plaintiffs flowed not from LCB's alleged support of a terrorist organization, but rather from rockets," these facts did not defeat jurisdiction. *Id.* at 341, 960 N.Y.S.2d 695. LCB "deliberately" used its New York correspondent bank account, rather than "once or twice *by mistake*." *Id.* at 340-41, 960 N.Y.S.2d 695 (emphasis added). Accordingly, the court held that there was "an articulable nexus" between these uses and the plaintiffs' claims. The assertion of specific personal jurisdiction was appropriate. *Id.*

When the case returned to the Second Circuit, the court summarized the New York Court of Appeals' analysis and holdings, and then proceeded to analyze whether exercising jurisdiction over

LCB also comported with constitutional due process. *Licci IV*, 732 F.3d at 168-69. Before doing so, the court noted that although "personal jurisdiction permitted under [New York's] long-arm statute may theoretically be prohibited under due process analysis," it "expect[ed] such cases to be rare." *Licci IV*, 732 F.3d at 170. The court explained that

> [i]t would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity within the meaning of section 302(a)(1), and yet, in connection with the same transaction of business, the defendant cannot be found to have purposefully availed itself of the privilege of doing business in the forum and to have been able to foresee being haled into court there, or the assertion of specific jurisdiction would somehow otherwise offend traditional notions of fair play and substantial justice.

*Id.* In fact, the Second Circuit stated that it was unaware of any such case where jurisdiction had lied under New York's long-arm statute, but the exercise of jurisdiction would violate constitutional due process. *Id.*

Unsurprisingly, then, the Second Circuit went on to hold that exercising personal jurisdiction over LCB was consistent with due process. The court held that LCB's use of the correspondent account as an instrument to achieve the wrong complained of satisfied the minimum contacts' component of the due process inquiry. *Id.* at 173. In reaching this conclusion, it relied on the fact that although "LCB could have . . . processed U.S.-dollar-denominated wire transfers . . . through correspondent accounts anywhere in the world," it instead "deliberately chose to process the . . . wire transfers through [an account] in New York." *Id.* at 171. Accordingly, its "in-forum activity sufficiently reflect[ed] [its] 'purposeful availment' of the privilege of carrying on its activities here, . . . even [though] the effects of [its] entire course of conduct [we]re felt elsewhere." *Id.* at 173. In sum, the court justified the assertion of jurisdiction over LCB by explaining that "[i]t should hardly be unforeseeable to a bank that selects and makes use of a particular forum's banking system that it

might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use." *Id.* at 171-72.

The court then analyzed whether exercising jurisdiction over LCB would nevertheless be unreasonable because doing so would offend traditional notions of fair play and substantial justice. The court concluded that it would not. *Id.* at 174. It explained that modern communication and transportation eased any burden of defending the case in New York. *Id.* at 174. Additionally, the court explained that although the plaintiffs' injuries occurred in Israel, the United States and New York both have an interest in monitoring banks and banking activity to ensure that their financial systems are not used for nefarious ends. *Id.* Based on a consideration of these factors, and the absence of any compelling interest that outweighed them, the court held that exercising jurisdiction over LCB in New York was not unconstitutional. *Id.*

## B. The Banks' Selection of New York Correspondent Accounts are "Minimum Contacts" on which to Assert Personal Jurisdiction

The *Licci* litigation yields several insights applicable to the instant appeal. First, the use of a correspondent bank account, even if the defendant has no other contacts with New York, satisfies the first prong of New York's long-arm statute so long as the use was purposeful and not coincidental or adventitious. *Licci III*, 20 N.Y.3d at 338-39; *see Licci II*, 673 F.3d at 65-66. Second, under the "relatively permissive" second prong, the defendant's use of the correspondent bank account need not be at the "very root" of the plaintiff's claim. *See Licci III*, 20 N.Y.3d at 339-41 (stating jurisdiction lies "over those claims in some way *arguably* connected to the transaction [of business in New York]" (emphasis added)). Rather, as long as the use of the correspondent bank account is not "completely unmoored" from one of the elements of the plaintiff's cause of action, the prong is satisfied. *Id.* at 340. Third, although the jurisdictional analysis under the New York long-arm statute and constitutional due process are not completely coextensive, they closely

resemble one another, and this resemblance is "particularly evident with respect to [long-arm statute subdivision] § 302(a)(1)." *Licci II*, 673 F.3d at at 61 n.11. Thus, when a defendant purposely selects and uses a correspondent bank account to effectuate a particular transaction, and a plaintiff later files a lawsuit asserting a cause of action arising out of that transaction, the defendant can hardly claim that it could not have foreseen being haled into court in the forum in which the correspondent bank account it had selected is located. *Id.* at 171-72.

Although this is an adversary proceeding arising out of a chapter 11 bankruptcy reorganization,[13] given the striking similarities between the analysis conducted under N.Y. C.P.L.R. § 302(a)(1) and constitutional due process, whether jurisdiction lies under § 302(a)(1) is particularly probative of the ultimate inquiry.[14] *Licci II*, 673 F.3d at 61 n.11 (noting that "[i]n many cases, the jurisdictional analysis under the New York long-arm statute may closely resemble the analysis under the Due Process Clause," and that the "similarity of state-law and constitutional standards appears particularly evident with respect to N.Y. C.P.L.R. § 302(a)(1)"); *Licci IV*, 732 F.3d at 170 (stating it would be "rare" for there to be jurisdiction under § 302(a)(1) and not under due process analysis).

The Banks' purposeful use of correspondent bank accounts in New York constitutes a "transaction of business" within New York. The Banks, not Arcapita, set the terms of each placement transaction, and then presented those terms in an offer to Arcapita. ((Mohammed Decl., Exhibit A, at APP040 ¶ 4.1; Rashdan Decl., Exhibit A, APP060 ¶ 5.1-5.2.) The Banks selected U.S.

---

[13] *Compare Madoff*, 460 B.R. at 117 (stating that due process is the only jurisdictional inquiry in bankruptcy case and citing case law for proposition that defendant need only have contact with United States, not forum state), *with Licci IV*, 732 F.3d at 168 ("Determining personal jurisdiction over a foreign defendant in a federal-question case such as this requires [a court to first] look to the law of the forum state to determine whether personal jurisdiction will lie.").

[14] Furthermore, as the Bankruptcy Court noted, many of the cases cited by the parties involved jurisdictional analysis under § 302(a)(1).

dollars as the currency in which to execute the transaction.[15]  (*Id.* at APP043; Bassett Decl., Exhibits A-C, at APP081-086.)  The Banks designated New York correspondent bank accounts to receive the funds from Arcapita.  (*Id.* at APP043; Bassett Decl., Exhibits A-C, at APP081-086.)  The Banks' selection of dollars and their decision to utilize New York's banking system to effectuate the transfer was no less deliberate than LCB's use of New York's banking system in *Licci*.  Additionally, unlike the defendant in *Amigo Foods,* the Banks' contacts with New York were not established passively through another entity's unilateral action.  In fact, the Banks were not simply complicit, or even mere participants, in the selection of the New York correspondent bank accounts.  Rather, the selection of the New York correspondent bank accounts that received the funds *originated with* the Banks; they *actively directed* the funds at issue into those New York accounts.

The Committee's cause of action for the avoidance of a preferential transfer "arises from" the Banks' use of the New York correspondent bank accounts.  A party seeking the avoidance of a preferential transfer must show, *inter alia,* "(1) a *transfer* to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such *transfer* was made."  11 U.S.C. § 547(b) (emphasis added).  The Banks' New York contacts—*i.e.*, the receipt of the transferred funds in New York correspondent bank accounts—are at the heart of this cause of action.  The receipt of the funds in New York is precisely the conduct targeted by the Committee, and the activity that the cause of action seeks to have voided.

---

[15] The Bankruptcy Court noted that "[t]he Banks had claimed that the correspondent accounts were used to accommodate Arcapita's desire to transfer the funds in U.S. dollars, but there was no evidence of that in the record."  (Decision at APP282 n.10.)  This Court is mindful of its obligation to construe all pleadings and affidavits in the light most favorable to the plaintiff and to resolve all doubts in the plaintiff's favor.  *See Penguin Grp.,* 609 F.3d at 34.  Given that the record demonstrates BisB presented the Placement offer to Arcapita, absent any contrary evidence, the decision to conduct the transaction in dollars is properly viewed as originating with, and thus attributable to, BisB.  With respect to Tadhamon, the Tadhamon Placement Agreement states that Arcapita and Tadhamon would jointly determine the currency in which each Placement would be executed.  (Rashdan Decl., Exhibit A, at APP061 ¶5.6.)  Tadhamon is therefore equally responsible for this decision, and cannot claim that the decision to use U.S. dollars should not be attributed to it.

16

That specific jurisdiction may be asserted under N.Y. C.P.L.R. § 302(a)(1) is strong evidence that the assertion of jurisdiction comports with constitutional due process. This is so because the jurisdictional test to comport with constitutional due process is strikingly similar to the test under § 302(a)(1). *Licci II*, 673 F.3d at 61 n.11. In fact, to this Court's knowledge, no court has yet held that § 302(a)(1) confers jurisdiction, but that asserting such jurisdiction would nonetheless violate constitutional due process. *See Licci IV*, 732 F.3d at 170 (stating that it would be "rare" for there to be jurisdiction under § 302(a)(1), but the exercise of such jurisdiction would be unconstitutional and that to Second Circuit's knowledge, the situation had never arisen).[16]

"Where the [plaintiff's] claim arises out of, or relates to, the defendant's contacts with the forum—i.e., specific jurisdiction is asserted—minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* (internal brackets omitted (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). The Banks' selection and uses of the New York correspondent bank accounts were undoubtedly "contacts" with the United States, and the Committee's preferential transfer cause of action "arise[s] out of or relate[s] to " to those contacts.[17] BisB did not purchase commodities in the United States with the funds, but instead purchased palladium through a London broker. Similarly, Tadhamon did not purchase or invest in United States securities; instead, it used the funds to make Bharaini

---

[16] Neither party contends that the purposeful selection and use of a correspondent bank account in New York to receive millions of dollars is a particularly rare case.

[17] The Banks argue that, pursuant to the terms of the Placement Agreements, they were acting as Arcapita's agent, and so the New York correspondent bank accounts are not the Banks' contacts, but Arcapita's. (Brief for Appellees at 12–14.) Although the Banks' acted as Arcapita's agent when purchasing commodities and securities on its behalf, the Banks made the decision on where to receive the funds to make those purchases in their sole discretion. They could have received the funds elsewhere and still performed their duties under the Placement Agreements and offers. The Banks' decisions to utilize New York correspondent bank accounts were made independently, and therefore properly attributable to the Banks.

investments. Nevertheless, both Banks deliberately chose to receive Arcapita's funds in U.S. dollars and designated correspondent bank accounts in New York to receive the funds, even though they presumably could have performed the Placement transactions without ever directing the funds through New York or anywhere else in the United States. The Banks are therefore similarly situated to the defendant in *Licci*, who also could have utilized accounts elsewhere in the world. *Licci IV*, 732 F.3d at 171 (the defendant "could have . . . processed U.S.-dollar-denominated wire transfers to [its client] through correspondent accounts anywhere in the world"). The Banks' deliberate choice to utilize the New York correspondent bank accounts and, more generally, New York's and the United States's banking system, are United States contacts attributable to them.[18, 19] Additionally, the Committee's causes of action for the avoidance of preferential transfers arise out of or relate to the Banks' contacts with the forum. In other words, if preferential transfers are found to have occurred, they occurred at the time the funds were transferred into the New York correspondent bank accounts at the Banks' direction.[20]

---

[18] The Bankruptcy Court found that "Tadhamon's use of a third party's correspondent bank account is insufficient to establish specific jurisdiction," because "Tadhamon made a conscious decision to forgo maintenance of a correspondent account in the United States and has clearly not benefitted from the privilege of doing business here under these circumstances." This Court disagrees. The fact that Tadhamon utilized Khaleeji's correspondent account, rather than its own, does not alter the fact that Tadhamon is the entity that instructed Arcapita to make two wire transfers, totaling $20 million, to accounts located in New York. Contrary to the Bankruptcy Court's suggestion, Tadhamon sought to, and in fact, did take advantage of the United States's dependable and transparent banking system by receiving the funds into a New York account before transferring them to its own account in Bahrain. Because Tadhamon directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a "contact" properly attributed to Tadhamon. In any case, as the Bankruptcy Court noted, Khaleeji acted as Tadhamon's agent when it received the funds, and thus, Khaleeji's receipt of the funds in New York can be imputed to Tadhamon.

[19] The Bankruptcy Court also concluded that the Banks' "mere knowing receipt of funds at a correspondent bank account is insufficient to establish jurisdiction." (Decision at APP 280-81.) As this record makes clear, however, the Banks' did not merely knowingly receive the funds in a correspondent account, but actively selected the correspondent bank accounts in New York and directed the funds to these accounts. Thus, the Banks' connection to New York was not passive, but active and volitional.

[20] In a footnote, the Bankruptcy Court stated that the Banks' use of the New York correspondent bank accounts could not serve as the basis to assert jurisdiction over the Banks for the Committee's preferential

As the Second Circuit stated, "[i]t should hardly be unforeseeable to a bank that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use." *See Licci*, 732 F.3d at 171-72. Just like the defendant in *Licci*, the Banks deliberately chose to effectuate the Placements by directing the transfer of millions of dollars through New York. The exercise of jurisdiction over the Banks for a cause of action that relates to those transfers is constitutional.

Finally, asserting jurisdiction over the Banks does not somehow render "mere maintenance" of a correspondent account in the United States sufficient to support personal jurisdiction over the account-holder in connection with any controversy. Had the record demonstrated that Arcapita, as opposed to the Banks, selected the U.S. dollar and the New York accounts to effectuate the Placements, the Banks' contacts with the United States would have been adventitious, and jurisdiction would not have lied. But where, as here, the defendant's in-forum activity reflects its "purposeful availment" of the privilege of carrying on its activities here, the defendant has established minimum contacts sufficient to confer a court with jurisdiction over it, even if the effects of the defendant's conduct are felt entirely outside of the United States. *Licci IV*, 732 F.3d at 173. Had the Banks wished to avoid being subject to jurisdiction in the United States in connection with these particular Placements, they could have presented Arcapita with Placement offers designating non-U.S. accounts to receive the Placement funds.

---

transfer cause of action because "the use of the correspondent account [was] not the actionable conduct in and of itself." (Decision at APP 288.) Due process analysis, however, closely tracks N.Y. C.P.L.R. § 302(a)(1), the application of which has never been held unconstitutional, and there is undoubtedly an articulable nexus between the preferential transfer cause of action and the Banks' use of the New York correspondent accounts.

### C. Assertion of Personal Jurisdiction is "Reasonable"

Only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable" can a defendant that has purposefully directed its activities at the forum defeat jurisdiction on due process grounds. *Licci IV*, 732 F.3d at 173 (quoting *Burker King*, 471 U.S. at 477). The Second Circuit has identified several factors relevant to determining reasonableness, including: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; and (3) the plaintiff's interest in obtaining convenient and effective relief." *Licci IV*, 732 F.3d at 170 (quoting *Bank Brussels*, 305 F.3d at 129).

These factors support the constitutional exercise of personal jurisdiction over the Banks. With regard to the first factor, courts have held that the burden imposed on a defendant forced to litigate far from home is substantially mitigated by the conveniences of modern communication and transportation. *Bank Brussels*, 305 F.3d at 129-30. With regard to the second factor, the United States has a strong interest in adjudicating claims that arise under its Bankruptcy Code so that both creditors and debtors can obtain the remedies and relief that the United States Congress has determined are fair and equitable. *Picard v. Chais (In re Bernard L. Madoff Investment Secs. LLC)*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010) (stating that "[t]he United States has a strong interest in applying the provisions of its bankruptcy code"); *U.S. Lines, Inv. v. GAC Marine Fuels Ltd. (In re McLean Indus. Inc.)*, 68 B.R. 690, 699 (Bankr. S.D.N.Y. 1986) (finding that United States had strong interest in adjudicating dispute because it arose "solely under [the United States' bankruptcy] laws and concern[ed] a vital protection provided by federal statute to those who seek to reorganize"). Indeed, it does not seem prudential to allow foreign creditors to potentially obtain priority over domestic creditors based simply on their foreign status. Third, the Committee has a strong interest in obtaining convenient and effective relief, and it is unclear whether it would be able to bring a

similar causes of action to those grounded in the United States bankruptcy code in a non-U.S. forum. Although it is true that the Banks must defend themselves in a foreign legal system, and this weighs in the Banks' favor, this factor alone is not dispositive, otherwise a United States court could never constitutionally exercise jurisdiction over a non-U.S. entity. *See Asahi*, 480 U.S. at 114. Given that the balance of factors weigh in the Committee's favor, the exercise of personal jurisdiction over the Banks' in this particular action comports with constitutional due process.

## V. Conclusion

The Banks' selection and use of correspondent bank accounts in New York provides a sufficient basis for a court to assert personal jurisdiction over them. Accordingly, this Court vacates the Bankruptcy Court's orders dismissing with prejudice the Committee's underlying adversary proceedings against each Bank, and remands them to the Bankruptcy Court.

Dated: March 30, 2016
        New York, New York

SO ORDERED.

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE

21



| Home | Contact Us | Sitemap | | Search | |
|---|---|---|---|---|---|
| About Ministry | Directorates | Services | Law and Legislation | Supreme Judicial Council | Cassation Court | Links |

### Kingdom of Bahrain
### Ministry of Justice and Islamic Affairs

Publications | Directory



Hearings Enquiry

Judicial and Legal
Studies Institute

BCDR AAA
BUSINESS friendly

**Home >> Law and Legislation >> Civil Law**

## Civil Law

### General Provisions

—— **PART I**

#### Article 1

(a) Provisions of laws govern all matters to which these provisions apply in letter or spirit.

(b) In the absence of a provision of a law that is applicable, the Judge will decide according to custom and in the absence of custom in accordance with the principles of Islamic Shariaa that suit the conditions and circumstances of the country. In the absence of such principles, the Judge will apply the principles of natural justice and the rules of equity.

#### Chapter One
#### Contract

#### Article 29

A contract is an agreement where a proposal is made and subsequently accepted with the intent of creating a certain legal effect.

#### Section I
#### Conclusion of Contract

#### Article 30

A contract is created, subject to any special formalities that may be required by law for its conclusion, from the moment that two persons have exchanged two concordant intentions without prejudice to the requirements of the law in special cases in terms of certain requirements for rendering the validity of such contract.

#### First: Elements of Contract:

##### 1. Consent:
##### Article 31

For conclusion of a contract, an intention of consent shall be expressed. Consent shall be available upon disposal unless proved to the contrary or the law requires otherwise.

##### (a) Declaration of Intention:

##### Article 32

An intention may be declared verbally, in writing, by signs in general use, and also by such conduct, as the case may be, leaves no doubt as to its true meaning, unless otherwise required by the law in special circumstances to declare an intention in a certain manner.

A declaration of intention may be implied when neither the law nor the parties require it to be expressed.

##### Offer:
##### Article 37

A proposal is an offer made by a person to another person of his intention to conclude a certain contract merely by acceptance of the person to whom it is offered.

It shall include at least the nature of the contract required to be concluded and its fundamental conditions.

### Article 41

(a An offeree shall have the choice of acceptance.

(b) A contract is deemed to have been concluded if acceptance conforms with the offer.

(c) An acceptance that goes beyond the offer, or that is accompanied by a restriction or a modification, is deemed to be a rejection comprising a new offer.

### Link Between Offer and Acceptance:
### Article 44

If an offer is linked with acceptance, the contract shall be binding upon both parties and either party shall not abide by its provisions even before they physically leave the place of the meeting, unless they agree to another contract or as otherwise the law or custom may require.

### 3. Consideration:

### Article 111

(a) A contract is void when an obligation is assumed without consideration or for a consideration contrary to the public order or morality.

(b) An obligation is deemed to have lawful consideration by the motive that urges a contracting party to conclude a contract if the other contracting party was aware of such motive, or should have been aware thereof.

### Article 112

An obligation is deemed to have lawful consideration, even if such consideration is not expressed in the contract, unless the contrary is proved.

The consideration expressed in the contract is deemed to be the true consideration until evidence to the contrary is produced. Upon evidence being produced that the consideration is feigned, the onus falls on the person who maintains that the obligation has another la wful consideration of proving his contention.

### Part II
### The Effects of a Contract

### First: Interpretation and Determination of its Contents:

### 1. Construction of Contract.

### Article 125

(a) When the wording of a contract is clear, it cannot be deviated from in order to ascertain by means of interpretation the intention of the parties.

(b) When a contract has to be construed, it is necessary to ascertain the common intention of the parties and to go beyond the literal meaning of the words, taking into account the nature of the transaction as well as that loyalty and confidence which should exist between the parties in accordance with commercial usage.

### Second: Binding Force of Contract:

### Article 128

The contract makes the law of the parties. It can be revoked or altered only by mutual consent of the parties or for reasons provided for by the law.

### Article 129

A contract must be performed in accordance with its contents and in compliance with the requirements of good faith and honesty.

### Part III
### Expiry of Contract

### First: Dissolution of Contract

### Article 140

(a) In bilateral binding contracts if one of the parties does not perform his obligation, the other party may, after serving a formal summons on the other party, demand from the judge the performance or dissolution of the contract, with damages, if due, in e ther case, unless the party demanding dissolution does not also perform his obligation.

(b) The judge may grant additional time to the debtor, if it is necessary as a result of the circumstances. The judge may also reject an applica on for dissolution when the part of the contract which the party has failed o perform is of little importance in comparison with the obligation in its entirety.

Case 22-1222, Document 57, 09/16/2022, 3384089, Page138 of 180

SPA-65

**Article 188**

When a person has received, in good faith, that which is not due to him, he is bound only to restitute that which he has received.

If he has received in bad faith, he is bound to restitute in addition the interest and profit that he has gained or that he has failed to gain by neglect on the thing unduly received, from the date of payment or from the date he became of bad faith.

In any case a person who has received that which is not due to him, is bound to restitute the proceeds thereof from the date of a claim in the Courts.

**Article 223**

The court will fix the amount of damages, if it has not been fixed in the contract or by law. The amount of damages includes losses suffered by the creditor and profits of which he has been deprived, provided that they are the normal result of the failure to perform the obligation or of delay in such performance. These losses shall be considered to be normal result, if the creditor is not able to avoid them by making a reasonable effort.

When, however, the obligation arises from contract, a debtor who has not been guilty of fraud or gross negligence will not be held liable for damages greater than those which could have normally been foreseen at the time of entering into the contract.

A debtor of the right assigned may raise, as against the assignee, the defences that he was entitled to raise against the assignor at the moment that the assignment became effective against him. He may also raise defences arising from the contract of assignment.

### Article 306

(a) If the debt subject to assignment is forfeited for any contingency after the effectiveness thereof shall not be affected by the drawing up of the assignment; and the assignee shall have recourse against the debtor for the payment made to the assignor.

(b) If the debt subject to the assignment becomes invalid for a cause prior to making such assignment but not attributed to the assignee, the assignment shall become void.

### Article 307

In all cases where the sold debt subject to the assignment in respect of its price becomes due, the assignee shall where he has paid the price have recourse against the debtor or the assignor who has received such price.

### Article 308

If the debtor refers his creditor to the trustee having an assignment in respect of the property held therewith, then the deposited property prior to the settlement to the assignee without fault of the trustee in possession thereof, this shall result in the termination of the assignment. However, if the property held in trust becomes due to a third party, the assignment shall be null and void.

### Article 309

If the debtor refers his creditor to the usurper by means of a restricted assignment in respect of the property held therewith, and the property is destroyed while being retained by the usurper before return thereof to the assignee, this shall not affect the existence of the assignment. If the property held in trust becomes due to a third party, the assignment shall be null and void.

### Article 310

The assignee shall not have recourse against the assignee unless there is a clause in the assignment for having recourse in case of failure to recover the debt from the assignee or if the restricted assignment is terminated or invalidated by the expiry of the debt, destruction of the property or if it becomes due according to the provisions of Articles 306, 307, 308 and 309.

### Article 311

If the original debtor makes an absolute assignment of his debt without having towards the assignee any debt or property, the assignee shall have recourse against him after payment of the debt to the extent of the amount of the assigned debt.

### Article 312

If the original debtor makes an absolute assignment of his debt and where he is owed by the assignee a debt or property held in trust or usurped property, he shall have after the assignment a right to claim the debt or property against the assignee until repayment is made by the assignor to the assignee. If the assignee makes payment to the debtor, the debt owed shall be forfeited by way of set-off to the extent of the payment made.

### Article 313

If the assignment is made in respect of a debt or property, the original debtor shall not have a claim against the assignee. The assignee shall not have to make payment in respect of that to the debtor.

### Part V
### The extinction of obligations

### Chapter I
### Payment

### Article 314

Payment may be made by the debtor, by his representative or by other interested party, subject to the provision of Article 213 First Paragraph.

Payment may also, subject to the above reservation, be made by a third party who is interested in such payment, even without the knowledge or against the wish of the debtor, but the creditor may refuse payment tendered by a third party if it is opposed by the debtor and the debtor has informed the creditor of his opposition.

### Article 315

If third party pays off the debt, such third party shall have a remedy against the debtor up to the amount that he has paid.

The debtor, against whose knowledge and wish payment has been made, may contest the claim made against him by the person who has made the payment on his behalf as regards all or part of the payment made, if he proves that he had any interest in opposing the payment.

### Article 316

Case 22-1222, Document 57, 09/16/2022, 3384089, Page140 of 180

SPA-67

Ministry of Justice and Islamic Affairs                                    Page 12 of 21
13-01434-shl    Doc 87-6    Filed 09/07/18    Entered 09/07/18 21:37:18    Exhibit 6
Pg 3 of 9

Payment is only valid if the person who made payment is the owner of that with which he has paid the obligation and has the capacity of disposing of it.

When payment of that which is due is made by a person without the necessary legal capacity to dispose of the thing with which payment is effected, it extinguishes the obligation provided that it does not prejudice the person who has paid.

If a debtor makes payment of a debt owed to some creditors while on his deathbed but his funds are insufficient for repayment of all his debts and where the repayment of debts prejudices the remaining creditors, payment shall not be effective towards the said remaining creditors.

### Article 317

When payment is made by a third party other than the debtor, such third party is subrogated in the rights of the creditor who is paid off in the following cases:

(a) When such third party was liable for the debt jointly with the debtor or was under an obligation to pay the debt on his behalf;

(b) When such third party, being himself a creditor, even an unsecured creditor, had paid another creditor ranking before him by reason of a real security;

(c) When, having acquired an immovable, he has paid the price to creditors having a real security upon the immovable in question;

(d) When the law expressly gives him the right of subrogation.

### Article 318

A creditor who receives what is due to him from a third party may, by agreement with the party, subrogate such third party into his rights even if the debtor does not agree to the subrogation. The agreement must not be concluded by an instrument in writing with a specific date that is not after the time of payment.

### Article 319

A debtor may also, when he has borrowed a sum with which he has paid the debt, subrogate the lender into the rights of the creditor who received the payment, even without the consent of the creditor, provided that in the contract of loan that has a fixed date, it is stated that the sum in question was borrowed for the purpose of effecting the payment, and that in the receipt in discharge, it is stated that the payment was made with the money lent by the new creditor. The original creditor may not refuse including such statement.

### Article 320

A third party subrogated in law or by agreement in the rights of the creditor, is substituted for the creditor as regards the debt to the amount of the sums that he has himself paid with all the attributable accessories, securities and defences attached to the debt . Such subrogation shall be to the extent of the payment made by the person replacing the creditor.

### Article 321

(a) In the absence of an agreement to the contrary, when a third party pays part of a debt to a creditor and is subrogated into the rights of the creditor as regards such part, the creditor shall not be prejudiced by such partial payment and may exercise his rights for that which remains due, in preference to the third party.

(b) When a further third party subrogated in the rights of the creditor, as regards the which remains due to this creditor, this further third party so subrogated, together with the third party subrogated before him, will have a right to claim what is due to each of them pro rata.

### Article 322

A third party holder of mortgaged property who has paid all the mortgage debt and has been subrogated into the rights of the creditors, shall only have the right, by reason of such subrogation, to claim from the holder in the debt proportional to the value of the immovable held by him.

### Article 323

Payment shall be made to the creditor or to his representative. A person who produces to the debtor a receipt in discharge issued by the creditor is deemed to be qualified to receive payment unless it has been agreed that payment shall be made to the creditor in person.

### Article 324

Payment to someone other than the creditor or his representative does not free the debtor of his obligation unless the payment is ratified by the creditor, or profits the creditor and then only to the extent of such profit, or unless the payment was made in good faith to a person holding the title to the debt.

### Article 325

(a) When a creditor refuses, without good reason, to accept payment that is regularly offered to him, or to do such things without which payment cannot be made, or declares that he will no accept payment, he will be deemed to have been duly summoned to accept payment from the time that such refusal is recorded by summons notified to him by legal process.

(b) From the time that a summons has been served on a creditor he shall be responsible for the loss or the deterioration of the thing and interest on the debt ceases to run; the debtor shall then have the right to place the thing in safe keeping at the cost of the creditor and claim compensation for any damages he may have suffered.

### Article 326

When the subject matter of the payment is a definite and specific thing which must be delivered at the place where it is situated, the debtor may, after having summoned the creditor to take delivery, obtain an order of the Court to place it in safe keeping. If the thing in question is an immovable or a thing intended to remain in place, the debtor may ask for it to be placed under judicial custody.

### Article 327

The debtor may, by permission of the Court, sell, by public auction, things of a rapidly perishing nature or movables that necessitate an exorbitant expenditure for safekeeping or custody, and deposit the price in the Court Treasury.

When the thing has a known price on the market or is quoted on the stock exchange, it may only be sold by public auction if it is impossible to sell it by agreement at the market or quoted price.

### Article 328

The actual tender of the thing due is equivalent to payment, in so far as the debtor is concerned, when it is followed by a deposit made in the manner prescribed in the Civil and Commercial Procedures Act, or by any other equivalent measure, provided that it is accepted by the creditor or recognised as valid by a final judgement.

### Article 329

A debt shall be deemed discharged towards the debtor if he deposits the entire debt or takes an equivalent measure according to the Civil and Commercial Procedures Act in the following events:

(a) If the debtor is unaware of the creditor's identity or his domicile.

(b) If the creditor is legally disqualified or lacking in legal capacity and has no representative who can accept payment on his behalf.

(c) If the debt is disputed among several persons.

(d) If there are other serious grounds making it impossible to take the proper offer measures in respect of the debt before making the deposit or such alternative measure.

### Article 330

(a) A debtor who has made a tender of the debt followed by a deposit, or by an equivalent measure, may retract his tender so long as it has not been accepted by the creditor, or so long as it has not been recognised a valid by a final judgement, in which case the co-debtor and sureties will not be freed.

(b) If a debtor retracts his tender after its acceptance by the creditor or after it has been declared valid by a judgement, and his withdrawal is accepted by the creditor, the creditor shall no longer have the right, to avail himself of the securities guaranteeing his right, and the co-debtors and the sureties shall in such case be released.

### Article 331

Payment must be made with the very thing due. The creditor cannot be forced to accept anything else, even if the value of such other thing is equal or greater.

### Article 332

(a) In the absence of an agreement or a legal provision to the contrary, the debtor cannot be force his creditor to accept a partial payment of his debt.

(b) If, in a case where part of the debt is contested, a creditor agrees to receive payment of that part of his claim which is admitted, the debtor cannot refuse to pay the part that is admitted.

### Article 333

When a debtor is under an obligation to pay expenses together with a compensation for delay in payment, and makes a payment that does not cover the principal and all these accessories, the payment shall, unless otherwise agreed, be imputed, in the first instance, to expenses, then compensation for delay in payment, then to the principal.

### Article 334

If a debtor owes the same creditor several debts of the same kind and if the payment made by him does not suffice to cover all the debts, he has the right to indicate, when effecting payment, the debt which he intends to discharge, provided that he is not prevented from so doing by law or by agreement.

### Article 335

Case 22-1222, Document 57, 09/16/2022, 3384089, Page142 of 180

SPA-69

Failing any indication by the debtor as provided for in the preceding Article, the payment shall be imputed to the debt that has fallen due; in case where several have fallen due, to the most onerous debt; in case where the debts are equally onerous to the debt indicated by the creditor.

### Article 336

(a) In the absence of an agreement or of a provision of the law to the contrary, payment must be made as soon as the obligation has been created as a liability of the debtor.

(b) However, the judge may in exceptional cases and in the absence of a provision of the law barring him to the contrary, consider granting to the debtor, when his position so requires, one or more reasonable delays for the performance of his obligation or allow payment by instalments, provided that no serious prejudice is thereby caused to the creditor.

### Article 337

(a) If the debt is deferred, the debtor shall have the right to pay it prematurely if such postponement is solely in his interest; and the creditor shall not refuse such payment.

(b) If the debtor settles the debt before its due date, then the amount so received becomes due, the debt shall become deferred once more.

### Article 338

(a) When the subject-matter of the obligation is a definite and ascertained thing, it should be delivered at the place it was situated at the time the obligation was created.

(b) In the case of other obligations, payment is due at the debtor's domicile at the time of payment or at his place of business if the obligation is considered with such business.

(c) The above shall be in the absence of an agreement or a provision of the law to the contrary.

### Article 339

In the absence of an agreement or a provision of the law to the contrary, expenses in connection with payment are at the charge of the debtor.

### Article 340

A person who pays part of a debt has the right to demand a receipt for the amount he has paid and a note showing the payment on the document of title of the debt.

He has also the right, at the time the debt is paid in full, to demand the restitution or the cancellation of the document of title. If this document has been lost, the debtor may demand a written declaration from the creditor that the document of title has been lost.

If the creditor refuses to comply with the conditions laid down in the preceding paragraph, the debtor may place the object due in judicial custody according to the law.

### Chapter II
### Methods of extinction of the obligation equivalent to performance.

### First: Giving in payment

### Article 341

When a creditor accepts in settlement of his right another prestation in place of that which is due, this giving in payment takes the place of payment.

### Article 342

The provisions of the law relating to sale, especially those which relate to the legal capacity of the parties, warranty against eviction and hidden defects, apply to giving in payment in cases where it transfers the ownership of the thing, given in place of the prestation due. The provisions of the law relating to payment, especially those which relate to the legal capacity of the contracting parties and to the extinction of warranties, are also applicable in so far as the giving in payment extinguishes the debt.

### 2. Novation and delegation

### Article 343

There is novation of an obligation:

1. by a change of the debt when the two parties agree to substitute a new obligation for the original obligation, which new obligation differs from the original obligation regards its object or as regards its source;

2. by a change of the debtor, when a creditor and a third party agree that such third party shall take the place of the original debtor and that the original debtor shall be released of the debt without his consent being necessary, or when the debtor has a procured the consent of the creditor to substitute the debtor by a third party who consents to be the new debtor;

3. by a change of the creditor, when the creditor, the debtor and a third party agree that his third party shall be the new creditor.

Case 22-1222, Document 57, 09/16/2022, 3384089, Page143 of 180

SPA-70

### Article 344

(a) Novation can be effected if the two obligations, the original and the new obligation are free from any grounds of nullity.

(b) If the original obligation results from a voidable contract, the novation is only valid if the new obligation has been assumed both with a view to confirming the contract and to replacing the original obligation.

### Article 345

Novation is not presumed, it must be expressly agreed or result clearly from the circumstances.

In particular, novation does not result, in the absence of an agreement to the contrary, from the subscription of a promissory note in respect of pre-existing debt, from changes that relate only to the date, place or mode of performance of prestation, or from modifications made to the obligation only as regards securities unless there is agreement to the contrary.

### Article 346

(a) The mere entry of the debt in a current account does not effect novation.

(b) There is, however, novation when the balance of a current account has been fixed and agreed; if, however, the debt was guaranteed by means of special security, that security is maintained unless otherwise agreed.

### Article 347

(a) Novation has the effect of extinguishing the original obligation with its accessories and of substituting for it a new obligation.

(b) Securities which guaranteed the performance of the original obligation, are not transferred to the new obligation, unless the law provides otherwise, or unless it appears from the agreement or the circumstances of the case that such is the intention of the parties.

### Article 348

1. If the debtor has given real securities in guarantee of the original obligation, the following conditions will be observed in the agreement providing for the transfer of these securities to the new obligation:

(a) When the novation results from a change of the debt, the creditor and the debtor may agree that the securities shall be transferred to the new obligation.

b) When the novation results from a change of the debtor, the creditor and the new debtor may agree, without the consent of the original debtor that the real securities shall be maintained;

c) When the novation results from the change of the creditor, the contracting parties may agree that the securities shall be maintained.

2. If the real securities are provided by a third party, the parties to the novation may agree on maintaining the securities.

3. In all case, the agreement providing for the transfer of the real securities cannot be effective against third parties, unless it is made at the same time as the novation to the extent that it does not prejudice third parties, and the provisions as to the registration of real rights are complied with.

### Article 349

Real and personal as well as joint and several suretyship is only transferred to the new obligation with the consent of the sureties and of the joint and several co-debtors.

### Third: Delegation in Payment:

### Article 350

(a) There is delegation when a debtor procures the acceptance by his creditor of a third party who undertakes to pay in his stead.

(b) Delegation does not necessarily infer the existence of a previous debt between the debtor and such third party.

### Article 351

(a) When, in a case of delegation, the contracting parties agree to substitute a new obligation for the original obligation, such a delegation constitutes a novation by the change of the debtor. It results in the liberation of the original debtor from the obligation to his creditor provided that the new obligation assumed by the new debtor is valid and that such new debtor is not insolvent at the time of the delegation.

(b) Novation is not assumed in a case of delegation; in the absence of an agreement providing for novation, the original obligation continues concurrently with the new obligation.

### Article 352

In the absence of an agreement to the contrary, the obligation of the new debtor towards the creditor is valid even if his obligation towards the original debtor is void or liable to be contested, subject to the new debtor's right of recourse against the original debtor.

Case 22-1222, Document 57, 09/16/2022, 3384089, Page144 of 180

SPA-71

**Fourth: Set off:**

**Article 353**

(a) A debtor has a right to a set-off of that which he owes to his creditor against that which such creditor owes to him, even when the causes giving rise to the two debts are different, provided that they are both for a sum of money or fungibles of a like nature and quality, that they are not in dispute and that they are due and may be sued for.

(b) Postponement of payment by reason of delay granted by the Judge or by the creditor does not prevent a set-off.

**Article 354**

A debtor may avail himself of set-off even when the places of payment of the two debts are different, but he must, in such a case, make good any loss caused to the creditor by reason of the fact that the creditor was not able, as result of the compensation, to obtain or to perform the prestation at the place fixed for this purpose.

**Article 355**

A set-off takes place, whatever may be the sources of the debts, except in the following cases:

(a) where one of the two obligations consists of a thing of which the owner has been unjustly deprived, and is the object of a claim for restitution;

(b) where one of the two debts consists of a thing that has been deposited or lent for use or is the object of a claim for restitution;

(c) where one of the two debts is a right which is not liable to attachment.

(d) where one of the two debts is payable in respect of alimony.

**Article 356**

(a) Set-off only takes place when set up by the interested party. Set-off cannot be renounced before the right thereto has come into existence.

(b) Set-off extinguishes the two debts to the extent of the amount of the smaller debt, from the moment they become subject to set-off. Imputation of the amount discharged in set-off takes place in the same way as in ordinary payment.

(c) If the debtor owes several debts, determination of the set-off shall take place in the same manner as the determination upon the payment thereof.

**Article 357**

If the delay for prescription of a debt has expired when set-off is set up, set-off will nevertheless still take place if the delay for prescription has not expired when set-off became possible.

**Article 358**

(a) Set-off cannot take place to the detriment of rights acquired by third parties.

(b) If, after the seizure by a third party of the property held by the debtor for his creditor, such debtor becomes the creditor of his creditor, he cannot set up set-off to the prejudice of the attaching creditor.

**Article 359**

(a) When a creditor has assigned his debt to a third party, the debtor who has consented to the assignment without reserve, cannot set up set-off against the assignee, which he had the right to set up before he consented to the assignment; he can only enforce his claim against the assignor.

(b) But a debtor who has not accepted an assignment which has been notified to him, may, notwithstanding the assignment, set up compensation.

**Article 360**

A debtor who had the right to set up set-off but who nevertheless paid his debt, cannot avail himself, to the prejudice of third parties, of the securities guaranteeing his right unless he did not know of the existence of his right.

**Fifth: Merger**

**Article 361**

When the qualities of creditor and debtor in the same debt are united in the same person, the debt is extinguished to the extent of the merger.

When the cause which gave rise to the merger disappears and its disappearance is retroactive, the debt revives with its accessories as regards all interested parties and the merger is deemed never to have existed.

**Chapter III**
**The Extinction of Obligations Without Payment**

Case 22-1222, Document 57, 09/16/2022, 3384089, Page145 of 180

SPA-72

**First: Release of the Obligation:**

**Article 362**

Obligations are extinguished by a voluntary release of a debtor by his creditor. The release is completed as soon as it comes to the knowledge of the debtor, but becomes void if refused by him.

If they become void, the obligation shall return with all its qualities and all the securities included as well all the defences made in respect thereof.

**Article 363**

The release of an obligation is subject to the basic rules that govern gifts. No special form is required for release even if it is the release of an obligation whose existence was conditional upon a special form required by law or by the agreement entered into by the parties.

**Second: Impossibility of Performance:**

**Article 364**

An obligation is extinguished if the debtor establishes that its performance has become impossible by reason of causes beyond his control.

**Article 365**

The term of prescription for personal obligations is fifteen years with the exception of those cases for which a special provision is contained in the law and with the exception also of the following cases.

**Article 366**

(a) Unless there is a provision in the law to the contrary, the term of prescription for sums payable periodically at recurring intervals such as the rent of buildings and of agricultural land, salaries, wages and pensions, is five years, where the debt is not admitted by the debtor.

(b) The term of prescription for revenue due by a holder in bad faith and for revenue due by a custodian of a waqf to the beneficiaries is fifteen years.

**Article 367**

The term of prescription for sums due to physicians, chemists, lawyers, experts, receivers in bankruptcy, brokers, professors or teachers is five years, provided that the debts are due as remuneration for work coming within the scope of their professional work or in payment of expenses incurred by them.

**Article 368**

(a) The term of prescription for taxes and dues owing to the State if three years. The term of prescription for taxes and annual dues commences to run from the end of the year for which they were due: that for fees for legal documents from the date of termination of the hearing of the case in respect of which such documents were prepared, or, if no hearing takes place, from the drawing up of such documents.

(b) The same provision shall be applicable if the claim relates to the repayment of taxes and dues unduly paid. This period runs from the date of notifying the taxpayer of the final settlement in respect of such taxes and dues.

(c) The preceding provisions shall not prejudice the provisions set forth in special laws.

**Article 369**

1. The term of prescription is one year for the following rights of action:

(a) The rights of action of merchants and manufacturers in respect of things supplied to persons who do not trade in these articles, as well as the rights of action of hotel and restaurant proprietors for the cost of accommodation and food and for expenses incurred by them on behalf of the clients.

(b) The rights of action of domestic servants and similar persons.

2. When a person invokes the non-admission of the law-suit indicated in the preceding paragraph, he must take the oath that he has actually paid the debt. If he is an heir of the debtor or a legal representative thereof or of his heirs, he shall take the oath that he does not know of the existence of the debt nor is he aware of his death. Then, the Court will of its own accord pass the oath.

**Article 370**

(a) The term of prescription in respect of rights referred to in Articles 367 and 369 runs from the time that the prestations were made by the creditors, even when the creditors continue to make further prestations.

(b) Once any of these rights has been established by a written document, it is only prescribed after fifteen years.

**Article 371**

Periods of prescription are calculated in days, not in hours; the first day does not count and prescription is completed when the last day is at an end.

**Article 372**

SPA-73

(a) Prescription runs, unless there is a special provision of the law to the contrary, only from the day on which the debt becomes due.

(b) When the date upon which the obligation becomes due depends upon the will of the creditor, prescription runs from the date on which the obligation is created.

**Article 373**

(a) Prescription does not run whenever there is a bar, even a moral one, which prevents the creditor from claiming his right. It does not run between principal and his representative.

(b) Prescription does not run as regards a creditor who is legally incapable, absent or convicted criminal if he is not legally represented.

**Article 374**

If there is a cause that interrupts the effective period of prescription towards some of the creditors' heirs, the prescription shall not be interrupted towards the remaining heirs.

**Article 375**

Prescription is interrupted by legal proceedings even if instituted in a court without jurisdiction, by a summons or by an attachment, by the application of a creditor for the admission of his claim in a bankruptcy or in a distribution, or by any act of a creditor to claim his right in the course of legal proceedings.

**Article 376**

(a) Prescription is interrupted by an express or tacit admission of the right of the creditor by the debtor.

(b) A debtor who leaves a pledge in the hands of his creditor as security for his debt is deemed to have tacitly acknowledged the debt even though the creditor retained it on the basis of his right to refuse returning it pending the settlement of the debt related thereto in pursuance of Article 240.

**Article 377**

1. When prescription is interrupted, a new prescription commences to run from the time that the effect of the act that gave rise to the interruption has ceased. The term of the new prescription will be of the same duration as that of the former one.

2. However, the term of the new prescription shall be fifteen years in the following events:

a) When the debt has been awarded by a final court judgement except where the judgement rules for granting renewable periodical obligations that shall be due after it has been handed down.

b) When the right in question shall not be admitted after the lapse of five years in accordance with Article 367 or upon the lapse of one year according to Article 369 and the prescription period was interrupted due to the debtor's admission.

**Article 378**

When a right is extinguished by prescription, the other accessories to the debt are also extinguished even if the term of the particular prescription applying to these accessories has not expired.

**Article 379**

(a) The Court of its own initiative cannot invoke prescription. Prescription must be invoked by the debtor, or by his creditors, or by any interested party, even if the debtor has failed to do so.

(b) Prescription may be invoked at any stage of the proceedings, even before the Court of Appeal.

**Article 380**

(a) A debtor cannot renounce the benefit of prescription before he has acquired the right to invoke it, nor can he agree to a term of prescription other than that fixed by law.

(b) A person, however, who is legally capable of disposing of his rights, may renounce, even tacitly, a right to prescription which he is in a position to invoke, but a renunciation made to the detriment of his creditors will have no effect against them.

**BOOK TWO**
**SPECIFIC CONTRACTS**

**PART I**
**Contracts as Regards Ownership**

**Chapter One**
**Sale**

**Section One:**
**Sale in General**

**Article 381**

13-01434-shl    Doc 87-11    Filed 09/07/18    Entered 09/07/18 21:37:18    Exhibit 11
Pg 2 of 21

المعايير الشرعية

# SHARI'AH STANDARDS

**Full Text of Shari'ah Standards for Islamic Financial Institutions As at Safar 1439 A.H. ~ November 2017 A.D.**



## ACCOUNTING AND AUDITING ORGANIZATION FOR ISLAMIC FINANCIAL INSTITUTIONS



# SHARI'AH
# STANDARDS

© The Accounting and Auditing Organization for Islamic Financial Institutions, 2015

*King Fahd National Library Cataloging-in-Publication Data*

The Accounting and Auditing Organization for Islamic Financial Institutions
Shari'ah Standards. / The Accounting and Auditing Organization for Islamic Financial
Institutions.- Manama, 2015

  1262p ; 24×17 cm
  ISBN: 6-9616-01-603-978
  -1 Finance (Islamic Law)        |- Title
  275.5 dc                171/1437
  L.D. no. 168/1437

  ISBN: 6-9616-01-603-978

AAOIFI   **ACCOUNTING AND AUDITING ORGANIZATION
FOR ISLAMIC FINANCIAL INSTITUTIONS**

P.O. Box 1176, Manama, Kingdom of Bahrain
Telephone: :(17375400 (973+ – Fax: (17250194 (973+
E-mail: info@aaoifi.com
Website: www.aaoifi.com

Exclusive Sponsor of AAOIFI's Shari'ah Standards Online Version

SABB ◀☒▶ ساب
الخدمات المصرفية الإسلامية

**Worldwide Distribution: Dar AlMaiman for Publishing & Distributing**
For online shopping, visit our website: www.daralmaiman.com
For more information Email us: info@daralmaiman.com
Connect with us via twitter: @DarAlMaiman
Phone : +966 11 4627336    Fax   : +966 11 4612163
Mobile : +966 500004568    Mobile : +966 505455097

**No Unauthorized Photocopying**
All rights reserved for Accounting and Auditing Organization for Islamic Financial
Institutions. Without permission in writing, no part of this publication may be translated,
reprinted or reproduced or utilized in any form either in whole or in part or by any electronic,
mechanical or other means, now known or hereafter invented, including photocopying and
recording, or in any information storage and retrieval system.

AAOIFI's Shari'ah Standards are published both in Arabic and English. In case of any
difference between the two texts, the Arabic text shall prevail. Accounting and Auditing
Organization for Islamic Financial Institutions is not responsible for any negative
consequences occasioned to any person acting or refraining from action as a result of any
material in this publication due to its usage.

SPA-77

# SHARI'AH STANDARDS

**Full Text of Shari'ah Standards for Islamic Financial Institutions as at Safar 1437 A.H. – December 2015 A.D.**



AAOIFI

ACCOUNTING AND AUDITING ORGANIZATION
FOR ISLAMIC FINANCIAL INSTITUTIONS

Shari'ah Standard No. (4)

# Settlement of Debts by Set-Off

### (Revised Standard)

Case 22-1222, Document 57, 09/16/2022, 3384089, Page152 of 180

SPA-79



SPA-80

13-01434-shl    Doc 87-11    Filed 09/07/18    Entered 09/07/18 21:37:18    Exhibit 11
Pg 8 of 21

# Contents

| Subject | Page |
|---|---|
| **Preface** | 107 |
| **Statement of the Standard** | 108 |
| 1. Scope of the Standard | 108 |
| 2. Definition of Set-Off and its Various Forms | 108 |
| 3. Bilateral Exchange of Promises to Conclude a Set-Off in the Future | 110 |
| 4. Application of the Rules of Set-Off to Some Modern Transactions | 111 |
| 5. Currency Swaps | 111 |
| 6. Date of Issuance of the Standard | 112 |
| **Adoption of the Standard** | 113 |
| **Appendices** | |
| **Appendix (a):** Brief History of the Preparation of the Standard | 114 |
| **Appendix (b):** The Shari'ah Basis for the Standard | 116 |
| **Appendix (c):** Definitions | 117 |

Case 22-1222, Document 57, 09/16/2022, 3384089, Page154 of 180



SPA-82

*IN THE NAME OF ALLAH, THE ALL-MERCIFUL, THE MOST MERCIFUL*

All praise be to Allah, the Lord of all the worlds, and blessings and peace be upon our master, Muhammad, and his household and all his companions

# Preface

The aim of this standard is to outline the rules governing the use of set-off in settling debts, the Shari'ah requirements and conditions applicable to set-off, what is permissible or not permissible in this procedure and the most significant practices of Islamic financial Institutions (Institution/Institutions)[1] in this regard.

---

[1] The word (Institution/Institutions) is used here to refer, in short, to Islamic financial institutions including Islamic Banks.

SPA-83

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

# Statement of the Standard

## 1. Scope of the Standard

This standard covers the settlement of debt by way of set-off. The standard shall not apply to discharge of liability by way of transfer, waiving of obligation, composition, acquisition of a right payable or bilateral cancellation of a contract, as they are covered by their respective Standards.

## 2. Definition of Set-Off and Its Various Forms

A set-off is to extinguish a debt receivable by a debt payable. It is divided into two main forms: mandatory set-off and contractual set-off.

### 2/1 Mandatory set-off

A mandatory set-off is a set-off that occurs without the need for bilateral agreement or consent of both indebted parties and, in some cases of mandatory set-off, it is one party that is forced to comply with the request of the other party for set-off. It is divided into compulsory set-off (on both parties)[2] and set-off on demand (of the person with the superior debt whereby the other party is obliged to comply with the demand).

2/1/1 A compulsory set-off is the spontaneous discharge of two debts that is not contingent on the request or consent of both or either party.

2/1/2 The conditions of the permissibility of compulsory set-off are the following:

a) Each party should be a creditor and debtor simultaneously.

b) Both debts should be equal in kind, type, description and maturity. However, if the two debts are not equal in amount, a set-off will take place of an equivalent amount on both

---

[2] Compulsorily set-off is a set-off that occurs without a need to bilateral agreements or consents of the parties.

SPA-84

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

sides, and the party that is owed the larger debt will remain a creditor for the remaining balance.

c) Neither of the two debts should be encumbered by an obligation to a third party, such as the right of a mortgagee to one of the debts. The intention of this is to protect rights associated with the amount of the debt and belonging to third parties.

d) The set-off should not be arranged in a manner that results in violation of a rule of Shari'ah, such as Riba (usury) or *Shubhat al-Riba* (a transaction potentially involving Riba).

2/1/3 A set-off on demand is the discharge of two debts at the request of the creditor for the superior debt and his consent to forgo the excess of the amount or privilege he is owed over what he owes. This set-off will take place whether or not the creditor for the smaller debt consents.

2/1/4 The conditions of permissibility of a set-off on demand are the following:

a) Each party should be a creditor and debtor simultaneously.

b) The creditor for the superior debt, in terms of quality and duration, should consent to relinquish his additional right or privilege. An example of superiority in terms of quality is when the debt is secured by a mortgage, or when a third party has given a guarantee to pay the debt, and the owner of the secured debt consents to relinquish this guarantee. Superiority in terms of duration exists if the duration of one of the debts is shorter, or one debt is now due and the other is not yet due. In these cases, the debt which has the shorter duration or which is now due is superior.

c) Both debts should be similar in kind and type, but not necessarily in quality and date of maturity. However, if the two debts are not equal in amount, a set-off will take place of an equivalent amount on both sides, and the party that is owed the larger debt will remain a creditor for the remaining balance.

109

SPA-85

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

d) The set-off should not be arranged in a manner that results in violation of a rule of Shari'ah, such as Riba (usury) or a transaction potentially involving Riba.

## 2/2 Contractual set-off

2/2/1 A contractual set-off is the discharge of two debts by the consent of the two parties to extinguish their obligations towards each other.

2/2/2 The conditions of the permissibility of a contractual set-off are the following:

a) Each party should be a creditor and debtor simultaneously.

b) The two parties should mutually consent to the set-off.

c) The set-off should not be arranged in a manner that results in violation of a rule of Shari'ah, such as Riba or a transaction potentially involving Riba.

2/2/3 A contractual set-off is permissible even without the need for two debts to be similar in kind, type, description or maturity. This is because the agreement on contractual set-off means that each party has agreed to relinquish any extra privilege associated with his debt. A contractual set-off is also permissible if the two debts are not equal in terms of amount, in which case a set-off will take place of an equivalent amount on both sides, and the party that is owed the larger debt is entitled to request payment of the remaining balance. [see item 2/10 (a) of the Shari'ah Standards on Trading in Currencies]

## 3. Bilateral Exchange of Promises to Conclude a Set-Off in the Future

It is permissible for the Institution and its customers or other Institutions to exchange bilateral promises that debts that may be created between them in the future will be settled by way of set-off, in which case all the conditions mentioned in the items 2/1 and 2/2 will be applicable at the time of actual set-off. However, if the currencies of the two debts differ, a bilateral exchange of promise of set-off should be concluded on the basis

110

SPA-86

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

that a set-off will take place based on the current currency exchange rate at the time of actual set-off; this ruling is to prevent the practices of Riba by roundabout methods or by implied agreement for practicing Riba.

**4. Application of the Rules of Set-Off to Some Modern Transactions**

The followings are some rules of set-off to modern transactions:

4/1 Stipulating set-off between the customer and the Institution in respect of debts to the Institution arising out of sales on deferred payment. The agreement on contractual set-off of future debts, commonly known as set-off and consolidation, is a practice employed by a large number of financial Institutions. This form of set-off may take place either compulsorily or contractually depending on whether the situation that gives rise to this set-off meets the conditions of compulsory set-off or the conditions of contractual set-off. Moreover, by pre-stipulating this type of set-off in the agreement, a fresh agreement may be avoided at the time of set-off when the two currencies are different or when one of the debts is superior to the other.

4/2 A set-off may take place between a financial Institution accepting a cheque and the drawer of the cheque, through the clearing-house. This form of set-off may also take place either compulsorily or contractually depending on whether the state that gives rise to this set-off meets the conditions of compulsory set-off or the conditions of contractual set-off.

4/3 Set-off that is concluded among financial Institutions through international or national networking systems, such as credit card or debit card organisations. This form of set-off may be either compulsory or contractual depending on whether the state that gives rise to this set-off meets the conditions of compulsory set-off or the conditions of contractual set-off.

**5. Currency Swaps**

The currency swaps that are concluded on the basis of Riba are not permissible. This is because in this process it is the interest-based securities that are set-off against interest-based securities.

111

SPA-87

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

## 6. Date of Issuance of the Standard

This Standard was issued on 29 Safar 1422 A.H., corresponding to 23 May 2001 A.D.

112

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

# Adoption of the Standard

The Shari'ah Standard on Settlement of Debts by Set-off was adopted by the Shari'ah Board in its meeting No. (6) held on 25-29 Safar 1422 A.H., corresponding to 19-23 May 2001 A.D.

SPA-89

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

# Appendix (A)
# Brief History of
# the Preparation of the Standard

In its meeting No. (2) held in Makkah Al-Mukarramah on 10-14 Ramadan 1420 A.H., corresponding to 18-22 December 1999 A.D., the Shari'ah Board decided to give priority to the preparation of a Shari'ah Standard on settlements of debt by way of set-off.

On Tuesday 27 Ramadan 1420 A.H., corresponding to 4 January 2000 A.D., one Shari'ah consultant was commissioned to prepare a juristic study and an exposure draft.

In its meeting held in Bahrain on 18-19 Rabi' I, 1421 A.H., corresponding to 20-21 June 2000 A.D., the Shari'ah Studies Committee discussed the juristic study and made certain amendments to it. The committee also discussed the exposure draft of the Standard in its meeting No. (6) held in Bahrain on 20-21 Jumada II, 1421 A.H., corresponding to 18-19 September 2000 A.D., and asked the consultant to make some amendments in light of the comments made by the members.

In its meeting No. (7) held in Bahrain on 5-6 Sha'ban 1421 A.H., corresponding to 1-2 November 2000 A.D., the Shari'ah Studies Committee discussed the exposure draft and made some relevant amendments.

The revised exposure draft of the standard was presented to the Shari'ah Board in its meeting No. (5) held in Mecca on 8-12 Ramadan 1421 A.H., corresponding to 4-8 December 2000 A.D. The Shari'ah Board made further amendments to the exposure draft of the standard and decided that it should be distributed to specialists and interested parties in order to obtain their comments in order to discuss them in a public hearing.

A public hearing was held in Bahrain on 4-5 Dhul-Hajjah 1421 A.H., corresponding to 27-28 February 2001 A.D. The public hearing was attended by

114

SPA-90

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

more than 30 participants representing central banks, Institutions, accounting firms, Shari'ah scholars, academics and others who are interested in this field. Members of the Shari'ah Studies Committee responded to the written comments that were sent prior to the public hearing as well as to the oral comments that were expressed in the public hearing.

The Shari'ah Studies Committee held its meeting No. (8) on 16-17 Dhul-Hajjah 1421 A.H., corresponding to 11-12 March 2001 A.D., to discuss the comments made about the exposure draft. The Committee made the necessary amendments in light of both the written comments that were received and oral comments that took place in the public hearing.

The Shari'ah Board in its meeting No. (6) held in Al-Madinah Al-Munawwarah on 25-29 Safar 1422 A.H., corresponding to 19-23 May 2001 A.D., discussed the amendments made by the Shari'ah studies committee, and made necessary amendments. The Shari'ah Board unanimously adopted some of the items of the standard and some items were adopted by the majority vote of the members of the Shari'ah Board, as recorded in the minutes of the meetings of the Shari'ah Board.

The Shari'ah Standards Review Committee reviewed the standard in its meeting held in Muharram 1433 A.H., corresponding to November 2011 A.D., in the State of Qatar, and proposed after deliberation a set of amendments (additions, deletions, and rephrasing) as deemed necessary, and then submitted the proposed amendments to the Shari'ah Board for approval as it deemed necessary.

In its meeting No. (38) held in Al-Madinah Al-Munawwarah, Kingdom of Saudi Arabia on 28 Sha'ban to 1 Ramadan 1435 A.H., corresponding to 26-28 June 2014 A.D., the Shari'ah Board discussed the proposed amendments submitted by the Shari'ah Standards Review Committee. After deliberation, the Shari'ah Board approved the necessary amendments, and the standard was adopted in its current amended version.

SPA-91

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

# Appendix (B)
# The Shari'ah Basis for the Standard

The basis for debt settlements by way of set-off is that it has been practised from time immemorial without any report of disapproval. Moreover, set-off is in line with the objectives of the Shari'ah as it encourages discharging individuals from liability of debt and set-off is one way of discharging debt liabilities without involving futile processes of debt recovery.

In addition, there is no Shari'ah objection to a set-off taking place on demand. The authority for this permissibility is that the person entitled to the superior debt has agreed to forgo the advantage attached to his debt and the Shari'ah will not object to such a gesture.

If set-off is executed contractually, it is then based on the prophetic Hadith stating; *"Muslims are bound by the conditions and agreements they have made, except a condition that has rendered the unlawful lawful or rendered the lawful unlawful."*[3]

---

[3] The Hadith has been related by Al-Tirmidhi in his *"Sunan Al-Tirmidhi"* [3: 634] edited by Ahmad Muhammad Shakir and others, Beirut: Dar Ihya` Al-Turath Al-'Arabi. Also, it has been related by Al-Bayhaqi in his *"Sunan Al-Bayhaqi"* [7: 248]; and Al-Manawi, *"Fayd Al-Qadir"* [6: 272], Egypt: Al-Maktabah Al-Kubra, 1356 A.H..

SPA-92

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

# Appendix (C)
# Definitions

**Debt and Loan**

A debt is any liability that is not in terms of a specified or defined item, whatever the cause of its establishment, i.e. whether its origin is in cash or in a commodity, or in a particular described benefit such as the benefit of using particular things or services of persons. For instance, the consideration in deferred sales and loans is described as a debt.

The relationship between a loan and a debt is that the latter is more general than the former, since every loan is described as a debt but the converse is not true. Not all debts originate from a loan. In this sense, a loan is but one cause of the creation of debt.

**Due Debt**

A due debt is a debt that is immediately payable or that is payable on the creditor's demand, whether on its original due date or, if it has been rescheduled and deferred, on its rescheduled due date.

**Deferred Debt**

A deferred debt is a debt the payment thereof is due at a certain time in the future, and it may also be due in periodic instalments over time.

**Description**

A description is a condition that distinguishes particular specimens of the same species from one other. For examples, conditions such as good quality and poor quality, or mortgage of security or personal guarantees, letters of guarantee and the freezing of the amount of cheques for payment which are attached to the debt are considered descriptions.

**Ibra` (discharge)**

An act by a person to discharge another person from a liability (owed by the latter to the former)

117

SPA-93

Shari'ah Standard No. (4): Settlement of Debts by Set-Off

**Reconciliation (Sulh)**

An agreement to solve dispute between parties.

**Iqalah (Mutual Rescission of Contract)**

Revocation of a contract and cancellation of its effects with mutual consent of both parties.





§553                    TITLE 11—BANKRUPTCY                    Page 184

under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

§553. Setoff

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

(B)(i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent (except for a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561); or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor (except for a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561).

(b)(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, 561, 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

(c) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2602; Pub. L. 98–353, title III, §§395, 467, July 10, 1984, 98 Stat. 365, 380; Pub. L. 101–311, title I, §105, June 25, 1990, 104 Stat. 268; Pub. L. 103–394, title II,

§§205(b), 222(b), title V, §501(d)(19), Oct. 22, 1994, 108 Stat. 4123, 4129, 4146; Pub. L. 109–8, title IX, §907(n), Apr. 20, 2005, 119 Stat. 181.)

HISTORICAL AND REVISION NOTES

LEGISLATIVE STATEMENTS

Section 553 of the House amendment is derived from a similar provision contained in the Senate amendment, but is modified to clarify application of a two-point test with respect to setoffs.

SENATE REPORT NO. 95–989

This section preserves, with some changes, the right of setoff in bankruptcy cases now found in section 68 of the Bankruptcy Act [section 108 of former title 11]. One exception to the right is the automatic stay, discussed in connection with proposed 11 U.S.C. 362. Another is the right of the trustee to use property under section 363 that is subject to a right of setoff.

The section states that the right of setoff is unaffected by the bankruptcy code except to the extent that the creditor's claim is disallowed, the claim acquired (other than from the debtor) the claim during the 90 days preceding the case while the debtor was insolvent, the debt being offset was incurred for the purpose of obtaining a right of setoff, while the debtor was insolvent and during the 90-day prebankruptcy period, or the creditor improved his position in the 90-day period (similar to the improvement in position test found in the preference section 547(c)(5)). Only the last exception is an addition to current law.

As under section 547(f), the debtor is presumed to have been insolvent during the 90 days before the case.

EDITORIAL NOTES

AMENDMENTS

2005—Subsec. (a)(2)(B)(ii). Pub. L. 109–8, §907(n)(1), inserted "(except for a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561)" before semicolon.

Subsec. (a)(3)(C). Pub. L. 109–8, §907(n)(2), inserted "(except for a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561)" before period.

Subsec. (b)(1). Pub. L. 109–8, §907(n)(3), substituted "362(b)(7), 362(b)(27), 555, 556, 559, 560, 561," for "362(b)(14)," in introductory provisions.

1994—Subsec. (a)(1). Pub. L. 103–394, §501(d)(19)(A), struck out before semicolon at end "other than under section 502(b)(3) of this title".

Subsec. (b)(1). Pub. L. 103–394, §501(d)(19)(B), substituted "section 362(b)(14)," for "section 362(b)(14),,".

Pub. L. 103–394, §222(b), which directed the amendment of section 553(b)(1) by inserting "546(h)," after "365(h)," was executed by making the insertion in section 553(b)(1) of this title to reflect the probable intent of Congress.

Pub. L. 103–394, §205(b), substituted "365(h)" for "365(h)(2)".

1990—Subsec. (b)(1). Pub. L. 101–311 substituted "362(b)(7), 362(b)(14)," for "362(b)(7),".

1984—Subsec. (b)(1). Pub. L. 98–353 inserted ", 362(b)(7)," after "362(b)(6)", and substituted ", 365(h)(2), or 365(i)(2)" for "or 365(h)(1)".

Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced

under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

§554. Abandonment of property of the estate

(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

(b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

(c) Unless the court orders otherwise, any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2603; Pub. L. 98–353, title III, §468, July 10, 1984, 98 Stat. 380; Pub. L. 99–554, title II, §283(p), Oct. 27, 1986, 100 Stat. 3118; Pub. L. 111–327, §2(a)(23), Dec. 22, 2010, 124 Stat. 3560.)

HISTORICAL AND REVISION NOTES

LEGISLATIVE STATEMENTS

Section 554(b) is new and permits a party in interest to request the court to order the trustee to abandon property of the estate that is burdensome to the estate or that is of inconsequential value to the estate.

SENATE REPORT NO. 95–989

Under this section the court may authorize the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate. Abandonment may be to any party with a possessory interest in the property abandoned. In order to aid administration of the case, subsection (b) deems the court to have authorized abandonment of any property that is scheduled under section 521(1) and that is not administered before the case is closed. That property is deemed abandoned to the debtor. Subsection (c) specifies that if property is neither abandoned nor administered it remains property of the estate.

Editorial Notes

AMENDMENTS

2010—Subsec. (c). Pub. L. 111–327 substituted "521(a)(1)" for "521(1)".

1986—Subsec. (c). Pub. L. 99–554 substituted "521(1)" for "521(a)(1)".

1984—Subsecs. (a), (b). Pub. L. 98–353, §468(a), inserted "and benefit" after "value".

Subsec. (c). Pub. L. 98–353, §468(b), amended subsec. (c) generally. Prior to amendment, subsec. (c) read as follows: "Unless the court orders otherwise, any property that is scheduled under section 521(1) of this title and that is not administered before a case is closed under section 350 of this title is deemed abandoned."

Subsec. (d). Pub. L. 98–353, §468(c), struck out "section (a) or (b) of" after "not abandoned under".

Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–554 effective 30 days after Oct. 27, 1986, see section 302(a) of Pub. L. 99–554, set out as a note under section 581 of Title 28, Judiciary and Judicial Procedure.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

§555. Contractual right to liquidate, terminate, or accelerate a securities contract

The exercise of a contractual right of a stockbroker, financial institution, financial participant, or securities clearing agency to cause the liquidation, termination, or acceleration of a securities contract, as defined in section 741 of this title, because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title unless such order is authorized under the provisions of the Securities Investor Protection Act of 1970 or any statute administered by the Securities and Exchange Commission. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a derivatives clearing organization (as defined in the Commodity Exchange Act), a multilateral clearing organization (as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991), a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade (as defined in the Commodity Exchange Act), or in a resolution of the governing board thereof, and a right, whether or not in writing, arising under common law, under law merchant, or by reason of normal business practice.

(Added Pub. L. 97–222, §6(a), July 27, 1982, 96 Stat. 236; amended Pub. L. 98–353, title III, §469, July 10, 1984, 98 Stat. 380; Pub. L. 103–394, title V, §501(b)(6), (d)(20), Oct. 22, 1994, 108 Stat. 4143, 4146; Pub. L. 109–8, title IX, §907(g), (o)(7), Apr. 20, 2005, 119 Stat. 177, 182.)

Editorial Notes

REFERENCES IN TEXT

The Securities Investor Protection Act of 1970, referred to in text, is Pub. L. 91–598, Dec. 30, 1970, 84 Stat. 1636, as amended, which is classified generally to chapter 2B–1 (§78aaa et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 78aaa of Title 15 and Tables.

The Commodity Exchange Act, referred to in text, is act Sept. 21, 1922, ch. 369, 42 Stat. 998, as amended, which is classified generally to chapter 1 (§1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Federal Deposit Insurance Corporation Improvement Act of 1991, referred to in text, is Pub. L. 102–242, Dec. 19, 1991, 105 Stat. 2236, as amended. For complete classification of this Act to the Code, see Short Title of



552(a) of Pub. L. 98-353, set out as a note under section 101 of this title.

## § 362. Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—

(1) under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor;

(2) under subsection (a)—

(A) of the commencement or continuation of a civil action or proceeding—

(i) for the establishment of paternity;

(ii) for the establishment or modification of an order for domestic support obligations;

(iii) concerning child custody or visitation;

(iv) for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate; or

(v) regarding domestic violence;

(B) of the collection of a domestic support obligation from property that is not property of the estate;

(C) with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute;

(D) of the withholding, suspension, or restriction of a driver's license, a professional or occupational license, or a recreational license, under State law, as specified in section 466(a)(16) of the Social Security Act;

(E) of the reporting of overdue support owed by a parent to any consumer reporting agency as specified in section 466(a)(7) of the Social Security Act;

(F) of the interception of a tax refund, as specified in sections 464 and 466(a)(3) of the Social Security Act or under an analogous State law; or

(G) of the enforcement of a medical obligation, as specified under title IV of the Social Security Act;

(3) under subsection (a) of this section, of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title;

(4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

[(5) Repealed. Pub. L. 105-277, div. I, title VI, § 603(1), Oct. 21, 1998, 112 Stat. 2681-866;]

(6) under subsection (a) of this section, of the exercise by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any contractual right (as defined in section 555 or 556) under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right (as defined in section 555 or 556) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts;

(7) under subsection (a) of this section, of the exercise by a repo participant or financial participant of any contractual right (as defined in section 559) under any security agreement or arrangement or other credit enhance-

ment forming a part of or related to any re-purchase agreement, or of any contractual right (as defined in section 559) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

(8) under subsection (a) of this section, of the commencement of any action by the Secretary of Housing and Urban Development to foreclose a mortgage or deed of trust in any case in which the mortgage or deed of trust held by the Secretary is insured or was formerly insured under the National Housing Act and covers property, or combinations of property, consisting of five or more living units;

(9) under subsection (a), of—

(A) an audit by a governmental unit to determine tax liability;

(B) the issuance to the debtor by a governmental unit of a notice of tax deficiency;

(C) a demand for tax returns; or

(D) the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

(10) under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property;

(11) under subsection (a) of this section, of the presentment of a negotiable instrument and the giving of notice of and protesting dishonor of such an instrument;

(12) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Transportation under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage, or a security interest in or relating to a vessel or vessel under construction, held by the Secretary of Transportation under chapter 537 of title 46 or section 109(h) of title 49, or under applicable State law;

(13) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Commerce under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage in a vessel or a mortgage, deed of trust, or other security interest in a fishing fa-

cility held by the Secretary of Commerce under chapter 537 of title 46;

(14) under subsection (a) of this section, of any action by an accrediting agency regarding the accreditation status of the debtor as an educational institution;

(15) under subsection (a) of this section, of any action by a State licensing body regarding the licensure of the debtor as an educational institution;

(16) under subsection (a) of this section, of any action by a guaranty agency, as defined in section 435(j) of the Higher Education Act of 1965 or the Secretary of Education regarding the eligibility of the debtor to participate in programs authorized under such Act;

(17) under subsection (a) of this section, of the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

(18) under subsection (a) of the creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition;

(19) under subsection (a), of withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer—

(A) to the extent that the amounts withheld and collected are used solely for payments relating to a loan from a plan under section 408(b)(1) of the Employee Retirement Income Security Act of 1974 or is subject to section 72(p) of the Internal Revenue Code of 1986; or

(B) a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title;

but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d), or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title;

(20) under subsection (a), of any act to enforce any lien against or security interest in real property following entry of the order under subsection (d)(4) as to such real property in any prior case under this title, for a period of 2 years after the date of the entry of such an order, except that the debtor, in a subse-

quent case under this title, may move for relief from such order based upon changed circumstances or for other good cause shown, after notice and a hearing;

(21) under subsection (a), of any act to enforce any lien against or security interest in real property—

(A) if the debtor is ineligible under section 109(g) to be a debtor in a case under this title; or

(B) if the case under this title was filed in violation of a bankruptcy court order in a prior case under this title prohibiting the debtor from being a debtor in another case under this title;

(22) subject to subsection (*l*), under subsection (a)(3), of the continuation of any eviction, unlawful detainer action, or similar proceeding by a lessor against a debtor involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy petition, a judgment for possession of such property against the debtor;

(23) subject to subsection (m), under subsection (a)(3), of an eviction action that seeks possession of the residential property in which the debtor resides as a tenant under a lease or rental agreement based on endangerment of such property or the illegal use of controlled substances on such property, but only if the lessor files with the court, and serves upon the debtor, a certification under penalty of perjury that such an eviction action has been filed, or that the debtor, during the 30-day period preceding the date of the filing of the certification, has endangered property or illegally used or allowed to be used a controlled substance on the property;

(24) under subsection (a), of any transfer that is not avoidable under section 544 and that is not avoidable under section 549;

(25) under subsection (a), of—

(A) the commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power;

(B) the enforcement of an order or decision, other than for monetary sanctions, obtained in an action by such securities self regulatory organization to enforce such organization's regulatory power; or

(C) any act taken by such securities self regulatory organization to delist, delete, or refuse to permit quotation of any stock that does not meet applicable regulatory requirements;

(26) under subsection (a), of the setoff under applicable nonbankruptcy law of an income tax refund, by a governmental unit, with respect to a taxable period that ended before the date of the order for relief against an income tax liability for a taxable period that also ended before the date of the order for relief, except that in any case in which the setoff of an income tax refund is not permitted under applicable nonbankruptcy law because of a pending action to determine the amount or legality of a tax liability, the governmental unit

may hold the refund pending the resolution of the action, unless the court, on the motion of the trustee and after notice and a hearing, grants the taxing authority adequate protection (within the meaning of section 361) for the secured claim of such authority in the setoff under section 506(a);

(27) under subsection (a) of this section, of the exercise by a master netting agreement participant of any contractual right (as defined in section 555, 556, 559, or 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any master netting agreement, or of any contractual right (as defined in section 555, 556, 559, or 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements to the extent that such participant is eligible to exercise such rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue; and

(28) under subsection (a), of the exclusion by the Secretary of Health and Human Services of the debtor from participation in the medicare program or any other Federal health care program (as defined in section 1128B(f) of the Social Security Act) pursuant to title XI or XVIII of such Act).

The provisions of paragraphs (12) and (13) of this subsection shall apply with respect to any such petition filed on or before December 31, 1989.

(c) Except as provided in subsections (d), (e), (f), and (h) of this section—

(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;

(2) the stay of any other act under subsection (a) of this section continues until the earliest of—

(A) the time the case is closed;

(B) the time the case is dismissed; or

(C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied;

(3) if a single or joint case is filed by or against a debtor who is an individual in a case under chapter 7, 11, or 13, and if a single or joint case of the debtor was pending within the preceding 1-year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b)—

(A) the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

(B) on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the

Case 22-1222, Document 57, 09/16/2022, 3384089, Page172 of 180

expiration of the 30-day period only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed; and

(C) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)—

    (i) as to all creditors, if—

      (I) more than 1 previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was pending within the preceding 1-year period;

      (II) a previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was dismissed within such 1-year period, after the debtor failed to—

        (aa) file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be a substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney);

        (bb) provide adequate protection as ordered by the court; or

        (cc) perform the terms of a plan confirmed by the court; or

      (III) there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded—

        (aa) if a case under chapter 7, with a discharge; or

        (bb) if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; and

    (ii) as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, that action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to actions of such creditor; and

(4)(A)(i) if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b), the stay under subsection (a) shall not go into effect upon the filing of the later case; and

(ii) on request of a party in interest, the court shall promptly enter an order confirming that no stay is in effect;

(B) if, within 30 days after the filing of the later case, a party in interest requests the court may order the stay to take effect in the case as to any or all creditors (subject to such conditions or limitations as the court may impose), after notice and a hearing, only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed;

(C) a stay imposed under subparagraph (B) shall be effective on the date of the entry of the order allowing the stay to go into effect; and

(D) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)—

    (i) as to all creditors if—

      (I) 2 or more previous cases under this title in which the individual was a debtor were pending within the 1-year period;

      (II) a previous case under this title in which the individual was a debtor was dismissed within the time period stated in this paragraph after the debtor failed to file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney), failed to provide adequate protection as ordered by the court, or failed to perform the terms of a plan confirmed by the court; or

      (III) there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under this title, or any other reason to conclude that the later case will not be concluded, if a case under chapter 7, with a discharge, and if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; or

    (ii) as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, such action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to such action of such creditor.

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

    (A) the debtor does not have an equity in such property; and

    (B) such property is not necessary to an effective reorganization;

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

    (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

Case 22-1222, Document 57, 09/16/2022, 3384089, Page173 of 180

(B) the debtor has commenced monthly payments that—

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

(4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either—

(A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

(B) multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

(e)(1) Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section. A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section. The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

(2) Notwithstanding paragraph (1), in a case under chapter 7, 11, or 13 in which the debtor is an individual, the stay under subsection (a) shall terminate on the date that is 60 days after a request is made by a party in interest under subsection (d), unless—

(A) a final decision is rendered by the court during the 60-day period beginning on the date of the request; or

(B) such 60-day period is extended—

(i) by agreement of all parties in interest; or

(ii) by the court for such specific period of time as the court finds is required for good cause, as described in findings made by the court.

(f) Upon request of a party in interest, the court, with or without a hearing, shall grant such relief from the stay provided under subsection (a) of this section as is necessary to prevent irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (d) or (e) of this section.

(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

(h)(1) In a case in which the debtor is an individual, the stay provided by subsection (a) is terminated with respect to personal property of the estate or of the debtor securing in whole or in part a claim, or subject to an unexpired lease, and such personal property shall no longer be property of the estate if the debtor fails within the applicable time set by section 521(a)(2)—

(A) to file timely any statement of intention required under section 521(a)(2) with respect to such personal property or to indicate in such statement that the debtor will either surrender such personal property or retain it and, if retaining such personal property, either redeem such personal property pursuant to section 722, enter into an agreement of the kind specified in section 524(c) applicable to the debt secured by such personal property, or assume such unexpired lease pursuant to section 365(p) if the trustee does not do so, as applicable; and

(B) to take timely the action specified in such statement, as it may be amended before expiration of the period for taking action, unless such statement specifies the debtor's intention to reaffirm such debt on the original contract terms and the creditor refuses to agree to the reaffirmation on such terms.

(2) Paragraph (1) does not apply if the court determines, on the motion of the trustee filed before the expiration of the applicable time set by section 521(a)(2), after notice and a hearing, that such personal property is of consequential value or benefit to the estate, and orders appropriate adequate protection of the creditor's interest, and orders the debtor to deliver any collateral in the debtor's possession to the trustee. If the court does not so determine, the stay provided by subsection (a) shall terminate upon the conclusion of the hearing on the motion.

(i) If a case commenced under chapter 7, 11, or 13 is dismissed due to the creation of a debt repayment plan, for purposes of subsection (c)(3), any subsequent case commenced by the debtor under any such chapter shall not be presumed to be filed not in good faith.

(j) On request of a party in interest, the court shall issue an order under subsection (c) confirming that the automatic stay has been terminated.

(k)(1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

(2) If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

(l)(1) Except as otherwise provided in this subsection, subsection (b)(22) shall apply on the date that is 30 days after the date on which the bankruptcy petition is filed, if the debtor files with the petition and serves upon the lessor a certification under penalty of perjury that—

(A) under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment for possession was entered; and

(B) the debtor (or an adult dependent of the debtor) has deposited with the clerk of the court, any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

(2) If, within the 30-day period after the filing of the bankruptcy petition, the debtor (or an adult dependent of the debtor) complies with paragraph (1) and files with the court and serves upon the lessor a further certification under penalty of perjury that the debtor (or an adult dependent of the debtor) has cured, under nonbankruptcy law applicable in the jurisdiction, the entire monetary default that gave rise to the judgment under which possession is sought by the lessor, subsection (b)(22) shall not apply, unless ordered to apply by the court under paragraph (3).

(3)(A) If the lessor files an objection to any certification filed by the debtor under paragraph (1) or (2), and serves such objection upon the debtor, the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the certification filed by the debtor under paragraph (1) or (2) is true.

(B) If the court upholds the objection of the lessor filed under subparagraph (A)—

(i) subsection (b)(22) shall apply immediately and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

(ii) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's objection.

(4) If a debtor, in accordance with paragraph (5), indicates on the petition that there was a judgment for possession of the residential rental property in which the debtor resides and does not file a certification under paragraph (1) or (2)—

(A) subsection (b)(22) shall apply immediately upon failure to file such certification, and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

(B) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating the absence of a filed certification and the applicability of the exception to the stay under subsection (b)(22).

(5)(A) Where a judgment for possession of residential property in which the debtor resides as a tenant under a lease or rental agreement has been obtained by the lessor, the debtor shall so indicate on the bankruptcy petition and shall provide the name and address of the lessor that obtained that pre-petition judgment on the petition and on any certification filed under this subsection.

(B) The form of certification filed with the petition, as specified in this subsection, shall provide for the debtor to certify, and the debtor shall certify—

(i) whether a judgment for possession of residential rental housing in which the debtor resides has been obtained against the debtor before the date of the filing of the petition; and

(ii) whether the debtor is claiming under paragraph (1) that under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment of possession was entered, and has made the appropriate deposit with the court.

(C) The standard forms (electronic and otherwise) used in a bankruptcy proceeding shall be amended to reflect the requirements of this subsection.

(D) The clerk of the court shall arrange for the prompt transmittal of the rent deposited in accordance with paragraph (1)(B) to the lessor.

(m)(1) Except as otherwise provided in this subsection, subsection (b)(23) shall apply on the date that is 15 days after the date on which the debtor files and serves a certification described in subsection (b)(23).

(2)(A) If the debtor files with the court an objection to the truth or legal sufficiency of the certification described in subsection (b)(23) and serves such objection upon the lessor, subsection (b)(23) shall not apply, unless ordered to apply by the court under this subsection.

(B) If the debtor files and serves the objection under subparagraph (A), the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the situation giving rise to the lessor's certification under paragraph (1) existed or has been remedied.

(C) If the debtor can demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph

Case 22-1222, Document 57, 09/16/2022, 3384089, Page175 of 180

(1) did not exist or has been remedied, the stay provided under subsection (a)(3) shall remain in effect until the termination of the stay under this section,

(D) If the debtor cannot demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied—

(i) relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to proceed with the eviction; and

(ii) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's certification.

(3) If the debtor fails to file, within 15 days, an objection under paragraph (2)(A)—

(A) subsection (b)(23) shall apply immediately upon such failure and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

(B) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating such failure.

(n)(1) Except as provided in paragraph (2), subsection (a) does not apply in a case in which the debtor—

(A) is a debtor in a small business case pending at the time the petition is filed;

(B) was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition;

(C) was a debtor in a small business case in which a plan was confirmed in the 2-year period ending on the date of the order for relief entered with respect to the petition; or

(D) is an entity that has acquired substantially all of the assets or business of a small business debtor described in subparagraph (A), (B), or (C), unless such entity establishes by a preponderance of the evidence that such entity acquired substantially all of the assets or business of such small business debtor in good faith and not for the purpose of evading this paragraph.

(2) Paragraph (1) does not apply—

(A) to an involuntary case involving no collusion by the debtor with creditors; or

(B) to the filing of a petition if—

(i) the debtor proves by a preponderance of the evidence that the filing of the petition resulted from circumstances beyond the control of the debtor not foreseeable at the time the case then pending was filed; and

(ii) it is more likely than not that the court will confirm a feasible plan, but not a liquidating plan, within a reasonable period of time.

(*o*) The exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph (6), (7), (17), or (27) of subsection (b) shall not be stayed by any order of a court or administrative agency in any proceeding under this title.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2570; Pub. L. 97–222, §3, July 27, 1982, 96 Stat. 235; Pub. L. 98–353, title III, §§304, 363(b), 392, 441, July 10, 1984, 98 Stat. 352, 363, 365, 371; Pub. L. 99–509, title V, §5001(a), Oct. 21, 1986, 100 Stat. 1911; Pub. L. 99–554, title II, §§257(j), 283(d), Oct. 27, 1986, 100 Stat. 3115, 3116; Pub. L. 101–311, title I, §102, title II, §202, June 25, 1990, 104 Stat. 267, 269; Pub. L. 101–508, title III, §3007(a)(1), Nov. 5, 1990, 104 Stat. 1388–28; Pub. L. 103–394, title I, §§101, 116, title II, §§204(a), 218(b), title III, §304(b), title IV, §401, title V, §501(b)(2), (d)(7), Oct. 22, 1994, 108 Stat. 4107, 4119, 4122, 4128, 4132, 4141, 4142, 4144; Pub. L. 105–277, div. I, title VI, §603, Oct. 21, 1998, 112 Stat. 2681–886; Pub. L. 109–8, title I, §106(f), title II, §§214, 224(b), title III, §§302, 303, 305(1), 311, 320, title IV, §§401(b), 441, 444, title VII, §§709, 718, title IX, §907(*o*), (*o*)(1), (2), title XI, §1106, title XII, §1225, Apr. 20, 2005, 119 Stat. 41, 54, 64, 75, 77, 79, 84, 94, 104, 114, 117, 127, 131, 176, 181, 182, 192, 199; Pub. L. 109–304, §17(b)(1), Oct. 6, 2006, 120 Stat. 1706; Pub. L. 109–390, §5(a)(2), Dec. 12, 2006, 120 Stat. 2696; Pub. L. 111–327, §2(a)(12), Dec. 22, 2010, 124 Stat. 3558.)

### HISTORICAL AND REVISION NOTES

#### LEGISLATIVE STATEMENTS

Section 362(a)(1) of the House amendment adopts the provision contained in the Senate amendment enjoining the commencement or continuation of a judicial, administrative, or other proceeding to recover a claim against the debtor that arose before the commencement of the case. The provision is beneficial and interacts with section 362(a)(6), which also covers assessment, to prevent harassment of the debtor with respect to pre-petition claims.

Section 362(a)(7) contains a provision contained in H.R. 8200 as passed by the House. The differing provision in the Senate amendment was rejected. It is not possible that a debt owing to the debtor may be offset against an interest in the debtor.

Section 362(a)(8) is new. The provision stays the commencement or continuation of any proceeding concerning the debtor before the U.S. Tax Court.

Section 362(b)(4) indicates that the stay under section 362(a)(1) does not apply to affect the commencement or continuation of an action or proceeding by a governmental unit to enforce the governmental unit's police or regulatory power. This section is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.

Section 362(b)(6) of the House amendment adopts a provision contained in the Senate amendment restricting the exception to the automatic stay with respect to setoffs to permit only the setoff of mutual debts and claims. Traditionally, the right of setoff has been limited to mutual debts and claims and the lack of the clarifying term "mutual" in H.R. 8200 as passed by the House created an unintentional ambiguity. Section 362(b)(7) of the House amendment permits the issuance of a notice of tax deficiency. The House amendment rejects section 362(b)(7) in the Senate amendment. It would have permitted a particular governmental unit to obtain a pecuniary advantage without a hearing on the merits contrary to the exceptions contained in sections 362(b)(4) and (5).

Section 362(d) of the House amendment represents a compromise between comparable provisions in the House bill and Senate amendment. Under section 362(d)(1) of the House amendment, the court may terminate, annul, modify, or condition the automatic stay for cause, including lack of adequate protection of an interest in property of a secured party. It is anticipated

that the Rules of Bankruptcy Procedure will provide that those hearings will receive priority in the calendar. Under section 362(d)(2) the court may alternatively terminate, annul, modify, or condition the automatic stay for cause including inadequate protection for the creditor. The court shall grant relief from the stay if there is no equity and it is not necessary to an effective reorganization of the debtor.

The latter requirement is contained in section 362(d)(2). This section is intended to solve the problem of real property mortgage foreclosure of property where the bankruptcy petition is filed on the eve of foreclosure. The section is not intended to apply if the business of the debtor is managing or leasing real property, such as a hotel operation, even though the debtor has no equity if the property is necessary to an effective reorganization of the debtor. Similarly, if the debtor does have an equity in the property, there is no requirement that the property be sold under section 363 of title 11 as would have been required by the Senate amendment.

Section 362(e) of the House amendment represents a modification of provisions in H.R. 8200 as passed by the House and the Senate amendment to make clear that a final hearing must be commenced within 30 days after a preliminary hearing is held to determine whether a creditor will be entitled to relief from the automatic stay. In order to insure that those hearings will in fact occur within such 30-day period, it is anticipated that the rules of bankruptcy procedure provide that such final hearings receive priority on the court calendar.

Section 362(g) places the burden of proof on the issue of the debtor's equity in collateral on the party requesting relief from the automatic stay and the burden on other issues on the debtor.

An amendment has been made to section 362(b) to permit the Secretary of the Department of Housing and Urban Development to commence an action to foreclose a mortgage or deed of trust. The commencement of such an action is necessary for tax purposes. The section is not intended to permit the continuation of such an action after it is commenced nor is the action to be construed to entitle the Secretary to take possession in lieu of foreclosure.

Automatic stay: Sections 362(b)(8) and (9) contained in the Senate amendment are largely deleted in the House amendment. Those provisions add to the list of actions not stayed (a) jeopardy assessments, (b) other assessments, and (c) the issuance of deficiency notices. In the House amendment, jeopardy assessments against property which ceases to be property of the estate is already authorized by section 362(c)(1). Other assessments are specifically stayed under section 362(a)(6), while the issuance of a deficiency notice is specifically permitted. Stay of the assessment and the permission to issue a statutory notice of a tax deficiency will permit the debtor to take his personal tax case to the Tax Court, if the bankruptcy judge authorizes him to do so (as explained more fully in the discussion of section 505).

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

The action commenced by the party seeking relief from the stay is referred to as a motion to make it clear that at the expedited hearing under subsection (e), and at hearings on relief from the stay, the only issue will be the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization of the debtor, or the existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against

the creditor, which, although relevant to the question of the amount of the debt, concern largely collateral or unrelated matters. This approach is consistent with that taken in cases such as *In re Essex Properties, Ltd.,* 430 F.Supp. 1112 (N.D.Cal.1977), that an action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert counterclaims. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustee to recover property of the estate or to object to the allowance of a claim. However, this would not preclude the party seeking continuance of the stay from presenting evidence on the existence of claims which the court may consider in exercising its discretion. What is precluded is a determination of such collateral claims on the merits at the hearing.

Paragraph (7) [of subsec. (a)] stays setoffs of mutual debts and credits between the debtor and creditors. As with all other paragraphs of subsection (a), this paragraph does not affect the right of creditors. It simply stays its enforcement pending an orderly examination of the debtor's and creditors' rights.

Subsection (c) governs automatic termination of the stay. Subsections (d) through (g) govern termination of the stay by the court on the request of a party in interest. Subsection (d) requires the court, on request of a party in interest, to grant relief from the stay, such as by terminating, annulling, modifying, or conditioning the stay, for cause. The lack of adequate protection of an interest in property of the party requesting relief from the stay is one cause for relief, but is not the only cause. As noted above, a desire to permit an action to proceed to completion in another tribunal may provide another cause. Other causes might include the lack of any connection with or interference with the pending bankruptcy case. For example, a divorce or child custody proceeding involving the debtor may bear no relation to the bankruptcy case. In that case, it should not be stayed. A probate proceeding in which the debtor is the executor or administrator of another's estate usually will not be related to the bankruptcy case, and should not be stayed. Generally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors. The facts of each request will determine whether relief is appropriate under the circumstances.

Subsection (e) provides a protection for secured creditors that is not available under present law. The subsection sets a time certain within which the bankruptcy court must rule on the adequacy of protection provided of the secured creditor's interest. If the court does not rule within 30 days from a request for relief from the stay, the stay is automatically terminated with respect to the property in question. In order to accommodate more complex cases, the subsection permits the court to make a preliminary ruling after a preliminary hearing. After a preliminary hearing, the court may continue the stay only if there is a reasonable likelihood that the party opposing relief from the stay will prevail at the final hearing. Because the stay is essentially an injunction, the three stages of the stay may be analogized to the three stages of an injunction. The filing of the petition which gives rise to the automatic stay is similar to a temporary restraining order. The preliminary hearing is similar to the hearing on a preliminary injunction, and the final hearing and order is similar to a permanent injunction. The main difference lies in which party must bring the issue before the court. While in the injunction setting, the party seeking the injunction must prosecute the action, in proceedings for relief from the automatic stay, the enjoined party must move. The difference does not, however, shift the burden of proof. Subsection (g) leaves that burden on the party opposing relief from

Case 22-1222, Document 57, 09/16/2022, 3384089, Page177 of 180

the stay (that is, on the party seeking continuance of the injunction on the issue of adequate protection.

At the expedited hearing under subsection (e), and at all hearings on relief from the stay, the only issue will be the claim of the creditor and the lack of adequate protection or existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor on largely unrelated matters. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustees to recover property of the estate or to object to the allowance of a claim.

### REFERENCES IN TEXT

Section 5(a)(3) of the Securities Investor Protection Act of 1970, referred to in subsecs. (a) and (b), is classified to section 78eee(a)(3) of Title 15, Commerce and Trade.

The Social Security Act, referred to in subsec. (b)(2)(D) to (G), (28), is act Aug. 14, 1935, ch. 531, 49 Stat. 620, as amended. Titles IV, XI, and XVIII of the Act are classified generally to subchapters IV (§ 601 et seq.), XI (§ 1301 et seq.), and XVIII (§ 1395 et seq.), respectively, of chapter 7 of Title 42, The Public Health and Welfare. Sections 464, 466, and 1128B of the Act are classified to sections 664, 666, and 1320a–7b, respectively, of Title 42. For complete classification of this Act to the Code, see section 1305 of Title 42 and Tables.

The National Housing Act, referred to in subsec. (b)(8), is act June 27, 1934, ch. 847, 48 Stat. 1246, as amended, which is classified principally to chapter 13 (§ 1701 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1701 of Title 12 and Tables.

The Higher Education Act of 1965, referred to in subsec. (b)(16), is Pub. L. 89–329, Nov. 8, 1965, 79 Stat. 1219, which is classified generally to chapter 28 (§ 1001 et seq.) of Title 20, Education, and part C (§ 2751 et seq.) of subchapter I of chapter 34 of Title 42, The Public Health and Welfare. Section 1083(j) of the Act is classified to section 1083(j) of Title 20. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of Title 20 and Tables.

The Internal Revenue Code of 1986, referred to in subsec. (b)(19), is classified generally to Title 26, Internal Revenue Code.

Section 408(b)(1) of the Employee Retirement Income Security Act of 1974, referred to in subsec. (b)(19)(A), is classified to section 1108(b)(1) of Title 29, Labor.

### AMENDMENTS

2010—Subsec. (a)(8). Pub. L. 111–327, § 2(a)(12)(A), substituted "tax liability of a debtor that is a corporation" for "corporate debtor's tax liability".

Subsec. (c)(3). Pub. L. 111–327, § 2(a)(12)(B)(i), inserted "a" after "against" in introductory provisions.

Subsec. (c)(4)(A)(i). Pub. L. 111–327, § 2(a)(12)(B)(ii), inserted "under a chapter other than chapter 7 after dismissal" after "refiled".

Subsec. (d)(4). Pub. L. 111–327, § 2(a)(12)(C), substituted "hinder, or" for "hinder, and" in introductory provisions.

Subsec. (*l*)(2). Pub. L. 111–327, § 2(a)(12)(D), substituted "nonbankruptcy" for "nonbankruptcy".

2006—Subsec. (b)(6), (7). Pub. L. 109–390, § 5(a)(2)(A), added pars. (6) and (7) and struck out former pars. (6) and (7) which read as follows:

"(6) under subsection (a) of this section, of the setoff by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any mutual debt and claim under or in connection with commodity contracts, as defined in section 761 of this title, forward contracts, or securities contracts, as defined in section 741 of this title, that constitutes the setoff of a claim against the debtor for a margin payment, as defined in

section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, arising out of commodity contracts, forward contracts, or securities contracts against cash, securities, or other property held by, pledged to, under the control of, or due from such commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency to margin, guarantee, secure, or settle commodity contracts, forward contracts, or securities contracts;

"(7) under subsection (a) of this section, of the setoff by a repo participant or financial participant, of any mutual debt and claim under or in connection with repurchase agreements that constitutes the setoff of a claim against the debtor for a margin payment, as defined in section 741 or 761 of this title, or settlement payment, as defined in section 741 of this title, arising out of repurchase agreements against cash, securities, or other property held by, pledged to, under the control of, or due from such repo participant or financial participant to margin, guarantee, secure or settle repurchase agreements;".

Subsec. (b)(12). Pub. L. 109–304, § 17(b)(1)(A), substituted "chapter 537 of title 46 or section 109(h) of title 49" for "section 207 or title XI of the Merchant Marine Act, 1936".

Subsec. (b)(13). Pub. L. 109–304, § 17(b)(1)(B), substituted "chapter 537 of title 46" for "section 207 or title XI of the Merchant Marine Act, 1936".

Subsec. (b)(17). Pub. L. 109–390, § 5(a)(2)(B), added par. (17) and struck out former par. (17) which read as follows: "under subsection (a), of the setoff by a swap participant or financial participant of a mutual debt and claim under or in connection with one or more swap agreements that constitutes the setoff of a claim against the debtor for any payment or other transfer of property due from the debtor under or in connection with any swap agreement against any payment due to the debtor from the swap participant or financial participant under or in connection with any swap agreement or against cash, securities, or other property held by, pledged to, under the control of, or due from such swap participant or financial participant to margin, guarantee, secure, or settle any swap agreement;".

Subsec. (b)(27). Pub. L. 109–390, § 5(a)(2)(C), added par. (27) and struck out former par. (27) which read as follows: "under subsection (a), of the setoff by a master netting agreement participant of a mutual debt and claim under or in connection with one or more master netting agreements or any contract or agreement subject to such agreements that constitutes the setoff of a claim against the debtor for any payment or other transfer of property due from the debtor under or in connection with such agreements or any contract or agreement subject to such agreements against any payment due to the debtor from such master netting agreement participant under or in connection with such agreements or any contract or agreement subject to such agreements against cash, securities, or other property held by, pledged to, under the control of, or due from such master netting agreement participant to margin, guarantee, secure, or settle such agreements or any contract or agreement subject to such agreements, to the extent that such participant is eligible to exercise such offset rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue; and".

2005—Subsec. (a)(8). Pub. L. 109–8, § 709, substituted "a corporate debtor's tax liability for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title" for "the debtor".

Subsec. (b)(2). Pub. L. 109–8, § 214, added par. (2) and struck out former par. (2) which read as follows: "under subsection (a) of this section—

"(A) of the commencement or continuation of an action or proceeding for—

"(i) the establishment of paternity; or

"(ii) the establishment or modification of an order for alimony, maintenance, or support; or

"(B) of the collection of alimony, maintenance, or support from property that is not property of the estate;".

Subsec. (b)(6). Pub. L. 109-8, §907(d)(1)(A), (o)(1), substituted "financial institution, financial participant," for "financial institutions," in two places and inserted ", pledged to, under the control of," after "held by".

Subsec. (b)(7). Pub. L. 109-8, §907(d)(1)(B), (o)(2), inserted "or financial participant" after "repo participant" in two places and ", pledged to, under the control of," after "held by".

Subsec. (b)(17). Pub. L. 109-8, §907(d)(1)(C), added par. (17) and struck out former par. (17) which read as follows: "under subsection (a) of this section, of the setoff by a swap participant, of any mutual debt and claim under or in connection with any swap agreement that constitutes the setoff of a claim against the debtor for any payment due from the debtor under or in connection with any swap agreement against any payment due to the debtor from the swap participant under or in connection with any swap agreement or against cash, securities, or other property of the debtor held by or due from such swap participant to guarantee, secure or settle any swap agreement;".

Subsec. (b)(18). Pub. L. 109-8, §1225, amended par. (18) generally. Prior to amendment, par. (18) read as follows: "under subsection (a) of the creation or perfection of a statutory lien for an ad valorem property tax imposed by the District of Columbia, or a political subdivision of a State, if such tax comes due after the filing of the petition;".

Subsec. (b)(19). Pub. L. 109-8, §224(b), added par. (19).

Subsec. (b)(20), (21). Pub. L. 109-8, §303(b), added pars. (20) and (21).

Subsec. (b)(22) to (24). Pub. L. 109-8, §311(a), added pars. (22) to (24).

Subsec. (b)(25). Pub. L. 109-8, §401(b), added par. (25).

Subsec. (b)(26). Pub. L. 109-8, §718, added par. (26).

Subsec. (b)(27). Pub. L. 109-8, §907(d)(1)(D), added par. (27).

Subsec. (b)(28). Pub. L. 109-8, §1106, added par. (28).

Subsec. (c). Pub. L. 109-8, §305(1)(A), substituted "(e), (f), and (h)" for "(e), and (f)" in introductory provisions.

Subsec. (c)(3), (4). Pub. L. 109-8, §302, added pars. (3) and (4).

Subsec. (d). Pub. L. 109-8, §303(a), added par. (4) and concluding provisions.

Subsec. (d)(3). Pub. L. 109-8, §444(1), inserted "or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later" after "90-day period)" in introductory provisions.

Subsec. (d)(3)(B). Pub. L. 109-8, §444(2), added subpar. (B) and struck out former subpar. (B) which read as follows: "the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate; or".

Subsec. (e). Pub. L. 109-8, §320, designated existing provisions as par. (1) and added par. (2).

Subsec. (h). Pub. L. 109-8, §305(1)(C), added subsec. (h). Former subsec. (h) redesignated (k).

Subsecs. (i), (j). Pub. L. 109-8, §106(f), added subsecs. (i) and (j).

Subsec. (k). Pub. L. 109-8, §441(1), designated existing provisions as par. (1), substituted "Except as provided in paragraph (2), an" for "An", and added par. (2).

Pub. L. 109-8, §305(1)(B), redesignated subsec. (h) as (k).

Subsecs. (l), (m). Pub. L. 109-8, §311(b), added subsecs. (l) and (m).

Subsec. (n). Pub. L. 109-8, §441(2), added subsec. (n).

Subsec. (o). Pub. L. 109-8, §907(d)(2), added subsec. (o).

1998—Subsec. (b)(4). Pub. L. 105-277 added par. (4) and struck out former pars. (4) and (5) which read as follows:

"(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

"(5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;".

1994—Subsecs. (a), (b). Pub. L. 103-394, §501(d)(7)(A), (B)(i), struck out "(15 U.S.C. 78eee(a)(3))" after "Act of 1970" in introductory provisions.

Subsec. (b)(2). Pub. L. 103-394, §304(b), amended par. (2) generally. Prior to amendment, par. (2) read as follows: "under subsection (a) of this section, of the collection of alimony, maintenance, or support from property that is not property of the estate;".

Subsec. (b)(3). Pub. L. 103-394, §204(a), inserted ", or to maintain or continue the perfection of," after "to perfect".

Subsec. (b)(6). Pub. L. 103-394, §501(b)(2)(A), substituted "section 761" for "section 761(4)", "section 741" for "section 741(7)", "section 101, 741, or 761" for "section 101(34), 741(5), or 761(15)", and "section 101 or 741" for "section 101(35) or 741(8)".

Subsec. (b)(7). Pub. L. 103-394, §501(b)(2)(B), substituted "section 741 or 761" for "section 741(5) or 761(15)" and "section 741" for "section 741(8)".

Subsec. (b)(9). Pub. L. 103-394, §116, amended par. (9) generally. Prior to amendment, par. (9) read as follows: "under subsection (a) of this section, of the issuance to the debtor by a governmental unit of a notice of tax deficiency;".

Subsec. (b)(10). Pub. L. 103-394, §501(d)(7)(B)(ii), struck out "or" at end.

Subsec. (b)(12). Pub. L. 103-394, §501(d)(7)(B)(iii), substituted "section 31325 of title 46" for "the Ship Mortgage Act, 1920 (46 App. U.S.C. 911 et seq.)" and struck out "(46 App. U.S.C. 1117 and 1271 et seq., respectively)" after "Act, 1936".

Subsec. (b)(13). Pub. L. 103-394, §501(d)(7)(B)(iv), substituted "section 31325 of title 46" for "the Ship Mortgage Act, 1920 (46 App. U.S.C. 911 et seq.)" and struck out "(46 App. U.S.C. 1117 and 1271 et seq., respectively)" after "Act, 1936" and "or" at end.

Subsec. (b)(14). Pub. L. 103-394, §501(d)(7)(B)(vii), amended par. (14) relating to the setoff by a swap participant of any mutual debt and claim under or in connection with a swap agreement by substituting "; or" for period at end, redesignating par. (14) as (17), and inserting it after par. (16).

Subsec. (b)(15). Pub. L. 103-394, §501(d)(7)(B)(v), struck out "or" at end.

Subsec. (b)(16). Pub. L. 103-394, §501(d)(7)(B)(vi), struck out "(20 U.S.C. 1001 et seq.)" after "Act of 1965" and substituted semicolon for period at end.

Subsec. (b)(17). Pub. L. 103-394, §501(d)(7)(B)(vii)(I), (III), redesignated par. (14) relating to the setoff by a swap participant of any mutual debt and claim under or in connection with a swap agreement as (17) and inserted it after par. (16).

Subsec. (b)(18). Pub. L. 103-394, §401, added par. (18).

Subsec. (d)(3). Pub. L. 103-394, §218(b), added par. (3).

Subsec. (e). Pub. L. 103-394, §101, in last sentence substituted "concluded" for "commenced" and inserted before period at end ", unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances".

1990—Subsec. (b)(6). Pub. L. 101-311, §202, inserted reference to sections 101(34) and 101(35) of this title.

Subsec. (b)(12). Pub. L. 101-508, §3007(a)(1)(A), which directed the striking of "or" after "State law;", could not be executed because of a prior amendment by Pub. L. 101-311. See below.

Pub. L. 101-311, §102(1), struck out "or" after "State law;".

Subsec. (b)(13). Pub. L. 101-508, §3007(a)(1)(B), which directed the substitution of a semicolon for period at end, could not be executed because of a prior amendment by Pub. L. 101-311. See below.

Pub. L. 101-311, §102(2), substituted "; or" for period at end.

Page 83 TITLE 11—BANKRUPTCY § 362

Subsec. (b)(14) to (16). Pub. L. 101–508, §3007(a)(1)(C), added pars. (14) to (16). Notwithstanding directory language adding pars. (14) to (16) immediately following par. (13), pars. (14) to (16) were added after par. (14), as added by Pub. L. 101–311, to reflect the probable intent of Congress.

Pub. L. 101–311, §102(3), added par. (14) relating to the setoff by a swap participant of any mutual debt and claim under or in connection with a swap agreement. Notwithstanding directory language adding par. (14) at end of subsec. (b), par. (14) was added after par. (13) to reflect the probable intent of Congress.

1986—Subsec. (b). Pub. L. 99–509 inserted sentence at end.

Subsec. (b)(6). Pub. L. 99–554, §283(d)(1), substituted '', financial institutions'' for ''financial institution,'' in two places.

Subsec. (b)(9). Pub. L. 99–554, §283(d)(2), (3), struck out ''or'' at end of first par. (9) and redesignated as par. (10) the second par. (9) relating to leases of nonresidential property, which was added by section 363(b) of Pub. L. 98–353.

Subsec. (b)(10). Pub. L. 99–554, §283(d)(3), (4), redesignated as par. (10) the second par. (9) relating to leases of nonresidential property, added by section 363(b) of Pub. L. 98–353, and substituted ''property; or'' for ''property.''. Former par. (10) redesignated (11).

Subsec. (b)(11). Pub. L. 99–554, §283(d)(3), redesignated former par. (10) as (11).

Subsec. (b)(12), (13). Pub. L. 99–509 added pars. (12) and (13).

Subsec. (c)(2)(C). Pub. L. 99–554, §257(j), inserted reference to chapter 12 of this title.

1984—Subsec. (a)(1). Pub. L. 98–353, §441(a)(1), inserted ''action or'' after ''other''.

Subsec. (a)(3). Pub. L. 98–353, §441(a)(2), inserted ''or to exercise control over property of the estate''.

Subsec. (b)(3). Pub. L. 98–353, §441(b)(1), inserted ''or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title''.

Subsec. (b)(6). Pub. L. 98–353, §441(b)(2), inserted ''or due from'' after ''held by'' and ''financial institution,'' after ''stockbroker'' in two places, and substituted ''secure, or settle commodity contracts'' for ''or secure commodity contracts''.

Subsec. (b)(7) to (9). Pub. L. 98–353, §441(b)(3), (4), in par. (8) as redesignated by Pub. L. 98–353, §392, substituted ''the'' for ''said'' and struck out ''or'' the last place it appeared which probably meant ''or'' after ''units;'' that was struck out by Pub. L. 98–353, §363(b)(1); and, in par. (9), relating to notices of deficiencies, as redesignated by Pub. L. 98–353, §392, substituted a semicolon for the period.

Pub. L. 98–353, §392, added par. (7) and redesignated former pars. (7) and (8) as (8) and (9), respectively.

Pub. L. 98–353, §363(b), struck out ''or'' at end of par. (7), substituted ''; or'' for the period at end of par. (8), and added par. (9) relating to leases of nonresidential property.

Subsec. (b)(10). Pub. L. 98–353, §441(b)(5), added par. (10).

Subsec. (c)(2)(B). Pub. L. 98–353, §441(c), substituted ''or'' for ''and''.

Subsec. (d)(2). Pub. L. 98–353, §441(d), inserted ''under subsection (a) of this section'' after ''property''.

Subsec. (e). Pub. L. 98–353, §441(e), inserted ''the conclusion of'' after ''pending'' and substituted ''The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be commenced not later than thirty days after the conclusion of such preliminary hearing.'' for ''If the hearing under this subsection is a preliminary hearing—

''(1) the court shall order such stay so continued if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the final hearing under subsection (d) of this section; and

''(2) such final hearing shall be commenced within thirty days after such preliminary hearing.''

Subsec. (f). Pub. L. 98–353, §441(f), substituted ''Upon request of a party in interest, the court, with or'' for ''The court,''.

Subsec. (h). Pub. L. 98–353, §304, added subsec. (h).

1982—Subsec. (a). Pub. L. 97–222, §3(a), inserted '', or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)),'' after ''this title'' in provisions preceding par. (1).

Subsec. (b). Pub. L. 97–222, §3(b), inserted '', or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)),'' after ''this title'' in provisions preceding par. (1).

Subsec. (b)(6). Pub. L. 97–222, §3(c), substituted provisions that the filing of a bankruptcy petition would not operate as a stay, under subsec. (a) of this section, of the setoff by a commodity broker, forward contract merchant, stockbroker, or securities clearing agency of any mutual debt and claim under or in connection with commodity, forward, or securities contracts that constitutes the setoff of a claim against the debtor for a margin or settlement payment arising out of commodity, forward, or securities contracts against cash, securities, or other property held by any of the above agents to margin, guarantee, or secure commodity, forward, or securities contracts, for provisions that such filing would not operate as a stay under subsection (a)(7) of this section, of the setoff of any mutual debt and claim that are commodity futures contracts, forward commodity contracts, leverage transactions, options, warrants, rights to purchase or sell commodity futures contracts or securities, or options to purchase or sell commodities or securities.

EFFECTIVE DATE OF 2006 AMENDMENT

Amendment by Pub. L. 109–390 not applicable to any cases commenced under this title or to appointments made under any Federal or State law, before Dec. 12, 2006, see section 7 of Pub. L. 109–390, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1990 AMENDMENT

Section 3007(a)(3) of Pub. L. 101–508 provided that: ''The amendments made by this subsection [amending this section and section 541 of this title] shall be effective upon date of enactment of this Act [Nov. 5, 1990].''

Section 3008 of Pub. L. 101–508, provided that the amendments made by subtitle A (§§3001–3008) of title III of Pub. L. 101–508, amending this section, sections 541 and 1328 of this title, and sections 1078, 1078–1, 1078–7, 1685, 1688, and 1091 of Title 20, Education, and provisions set out as a note under section 1078–1 of Title 20, were to cease to be effective Oct. 1, 1996, prior to repeal by Pub. L. 102–325, title XV, §1558, July 23, 1992, 106 Stat. 841.

EFFECTIVE DATE OF 1986 AMENDMENTS

Amendment by section 257 of Pub. L. 99–554 effective 30 days after Oct. 27, 1986, but not applicable to cases commenced under this title before that date, see section 302(a), (c)(1) of Pub. L. 99–554, set out as a note under section 581 of Title 28, Judiciary and Judicial Procedure.

Amendment by section 283 of Pub. L. 99–554 effective 30 days after Oct. 27, 1986, see section 302(a) of Pub. L. 99–554.

Section 5001(b) of Pub. L. 99–509 provided that: "The amendments made by subsection (a) of this section [amending this section] shall apply only to petitions filed under section 362 of title 11, United States Code, which are made after August 1, 1986."

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

REPORT TO CONGRESSIONAL COMMITTEES

Section 5001(a) of Pub. L. 99–509 directed Secretary of Transportation and Secretary of Commerce, before July 1, 1989, to submit reports to Congress on the effects of amendments to 11 U.S.C. 362 by this subsection.

## § 363. Use, sale, or lease of property

(a) In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

(b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

(2) If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then—

(A) notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

(B) notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the

Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended—

(i) pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to a cash tender offer;

(ii) pursuant to subsection (g)(2) of such section; or

(iii) by the court after notice and a hearing.

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

(3) Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

(4) Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

(d) The trustee may use, sell, or lease property under subsection (b) or (c) of this section—

(1) in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust; and

(2) only to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362.

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of