# 22-1222-bk

## United States Court of Appeals

*for the*

## Second Circuit

---

In re: ARCAPITA BANK B.S.C.(C),

*Debtor.*

_____

BAHRAIN ISLAMIC BANK,

*Appellant,*

– v. –

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF ARCAPITA BANK B.S.C. (C), *et al.*,

*Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLEE

ANDREW M. LEBLANC
SAMIR L. VORA
MILBANK LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
(202) 835-7500

DENNIS F. DUNNE
EVAN R. FLECK
MILBANK LLP
55 Hudson Yards
New York, New York 10001
(212) 530-5000

*Attorneys for Appellee*

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c) and its affiliated debtors-in-possession, by and through its undersigned counsel, hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated:  December 16, 2022
       Washington, D.C.

By: /s/ *Andrew M. Leblanc*_____
Dennis F. Dunne
Evan R. Fleck
Milbank LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000

Andrew M. Leblanc
Samir L. Vora
Milbank LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Counsel for Plaintiff-Appellee Official Committee of Unsecured Creditors of Arcapita BankB.S.C.(c), et al.*

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................1

STANDARDS OF REVIEW ......................................................................4

COUNTERSTATEMENT OF THE CASE................................................4

   I.   BISB'S BREACH OF THE PLACEMENT AGREEMENT AND
       PURPORTED SETOFF. ......................................................................4

     A.   The Parties' Prepetition Transactions Leave Arcapita in Debt to BisB .....4

     B.   BisB Agrees to Rollover the Placements, But Only After Arcapita
         Transfers Enough Money to Cover Its Indebtedness.................................6

     C.   Arcapita Files Bankruptcy and BisB and Arcapita Take Further Steps
         to Orchestrate Setoff Conditions..............................................................7

     D.   BisB Claims Setoff Just Before the CBB Issues a Formal Direction
         Prohibiting Exactly That Setoff ...............................................................8

  II.  PROCEDURAL HISTORY OF THIS LITIGATION.............................10

SUMMARY OF THE ARGUMENT ......................................................12

ARGUMENT ...........................................................................................15

   I.   THE DISTRICT COURT DID NOT ERR IN RULING THAT BISB IS
       SUBJECT TO BANKRUPTCY COURT JURISDICTION.........................15

     A.   BisB Purposefully Availed Itself of the United States .............................16

     B.   All of the Committee's Claims Arise Directly From BisB's Use of
         its New York Correspondent Bank Account .............................................21

     C.   Exercising Personal Jurisdiction over BisB is Reasonable .....................27

     D.   The District Court Did Not Limit Its Ruling to the Committee's
         Preference Claim........................................................................................29

  II.  THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION
       BY DECLINING TO ABSTAIN ON INTERNATIONAL COMITY
       GROUNDS...............................................................................................30

     A.   There is No Pending Foreign Proceeding to Which to Defer, and the
         Committee is Not Asking for Enforcement of the Formal Direction.......31

       1.   There is No Parallel Foreign Proceeding .............................................31

2. The Committee is Not Seeking Enforcement of the Formal Direction ................................................................................33

B. BisB's Prescriptive Comity Challenge Fails ..............................................34

1. The United States has a Strong Link to the Relevant Activity and a Strong Interest in its Regulation ..........................................35

2. No True Conflict Warrants Abstention on Comity Grounds ...............36

III. THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN REJECTING BISB'S ASSERTED SETOFF ..........................................38

A. BisB Had No Valid Setoff Right Under Bahraini Law ............................39

1. The CBB Law is A Special Law That Preempts General Laws Like the Bahraini Civil Code ................................................39

2. The Formal Direction is a Special Law Overriding the Bahraini Civil Code................................................................41

3. BisB Has Failed to Comply with the Formal Direction.......................42

4. BisB Incorrectly Asserts that the CBB's Powers Apply Only to Licensees' Future Actions ................................................42

B. BisB's Purported Setoff is Invalid Under Bankruptcy Code Section 553(a)(3)(C) ................................................................45

C. BisB's Setoff Is Disallowable On Equitable Principles .........................47

IV. SETOFF IS NOT PERFORMANCE OF A CONTRACT UNDER BAHRAINI LAW ................................................................48

V. THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN SETTING THE PREJUDGMENT INTEREST RATE AT 9% PER ANNUM ................................................................50

A. An Award of Prejudgment Interest Is Consistent With Bahraini Law .....50

B. A Prejudgment Interest Rate of 9% is Appropriate ...............................54

CONCLUSION ................................................................56

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allianz Ins. Co. v. Lerner*,
  416 F.3d 109 (2d Cir. 2005) ...............................................................20

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
  994 F.2d 996 (2d Cir. 1993) ..............................................................30

*Amigo Foods Corp. v. Marine Midland Bank-N.Y.*,
  39 N.Y.2d 391 (1976) ........................................................................17

*Asahi Metal Indus. Co. v. Super. Ct.*,
  480 U.S. 102 (1987)...........................................................................15

*Averbach v. Cairo Amman Bank*,
  No. 19-0004, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020).................22

*Bahr. Islamic Bank, BisB v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*,
  640 B.R. 604 (S.D.N.Y. 2022) ...................................................*passim*

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  305 F.3d 120 (2d Cir. 2002) ..............................................................29

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)...........................................................................15

*Cent. Va. Cmty. College v. Katz*,
  546 U.S. 356 (2006)...........................................................................36

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018) ................................................................30

*Citizens Bank of Maryland v. Strumpf*,
  516 U.S. 16 (1995).............................................................................38

*Correspondent Servs. Corp. v. J.V.W. Invs. Ltd.*,
  120 F. Supp. 2d 401 (S.D.N.Y. 2000) ...............................................25

*Dandong v. Pinnacle Performance Ltd.*,
  966 F. Supp. 2d 374 (S.D.N.Y. 2013) .................................................25

*Daou v. BLC Bank, S.A.L.*,
  42 F.4th 120 (2d Cir. 2022) .................................................18, 26, 27

*Davis v. R.A. Brooks Trucking, Co. (In re Quebecor World (USA), Inc.)*,
  491 B.R. 379 (Bankr. S.D.N.Y. 2013).................................................51

*Doe v. E. Lyme Bd. of Educ.*,
  962 F.3d 649 (2d Cir. 2020) .................................................4

*DuVoisin v. Foster (In re S. Indus. Banking Corp.)*,
  809 F.2d 329 (6th Cir. 1987) .................................................46

*Eldesouky v. Aziz*,
  No. 11-CV-6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) .................................................24, 28

*Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*,
  67 F.3d 1063 (2d Cir. 1995) .................................................50

*Esso Expl. & Prod. Nig. v. Nigerian Nat'l Petroleum Corp.*,
  397 F. Supp. 3d 323 (S.D.N.Y. 2019) .................................................25

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petro. Corp.*,
  40 F.4th 56 (2d Cir. 2022) .................................................4, 25

*Florsheim Grp. Inc. v. USAsia Int'l Corp. (In re Florsheim Grp. Inc.)*,
  336 B.R. 126 (Bankr. N.D. Ill. 2005) .................................................36

*Foresco Co. v. Oh*,
  337 F. Supp. 3d 304 (S.D.N.Y. 2018) .................................................54

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011).................................................15

*Gordon v. Tese-Milner (In re Gordon)*,
  577 B.R. 38 (S.D.N.Y. 2017) .................................................31

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993).................................................36

iv

*Johnson v. Ward*,
    4 N.Y.3d 516 (2005) ...................................................................27

*Jones v. UNUM Life Ins. Co. of Am.*,
    223 F.3d 130 (2d Cir. 2000) ........................................................55

*In re Lehman Bros. Holdings Inc.*,
    404 B.R. 752 (Bankr. S.D.N.Y. 2009).........................................38

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327 (2012) ...............................................16, 17, 21, 22

*Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012) .....................................................16, 21

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ................................................*passim*

*Marfia v. T.C. Ziraat Bankasi*,
    147 F.3d 83 (2d Cir. 1998) .....................................................50, 51

*Maxwell Commc'n Corp. ex rel. Homan v. Societe Generale (In re
    Maxwell Commc'n Corp.)*,
    93 F.3d 1036 (2d Cir. 1996) ................................................*passim*

*Metro Indus., Inc. v. Sammi Corp.*,
    82 F.3d 839 (9th Cir. 1996) .........................................................37

*Nat'l Bank of Anguilla (Private Banking Tr.) Ltd. v. Nat'l Bank of
    Anguilla (In re Nat'l Bank of Anguilla (Private Banking Tr.) Ltd.)*,
    580 B.R. 64 (Bankr. S.D.N.Y. 2018)...........................................32

*NIKE, Inc. v. Wu*,
    349 F. Supp. 3d 346 (S.D.N.Y. 2018) ..........................................25

*Nuss v. Sabad*,
    No. 7:10-cv-279, 2011 U.S. Dist. LEXIS 157287 (N.D.N.Y. Sep.
    7, 2011) ......................................................................................25

*Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v.
    Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c))*,
    529 B.R. 57 (Bankr. S.D.N.Y. 2015)...........................................10

v

*Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v.*
  *Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c)),*
  575 B.R. 229 (Bankr. S.D.N.Y. 2017)..............................................11, 31, 35, 36

*Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v.*
  *Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c)),*
  No. 12-11076 (SHL), 2018 WL 718399 (Bankr. S.D.N.Y. Feb. 5,
  2018) ..................................................................................................................11

*Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v.*
  *Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c)),*
  628 B.R. 414 (Bankr. S.D.N.Y. 2021)....................................... *passim*

*Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v.*
  *Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c)),*
  633 B.R. 207 (Bankr. S.D.N.Y. 2021).......................................*passim*

*Official Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v.*
  *Bahr. Islamic Bank,*
  549 B.R. 56 (S.D.N.Y. 2016) .......................................................*passim*

*Official Comm. of Unsecured Creditors v. Mfrs. & Traders Tr. Co. (In*
  *re Bennett Funding Grp.),*
  212 B.R. 206 (B.A.P. 2d Cir. 1997) .....................................39, 45, 48

*Official Comm. of Unsecured Creditors v. Mfrs. & Traders Tr. Co. (In*
  *re Bennett Funding Grp.),*
  146 F.3d 136 (2d Cir. 1998) .........................................................4, 39

*Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC),*
  440 B.R. 274 (Bankr. S.D.N.Y. 2010)..........................................16, 28

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re*
  *Bernard L. Madoff),*
  460 B.R. 106 (Bankr. S.D.N.Y. 2011)................................................15

*Union Cartage Co. v. Dollar Savings & Trust Co. (In re Union*
  *Cartage Co.),*
  38 B.R. 134 (Bankr. N.D. Ohio 1984)................................................46

*United States SEC v. Terraform Labs Pte Ltd.,*
  No. 22-368, 2022 U.S. App. LEXIS 15722 (2d Cir. June 8, 2022) ....................4

*United States v. Int'l Bhd. of Teamsters*,
  945 F. Supp. 609 (S.D.N.Y. 1996) .......................................37

*Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*,
  955 F.2d 831 (2d Cir. 1992) ................................................51

*Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.)*,
  940 F.2d 1507 (11th Cir. 1991) ...........................................45

## Rules, Laws and Statutes

11 U.S.C § 362 ..........................................................2, 49

11 U.S.C. § 541 ...........................................................49

11 U.S.C. § 542 ..........................................................2, 23

11 U.S.C. § 547 ............................................................2

11 U.S.C. § 553 .....................................................*passim*

Accounting and Auditing Organization for Islamic Financial Institutions
  (AAOIFI), Standard No. (3) .........................................53, 54

Bahraini Civil Code, Article 28 .......................................38, 44

Bahraini Civil Code, Article 128 .........................................49

Bahraini Civil Code, Article 129 .........................................49

Bahraini Civil Code, Article 140 .........................................52

Bahraini Civil Code, Article 188 .........................................52

Bahraini Civil Code, Article 223 .....................................51, 52

Bahraini Civil Code, Article 238 .........................................38

Bahraini Civil Code, Article 353 .....................................48, 49

Bahraini Civil Code, Article 354 .....................................48, 49

Bahraini Civil Code, Article 355 ..................................................44, 48, 49

Bahraini Civil Code, Article 356 ......................................................48, 49

Bahraini Civil Code, Article 357 ......................................................48, 49

Bahraini Civil Code, Article 358 ......................................................48, 49

Bahraini Civil Code, Article 359 ......................................................48, 49

Bahraini Civil Code, Article 360 ......................................................48, 49

Central Bank of Bahrain and Financial Institutions Law, Article 38 ...............41, 43

Central Bank of Bahrain Rulebook, Volume 2, Rule EN-3.1.1 .............................43

Central Bank of Bahrain Rulebook, Volume 2, Rule EN-3.1.2 .......................41, 43

Central Bank of Bahrain Rulebook, Volume 2, Rule EN-3.1.3 .............................41

Central Bank of Bahrain Rulebook, Volume 2, Rule UG-1.1.7 ......................41, 43

Fed. R. Bankr. P. 7004 ...................................................................30

N.Y. C.P.L.R. § 302 ..................................................................*passim*

**Secondary Authorities**

Restatement (Third) of Foreign Relations (1986), § 403 ...........................34, 35, 37

## **INTRODUCTION**

This appeal arises out of five orders from the Bankruptcy Court and two from the District Court, issued over the last six years, directing defendant-appellant, Bahrain Islamic Bank ("BisB"), to account for having misappropriated $10 million from the estate of a U.S. chapter 11 debtor, Arcapita Bank B.S.C.(c) ("Arcapita").

Arcapita filed for bankruptcy protection on March 19, 2012. *Days before*, on March 13, 14, and 15, Arcapita transferred three $10 million installments, as part of three purported investment transactions, into a New York correspondent bank account designated by BisB (the "Placements"). At the time, Arcapita owed BisB almost exactly $10 million in debts that were to mature on March 15 and March 16, 2012 (the "Antecedent Debt"). The Placements were to mature within weeks and would have netted Arcapita just a few thousand dollars.

All the while, representatives of these compatriot Bahraini banks colluded to ensure that BisB could apply the $10 million transferred to BisB on March 14, 2012 (the "March 14 Placement") toward the Antecedent Debt. BisB retained the $10 million and the profit thereon (collectively, the "Placement Proceeds") and later claimed to have exercised setoff under the Bahraini Civil Code—helping itself to a full recovery on claims that would otherwise be paid on a fractional basis through the bankruptcy. BisB exercised its setoff without approval from the

1

Bankruptcy Court and in contravention of a written demand (the "Formal Direction") from the Central Bank of Bahrain ("CBB") requiring BisB to either return the Placement Proceeds or seek permission from the Bankruptcy Court to keep them.

In August 2013, plaintiff-appellee, the Official Committee of Unsecured Creditors of Arcapita (the "Committee"), commenced an adversary proceeding against BisB alleging, among other things, that (i) BisB breached the contract giving rise to the March 14 Placement, (ii) the fully matured Placement Proceeds are subject to turnover under Bankruptcy Code Section 542(b), (iii) in the alternative, the transfer is avoidable under Bankruptcy Code Section 547(b), and (iv) BisB's setoff violated the automatic stay under Bankruptcy Code Sections 362(a)(3) and (7).

BisB responded with a years'-long campaign to shield its conduct from judicial scrutiny. BisB contested personal jurisdiction; it contested the extraterritorial reach of the Bankruptcy Code; and it argued the case should be dismissed on comity grounds. When those challenges failed, BisB sought reconsideration on multiple of these issues. None of it worked.

Discovery followed, and then cross-motions for summary judgment. The parties submitted hundreds of pages of briefing and four expert reports, and

2

amassed a vast evidentiary record, including contemporaneous transcripts of recorded telephone calls between representatives of Arcapita and BisB.

In a 99-page opinion, the Bankruptcy Court scrutinized the factual record and rejected the defenses that BisB reasserts here, holding that: (i) jurisdiction properly lied over BisB (an issue that had previously been decided by the District Court and is also subject to this appeal); (ii) it would not be an appropriate exercise of discretion to dismiss this case on comity grounds; and (iii) BisB's setoff cannot be reconciled with Bahraini law, the Bankruptcy Code, or equitable principles. Having dismissed BisB's defenses, the Bankruptcy Court granted the Committee summary judgment on its claims for breach of contract, turnover of the Placement Proceeds, and violation of the automatic stay.[1]  After additional briefing and argument, the Bankruptcy Court issued a detailed decision awarding the Committee prejudgment interest at 9% per annum.

The District Court, with the benefit of an additional hundreds of pages of briefing, and a similarly thorough review of the record, affirmed all of the Bankruptcy Court's challenged orders.  Those orders, together with the District Court's decision finding jurisdiction over BisB, should be affirmed.

---

[1]    Because the Bankruptcy Court found BisB to have breached the placement agreement, thus subjecting the Placement Proceeds to turnover, it did not reach the Committee's preference claim.

3

## STANDARDS OF REVIEW

The Court reviews a lower court's decision on personal jurisdiction for clear error regarding factual findings and *de novo* regarding legal conclusions. *United States SEC v. Terraform Labs Pte Ltd.*, No. 22-368, 2022 U.S. App. LEXIS 15722, at *8 (2d Cir. June 8, 2022).[2]

The Court reviews for abuse of discretion a lower court's decision to: (i) extend or deny comity; (ii) allow or disallow a setoff; and (iii) grant prejudgment interest and the rate of that interest. *See, e.g., Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petro. Corp.*, 40 F.4th 56, 72 (2d Cir. 2022) (comity); *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Tr. Co. (In re Bennett Funding Grp.)*, 146 F.3d 136, 138 (2d Cir. 1998) (setoff); *Doe v. E. Lyme Bd. of Educ.*, 962 F.3d 649, 661 (2d Cir. 2020) (prejudgment interest and interest rate).

## COUNTERSTATEMENT OF THE CASE

I. **BISB'S BREACH OF THE PLACEMENT AGREEMENT AND PURPORTED SETOFF**

A. **The Parties' Prepetition Transactions Leave Arcapita in Debt to BisB**

Arcapita and BisB engaged in Shari'a-compliant *murabaha* "placements" for years before Arcapita's bankruptcy, with the overwhelming majority of

---

[2] Unless otherwise indicated, this Brief omits internal quotation marks and citations from its presentation of legal authority.

placements made by BisB into Arcapita.  *See* A-1303 at A-1303-52.  As part of

each placement, including those at issue here, the "placing" party transfers funds to

the "receiving" party who then purchases specified commodities as agent for, and

on behalf of, the placing party.  In exchange, the receiving party agrees to

repurchase commodities from the placing party on a cost-plus basis to be paid on

an agreed-upon future date.  *Id*. at A-1304-17.  The transactions are documented by

form offers, acceptances, and confirmations.[3]

The debts owed by Arcapita to BisB that form the basis of BisB's purported

setoff originate from two December 2011 investments made under a Master

Placement Agreement entered into in 2002.  *See* A-1359 at A-1360-68 (BHD 1.8

million investment and rollovers); A-1369 at A-1371-76 ($5 million investment

and rollovers).  Under that agreement, BisB deposited approximately $9.8 million

in short-term investments with Arcapita.  *Id*.  Those deposits were continuously

rolled over and last set to mature on March 15 and 16, 2012.  *See id*.

Arcapita and BisB were also party to a similar agreement, through which

Arcapita infrequently placed funds with BisB.  Before the Placements, Arcapita

---

[3]    Commodity *murabaha* are considered synthetic loans or deposits "as they explicitly provide
for a creditor to recoup its investment with a specific rate of return."  *See Official Comm. of
Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahr. Islamic Bank (In re Arcapita Bank
B.S.C.(c))*, 628 B.R. 414, 462 (Bankr. S.D.N.Y. 2021) ("MSJ Order").

had not invested with BisB in 2012 and had made just one placement (which was rolled over five times) with BisB in 2011.  A-1353 at A-1358.

**B.**    **BisB Agrees to Rollover the Placements, But Only After Arcapita Transfers Enough Money to Cover Its Indebtedness**

BisB was acutely aware of Arcapita's financial difficulties in 2012.  *See, e.g.,* MSJ Order, 628 B.R. at 448-51 (citing record evidence).  For example, BisB's then-Senior Manager in Treasury and Investment forwarded internally a January 2012 proposal from Arcapita seeking an investment from BisB, with an admonition that "[o]utright decline is my response based on execution issues, risky exit avenue, and the general situation with Arcapita."  A-1538 at A-1539-40.  A colleague responded "How can we entertain?  [H]aving recommended 100% provision on Arcapita."  *Id*.  In return, the Senior Manager speculated that Arcapita "are just trying their luck.  It seems that the fund company is desperate."  *Id*.  On March 12, 2012, an Arcapita representative pleaded with his BisB counterpart that Arcapita "need[s] more money"; but BisB shot back: "You are unable to repay your loans, so how we can increase it to you!"  A-1406 at A-1445.

Faced with the imminent debt maturities (on March 15 and 16, 2012) of $9.8 million, and significant uncertainty as to whether Arcapita would repay it, BisB held firm against future rollovers, telling Arcapita on March 13, 2012: "No.  You have to pay," further noting that Arcapita was no longer "bringing good business of large deals."  *Id.* at A-1446-48.

6

But BisB's tune changed later that day when Arcapita floated the possibility that it would "conclude with [BisB] a good deal within this week[] [that] might be over 5 million." *Id*. BisB confirmed it was "looking for a good deal; something that exceeds 10 million"—an amount that essentially matched Arcapita's exposure to BisB. *Id*. That same day, Arcapita placed $10 million with BisB, maturing on March 27, 2012. A-1377 at A-1378.

This exchange continued on March 14, when an Arcapita representative called his BisB counterpart and asked: "If I say that I'm going to pay you your money, would you be pleased or otherwise[?] We want to renew both deals of [$5 million] and [1.8 million] Bahraini Dinar." A-1406 at A-1452-53. *This time*, BisB agreed to the rollovers, but "[o]nly for one week." *Id*. That day, Arcapita placed a second $10 million, maturing March 29, 2012. A-1381 at A-1383. On March 15, Arcapita placed a final $10 million, maturing March 26, 2012. A-1388 at A-1392.

Thus, just before Arcapita filed for bankruptcy, it continued to owe $9.8 million to BisB, with whom it had (suddenly) made a total of $30 million in deposits.

## C. Arcapita Files Bankruptcy and BisB and Arcapita Take Further Steps to Orchestrate Setoff Conditions

Arcapita filed for bankruptcy on March 19, 2012, and immediately contacted BisB. Arcapita assured BisB that, notwithstanding the filing, BisB would be paid,

7

stating: "do you want your money?  *We will pay you, don't be scared*."  A-1406 at A-1473 (emphasis added).  Later that day, Arcapita laid out the plan:

> Please note that we are unable as per Central Bank of Bahrain (CBB) instructions to repay Murabaha deals concluded with you.  You have also Murabaha deals with us. . . . See, both obligation balances between our banks are nearly the same.  See, Your balances with us is nearly USD 10 Million[.] . . . *We will withdraw only USD20 million from our placement balance and keep USD10 million with you*.

*Id.* at A-1475-76 (emphasis added).  BisB confirmed that if Arcapita did not plan to pay its debt it should "at least make netting to the two balances (between loans and deposits)."  *Id*.  A week later, Arcapita advised BisB that the "remaining balance of USD10 million *is more than enough to cover our obligations to you* (i.e., BHD1.8 million + USD5 million)," and asked that BisB repay "USD20 million . . . and *keep the remaining balance of USD10 million, just for comfort*."  *Id.* at A-1493 (emphases added).

And BisB did just that.  When the March 13 and 15 Placements matured on March 27 and 26, respectively, BisB paid Arcapita $20 million, but when the March 14 Placement matured on March 29, BisB did not pay—instead holding the $10 million as choreographed.  A-1399 at A-1400-02; A-1132 at A-1141.

### D.    BisB Claims Setoff Just Before the CBB Issues a Formal Direction Prohibiting Exactly That Setoff

On April 30, 2012, Arcapita (through its bankruptcy counsel) sent a letter to BisB demanding payment of the Placement Proceeds.  A-1541 at A-1542.

BisB stonewalled for nearly two months.  Only on June 28, 2012, did BisB, through its counsel, K&L Gates LLP, respond.  BisB refused to repay the Placement Proceeds because it intended to assert setoff "under Bahraini law."  A-1544 at A-1545.

BisB's response preceded by days the CBB's Formal Direction, which was issued on July 4, 2012.  A-1548 at A-1549.  The Formal Direction, which constitutes a form of special law in Bahrain, required BisB to either (i) "compl[y] with [Arcapita's] request to release the funds and return[] the funds immediately to" Arcapita *or* (ii) "seek[] permission from the US Bankruptcy Court (in accordance with the US Bankruptcy Code), prior to affecting any set-off . . . ."  A-1548 at A-1549; *see also* A-2480 at A-2492-94; A-1902 at A-1924 (reports of the parties' experts discussing CBB Law, as defined *infra*).[4]

Following the Formal Direction, BisB repeatedly contacted the CBB: (i) on July 10, 2012, BisB representatives travelled to the CBB's offices (A-1550 at A-1551); (ii) on July 16, 2012, BisB informed the CBB by letter that it "decided to go

---

[4]    Three days before, K&L Gates sent a similar letter on behalf of Tadhamon Capital B.S.C.(c) ("Tadhamon"), another Bahraini bank from whom Arcapita had demanded a return of placement proceeds.  A-4493 at A-4494.  Tadhamon knew when it sent its letter via counsel it shared with BisB that the CBB intended to issue an adverse formal direction.  *See, e.g.*, A-4503 at A-4505 (email from the CBB mentioning that "*further to our discussion last week the formal direction we spoke abt* is ready but before we issue it we need to see asap the legal opinion that you received on the subject matter.") (emphasis added).  On July 15, 2012, the CBB issued a Formal Direction to Tadhamon that is substantively identical to the one it issued to BisB.  A-4510 at A-4511.

in line with the recommendation of [its] legal counsel in Bahrain for set-off under Bahraini Law" (*id*.); (iii) on July 18, 2012, K&L Gates spoke to the CBB "to convey [BisB's] thoughts regarding the Direction" (A-1553 at A-1554); and (iv) BisB wrote a detailed letter to the CBB explaining why the CBB should "reconsider this Direction." *Id.* at A-1554-56. In that final letter, BisB acknowledged that "[b]y requesting us to return the full amount of funds previously held for Arcapita's account, the CBB is, in essence, requesting us to admit that we did something wrong or illegal." *Id*. at A-1554.

The CBB did not reconsider or withdraw its Formal Direction.

## II. PROCEDURAL HISTORY OF THIS LITIGATION

On August 26, 2013, the Committee commenced adversary proceedings, filing similar complaints against BisB and Tadhamon (the "Complaints"). *See*, *e.g.*, A-361-73.

BisB and Tadhamon moved to dismiss the Complaints based on lack of personal jurisdiction and principles of comity and extraterritoriality. On April 17, 2015, the Bankruptcy Court granted the motions to dismiss on personal jurisdiction grounds. *Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c))*, 529 B.R. 57, 73 (Bankr. S.D.N.Y. 2015) (Lane, J.). On March 30, 2016, the District Court reversed that ruling and remanded the case to the Bankruptcy Court. *Official Comm. of*

10

*Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahr. Islamic Bank*, 549 B.R. 56, 72 (S.D.N.Y. 2016) ("Dist. Ct. Personal Jdx. Op.") (Daniels, J.).

On October 13, 2017, the Bankruptcy Court denied the defendants' motions to dismiss on grounds of international comity and extraterritoriality. *Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c))*, 575 B.R. 229, 251-52 (Bankr. S.D.N.Y. 2017) ("Comity Order"). On February 5, 2018, the Bankruptcy Court further denied the defendants' motions for reconsideration. *Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c))*, No. 12-11076 (SHL), 2018 WL 718399, at *4 (Bankr. S.D.N.Y. Feb. 5, 2018).

After discovery, the Committee and the defendants each moved for summary judgment. On April 23, 2021, the Bankruptcy Court granted the Committee's motions for summary judgment on its claims for breach of contract, turnover, and violation of the automatic stay, and denied the defendants' summary judgment motions. *See* MSJ Order, 628 B.R. at 481.

On September 22, 2021, the Bankruptcy Court issued its decision setting the prejudgment interest rate of 9% per annum. *See Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c))*, 633 B.R. 207, 215 (Bankr. S.D.N.Y. 2021) ("Interest Rate Order"). On September 23, 2021, the Bankruptcy Court entered judgment in favor of the

11

Committee.  A-6550 at A-6551-52.  Thereafter, Arcapita and Tadhamon settled the adversary proceeding against Tadhamon.

On May 23, 2022, the District Court affirmed all five of the challenged Bankruptcy Court orders.  *Bahr. Islamic Bank, BisB v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 640 B.R. 604, 633 (S.D.N.Y. 2022) ("Dist. Ct. Affirmance") (Hellerstein, J.).

This appeal followed.

## SUMMARY OF THE ARGUMENT

BisB contends the District Court erred when it ruled on appeal that BisB is subject to the personal jurisdiction of the Bankruptcy Court.  BisB further contends the Bankruptcy Court erred, as did the District Court in its affirmance, by (i) not undoing the District Court's appellate decision with respect to personal jurisdiction based on "new evidence," (ii) declining to abstain from exercising jurisdiction in favor of Bahraini process, (iii) disallowing BisB's setoff as contrary to Bahraini law, the Bankruptcy Code, and equitable principles, (iv) rejecting BisB's argument that setoff constitutes performance of a contract under Bahraini law, and (v) awarding prejudgment interest at 9%.  BisB is wrong.

*First*, the District Court correctly held, consistent with this Court's precedents, that BisB is subject to the Bankruptcy Court's jurisdiction because (i) it purposefully structured, directed, and executed a wire transfer using U.S. bank

accounts, (ii) that transfer gave rise to the Committee's claims, and (iii) the exercise of jurisdiction comports with Constitutional due process. BisB argues that "new evidence" of Arcapita desiring to transact in U.S. dollars dictates a different result. It does not. That argument was not raised below, it misconstrues the evidence, and it mistakes the relevant inquiry, which focuses on the party that chose the U.S. bank account to use, not the party that supposedly chose the currency. Finally, BisB is incorrect that the District Court limited its opinion to the preference claim (*see* **Argument Section I**).

*Second*, the Bankruptcy Court properly exercised its discretion, as did the District Court on appeal, in declining to dismiss the case on comity grounds. BisB's newly-conjured argument that the Formal Direction created a parallel proceeding in Bahrain to which the Bankruptcy Court should defer is waived, unsupported by evidence, and *directly undermined by the Formal Direction itself*, which ordered BisB to litigate its entitlement to the Placement Proceeds *in the United States*. Further, the United States is the appropriate "regulating state," as the transfer of funds into BisB's New York bank account is at the heart of this case. Finally, the Bankruptcy Court's exercise of jurisdiction is appropriate given its U.S. Constitution-based interest in deciding issues relating to estate property of a U.S. debtor and the lack of "true conflict" between Bahraini and Bankruptcy Code setoff rules (*see* **Argument Section II**).

13

*Third*, the Bankruptcy Court properly held, as did the District Court on appeal, that BisB's setoff, while invalid from inception under Bahraini law, was superseded by the Formal Direction. Moreover, *undisputed* evidence shows that Arcapita and BisB entered into the March 14 Placement to incur a debt in favor of BisB for the purpose of obtaining a setoff right in violation of Bankruptcy Code Section 553(a)(3)(C). Finally, the Bankruptcy Court appropriately disallowed the setoff on equitable grounds (***see* Argument Section III**).

*Fourth*, the Bankruptcy Court properly rejected, as did the District Court on appeal, BisB's argument that setoff constitutes contract performance under Bahraini law. Foremost, the argument fails because BisB's setoff is not valid. It also finds no support in the Bahraini Civil Code (***see* Argument Section IV**).

*Finally*, the Bankruptcy Court properly exercised its discretion, as did the District Court on appeal, to award the Committee prejudgment interest at 9% based on appropriate and well-articulated considerations. The lower courts also correctly dismissed BisB's argument that Shari'a law prohibits prejudgment interest, recognizing instead that clear provisions of the Bahraini Civil Code and New York public policy require that the Arcapita estate be fully compensated for BisB's misconduct (***see* Argument Section V**).

14

## **ARGUMENT**

## I. **THE DISTRICT COURT DID NOT ERR IN RULING THAT BISB IS SUBJECT TO BANKRUPTCY COURT JURISDICTION**

Determining whether a bankruptcy court may exercise personal jurisdiction over a foreign defendant is a two-prong inquiry. First, the bankruptcy court must determine whether the defendant has "the requisite minimum contacts with the United States at large." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011). Where, as here, the plaintiff asserts specific jurisdiction over a defendant, the jurisdictional inquiry focuses on the "affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). This inquiry requires that (i) the defendant has purposeful contact with the forum and (ii) the underlying claims "arise out of or relate" to that contact. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

Next, the bankruptcy court must determine whether exercising personal jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 113 (1987). As this Court has explained, a finding of specific jurisdiction under New

York's long-arm statute, NY C.P.L.R. § 302,[5] will almost certainly satisfy federal due process standards. *See Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci III*") (observing that it would be "rare" and "unusual, indeed" for jurisdiction to lie under the New York long-arm statute and nevertheless violate Constitutional due process).[6]

### A.    BisB Purposefully Availed Itself of the United States

In the *Licci* cases, this Court certified questions to the New York Court of Appeals regarding the circumstances under which the use of a correspondent bank account provides a sufficient basis to exercise personal jurisdiction over a foreign bank under the New York long-arm statute. *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ("*Licci I*"). In response, the New York Court of Appeals clarified, for purposes of § 302(a)(1), (i) when a defendant's use of a correspondent bank account is considered a transaction of business and (ii) the showing required to establish the requisite nexus between that transaction and the claim. *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327 (2012) ("*Licci II*"). So equipped, this Court held that the defendant Lebanese bank ("LCB") submitted

---

5    NY C.P.L.R. § 302(a)(1) ("§ 302(a)(1)") confers jurisdiction where "(1) [t]he defendant . . . transacted business within the state; and (2) the claim asserted . . . arise[s] from that business activity." *Licci III*, 732 F.3d at 168.

6    *See also Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 274, 280 (Bankr. S.D.N.Y. 2010) (noting that, as a practical matter, because "section 302 of the CPLR does not reach as far as the Constitution permits, due process will be satisfied if the New York long arm statute is satisfied").

itself to the jurisdiction of the court by using its New York correspondent bank account to process dollar transfers and wire funds that facilitated rocket attacks by Hizballah in Israel. *Licci III*, 732 F.3d at 166.

In analyzing the "transaction of business" prong of § 302(a)(1), this Court explained that LCB's use of its correspondent account to accomplish dollar-denominated transfers "show[ed] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 168. Distinguishing a scenario in which a defendant bank "mere[ly] maintain[ed]" a correspondent account in the United States (which would not alone support jurisdiction), this Court acknowledged that "LCB could have, as it acknowledges, processed U.S.-dollar-denominated wire transfers . . . through correspondent accounts anywhere in the world," but "deliberately chose" to do it through its New York account. *Id.* at 171. On this basis, *Licci III* held that LCB's use of its correspondent account was sufficiently "purposeful," as opposed to "coincidental" or "adventitious," to satisfy the first prong of the statute. *Id.*; *see also Licci II,* 20 N.Y.3d at 338.[7]

---

[7]    The New York Court of Appeals contrasted LCB's purposeful use of the account with the defendant's *passive* receipt of funds in *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391 (1976). *See Licci II*, 20 N.Y.3d at 337 (observing that jurisdiction did not lie over defendant bank in *Amigo* because *plaintiff* unilaterally deposited funds into defendant's account).

17

So too, here. The District Court correctly determined that BisB's selection and use of its New York correspondent bank account to effectuate the March 14 Placement satisfied § 302(a)(1)'s "transaction of business" prong as it was "no less deliberate than LCB's use of New York's banking system in *Licci*." Dist. Ct. Personal Jdx. Op., 549 B.R. at 69.[8]

The evidence of this is clear: BisB (i) formally initiated the March 14 Placement by sending Arcapita an investment offer containing the terms of the proposed transaction; (ii) *chose to use a U.S. bank account to carry out the transaction and instructed Arcapita to transfer funds into that account*; (iii) received the funds into its U.S. account; and (iv) used that account to transfer the funds to Bahrain. *See* A-1381 (March 14 Placement Documentation) at A-1382-83, A-1385-86); A-532 (March 14 Placement transfer instruction email) at A-533; A-560 (March 14 Placement Swift Message) at A-561. BisB *concedes* this. *See* A-1204 at A-1256-57 (205:7-206:7; 207:19-22) (BisB's CEO testifying that Arcapita could not have known where to send the funds without BisB's instructions and that it was BisB's decision to accept a Placement from Arcapita in

---

[8]    As the District Court observed, the *Licci* cases did not hold that § 302(a)(1) requires *repeated* use of the account; the touchstone consideration is whether the defendant's use of the account was *purposeful*. *Id.* at 65-66, 67-68; *see also Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022) (observing that "Section 302(a)(1) is a single act statute, and proof of one transaction in New York" can satisfy the transaction prong of § 302(a)(1) "so long as the defendant's New York activities here were purposeful").

U.S. dollars).  On this basis, the District Court found the requisite "transaction of business," concluding that "the selection of the New York correspondent bank accounts that received the funds *originated with*" BisB, as it "*actively directed* the funds at issue into [its] New York account[]."  Dist. Ct. Personal Jdx Op., 549 B.R. at 69 (emphases in original).

BisB's only counter-argument is that both courts failed to consider "new evidence"—a telephone transcript excerpt—indicating that Arcapita desired to transact in U.S. dollars.  App. Br. at 32-35.  The argument fails for several reasons.

*First*, it has been waived.  BisB claimed in its summary judgment briefing before the Bankruptcy Court that new evidence warranted a departure from Judge Daniels' District Court opinion, but the evidence it cited to was BisB's minimal contacts with the United States and the volume of dollar-dominated placements between the banks.  *See* A-2316 at A-2350.  BisB argued to the Bankruptcy Court that this new evidence made it "even clearer" that BisB's sole contact with the United States was its correspondent bank account and that the District Court's decision would adversely impact non-U.S. parties.  *Id.*  Neither this evidence, nor the conclusion BisB draws from it, has *anything* to do with BisB's argument that jurisdiction does not lie because Arcapita sought to transact in U.S. dollars.  BisB

19

*never once* argued to the Bankruptcy Court that jurisdiction lacked on this basis.[9]

The argument has been waived. *See Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114

(2d Cir. 2005).

*Second*, the statement from Arcapita's representative to BisB's

representative on which BisB relies—"I want to place USD 10 million"—does not

undercut the premise of Judge Daniels' opinion. A-1406 at A-1450; App. Br. at

33. In effect, BisB argues that Arcapita's statement *compelled* BisB to offer such a

deal and *dictated* the use of its New York account. Judge Hellerstein rejected this

disavowal of agency, explaining that "[t]he fact that Arcapita *wanted* to invest in

U.S. Dollars does not render BisB's use of its New York correspondent bank[]

adventitious." Dist. Ct. Affirmance, 640 B.R. at 617-618 (emphasis in original).

BisB's *own witness* conceded that BisB was free to accept or reject Arcapita's

request. A-1204 at A-1256-57 (204:23-205:6; 207:17-22).

*Finally*, which party selected the *currency* is irrelevant to the personal

jurisdiction analysis, and the District Court's decision *did not* turn on that issue.

What matters is that BisB "actively selected the correspondent bank accounts in

New York and directed the funds to these accounts," thus rendering BisB's

"connection to New York . . . not passive, but active and volitional." Dist. Ct.

---

9    None of BisB's cites to the proceedings below refer to any *argument* it advanced. *See* App.
Br. at 33-34.

Personal Jdx. Op., 549 B.R. at 70 n.19.  The parties could have transacted in *any* currency; what is critical, as the judges below emphasized, is who directed *the use of the New York bank account*.  *See id*. at 71 ("Had [BisB] wished to avoid being subject to jurisdiction in the United States," it "could have presented Arcapita with Placement offers designating non-U.S. accounts to receive the Placement funds."); *see also* Dist. Ct. Affirmance, 640 B.R. at 617-18 (same).  BisB's efforts to minimize its leading role in the transaction must again be rejected.[10]  The first prong of the jurisdictional analysis is satisfied.

### B. All of the Committee's Claims Arise Directly From BisB's Use of its New York Correspondent Bank Account

The New York Court of Appeals further opined on the circumstances in which a claim "arises from" the defendant's transaction of business in New York, including "what sort of causal connection, if any, must be demonstrated."  *Licci I*, 673 F.3d at 70.  Ultimately, "there must be an articulable nexus or substantial relationship between the business transaction and the claim asserted."  *Licci II*, 20 N.Y.3d at 339.  "[C]ausation is not required[.]"  *Id.*

---

[10]  BisB points to Judge Daniels' statement that "[h]ad the record demonstrated that Arcapita, as opposed to the Banks, selected the U.S. dollar and the New York accounts to effectuate the Placements, the Banks' contacts with the U.S. would have been adventitious, and jurisdiction would not have lied."  App. Br. at 33.  But the record does not demonstrate *either* condition of this counterfactual: Arcapita did not select the U.S. dollar and—*as BisB concedes*—Arcapita did not select the New York account.

21

This prong is easily satisfied, as the inquiry "is relatively permissive." *Id.*;
*see also Averbach v. Cairo Amman Bank*, No. 19-0004, 2020 WL 486860, at *7
(S.D.N.Y. Jan. 21, 2020) (noting that establishing the "articulable nexus" test is
"not [a] heavy burden"). A plaintiff must merely demonstrate "a relatedness
between the transaction and the legal claim such that the latter is not completely
unmoored from the former." *Licci II*, 20 N.Y.3d at 339. Thus, jurisdiction is
available under § 302(a)(1) if the asserted claims are "in some way arguably
connected to the transaction." *Id.* Critically, "CPLR § 302(a)(1) does not require
that every element of the cause of action pleaded must be related to the New York
contacts; rather, where at least one element arises from the New York contacts, the
relationship between the business transaction and the claim asserted supports
specific jurisdiction under the statute." *Id.* at 341.

The nexus here is obvious. Arcapita transferred $10 million from its New
York account to BisB's correspondent account in New York as the only exchange
of consideration in performance of a contract that BisB breached when it failed to
return the Placement Proceeds fifteen days later, consistent with the scheme to
ensure BisB's full recovery on the Antecedent Debt. *See* A-361 at A-362, A-365,
A-367-68. As damages, the Committee sought, among other things, return of the
amounts transferred plus $2,292 in profits. *Id.* at A-368-73.

22

On these facts, Judge Hellerstein rightly observed that "the conduct at the heart of this action is the wire transfers routed through the New York correspondent banks" because "those transfers gave rise to *all* of [the Committee's] claims." Dist. Ct. Affirmance, 640 B.R. at 619 (emphasis in original). It is inarguable that the Committee would not have claims, nor would the Arcapita estate have been damaged, if BisB had not chosen to effectuate the March 14 Placement. Quite simply: this case *does not exist* without the New York wire transfer.

Unsurprisingly, the Committee's claims for breach of contract and turnover seek the return of *the transferred funds* (plus the small profit they were supposed to generate)—these funds are "property" subject to turnover under Bankruptcy Code Section 542 and form the lion's share of damages caused by BisB's breach.[11] Likewise, the transfer from Arcapita's U.S. bank account to BisB's designated account *is* the preferential transfer the Committee seeks to avoid. These claims are more than "arguably" connected to BisB's activity in New York—they are

---

[11] BisB holds out the Committee seeking a return of the expected profits (*i.e.* not limiting its damages to the transferred funds) as something of a "gotcha" that the Committee's claims do not arise from the U.S. wire transfer. *See, e.g.*, App. Br. at 29-30. This confuses the connection between a defendant's availment of the forum and the plaintiff's claim, which *is* the relevant inquiry, with the connection between that availment and the ultimate harm suffered, which *is not*. In *Licci III*, for example, this Court predicated personal jurisdiction on wire transfers processed through LCB's New York account, even though plaintiffs sought to hold LCB liable for damages relating to rocket attacks. *Licci III*, 732 F.3d at 168-69.

23

*necessarily* connected.  When viewed under § 302(a)(1)'s "permissive" standard, the Committee has alleged facts that BisB's use of its New York correspondent account is not "completely unmoored" from its claims.

This conclusion is well supported by case law in this Circuit.  For example, in *Eldesouky v. Aziz*, No. 11-CV-6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014), Egyptian plaintiffs brought suit in the Southern District of New York against Pyramid Grain International, Inc. ("Pyramid"), an out-of-state corporation, alleging that Pyramid failed to return $35,500 it had received from plaintiffs through a wire transfer into its New York bank account as part of a failed transaction relating to the purchase and shipment of grain from Canada.  *Id.* at *6. Recognizing that "the only connection" the case had to New York was "the Manhattan bank account[] held by Pyramid," into which the plaintiffs made the wire transfer, the court nevertheless found that this single wire transfer was sufficient to establish personal jurisdiction where the lawsuit sought return of the transferred funds:

> [T]he money that Plaintiffs wired pursuant to their contract with General Trade, and the return of which they seek by this lawsuit, was sent to Pyramid's account in New York.  These facts are sufficient to establish jurisdiction under New York's long-arm statute.

*Id.* at *6-7.  Notably, the conversion claim crystallized only after Pyramid refused to return the transferred funds—there is no allegation that the transfer itself was

24

illegal. This is precisely the situation here. The money Arcapita transferred, the

return of which the Committee seeks, went to BisB's account in the United States,

per BisB's instructions, and the Committee's claims arise from that transfer.[12]

BisB's arguments to the contrary are unpersuasive. BisB attempts to graft

onto the personal jurisdiction inquiry a requirement that the wire transfer *itself* be

unlawful. *See, e.g.,* App. Br. at 30 (criticizing the District Court for its focus on

the transfer, as opposed to later-occurring conduct, because "*the wire itself was not

wrongful.*") (emphasis in original). This requirement finds no support under the

New York or federal analyses, neither of which requires an *illegal* transaction or

---

[12] Multiple other cases in this Circuit have found a transfer into a U.S. bank account to confer jurisdiction in similar circumstances, even absent an allegation that the transfer itself was unlawful. *See, e.g.*, *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382-83 (S.D.N.Y. 2013) (exercising § 302(a)(1) jurisdiction over Cayman entity ("Pinnacle") that used U.S. bank accounts to receive funds in connection with a note issuance, which funds Pinnacle was alleged to have used to perpetrate a fraud; as the court noted, the transfer of funds into New York, while not itself unlawful, was "central to the allegedly fraudulent transactions at issue"); *Nuss v. Sabad*, No. 7:10-cv-279, 2011 U.S. Dist. LEXIS 157287, at *12, *36 (N.D.N.Y. Sep. 7, 2011) (exercising § 302(a)(1) jurisdiction over defendants who received plaintiffs' funds into their New York correspondent bank account, which funds defendants later transferred to Mexico to purchase property located there in furtherance of their allegedly unlawful scheme); *NIKE, Inc. v. Wu*, 349 F. Supp. 3d 346, 355-57 (S.D.N.Y. 2018) (exercising § 302(a)(1) jurisdiction over foreign banks to enforce trademark infringement judgment where the banks used New York correspondent bank accounts to facilitate transfers abroad in connection with the sale of counterfeit goods); *Correspondent Servs. Corp. v. J.V.W. Invs. Ltd.*, 120 F. Supp. 2d 401, 404-05 (S.D.N.Y. 2000) (holding that transfer of funds to New York correspondent account to facilitate an allegedly wrongful international transaction, which gave rise to plaintiff's claims, was sufficient to establish § 302(a)(1) personal jurisdiction); *Esso Expl. & Prod. Nig. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 344-46 (S.D.N.Y. 2019) (§ 302(a)(1) jurisdiction over defendant warranted in-part because defendant was alleged to have received and transferred funds into its New York account to perpetrate wrongs in Nigeria), *aff'd in relevant part*, 40 F.4th 56 (2d Cir. 2022).

*illegal* availment of the forum. Instead, a plaintiff need only allege the transfers "to have been used as *an instrument* to achieve the very wrong alleged," as opposed to constituting the *wrong itself. Licci III*, 732 F.3d at 171 (emphasis added). That is exactly the case here. As the courts below held, the wire transfer through BisB's New York account is *the very instrument* through which BisB was able to obtain property of the Arcapita estate that it wrongfully retained. BisB's conception of specific personal jurisdiction, on the other hand, reimagines the *permissive* "articulable nexus" inquiry into a *strict* one that requires perfect identity between the alleged U.S. contact and the asserted claim. This is obviously not the law, and the cases BisB cites do not support that proposition.[13]

BisB's reliance on this Court's recent opinion in *Daou* is no less puzzling. Personal jurisdiction was found to be lacking in *Daou* because the claims (relating to defendant-Lebanese banks' trapping of plaintiffs' funds in Lebanon) arose out of the defendants' *failure* to carry out transactions in New York. 42 F.4th at 131. This Court held that past and hypothetical future use of a New York account, *in transactions entirely unrelated to the claims*, did not bear the requisite "substantial connection" under New York's long-arm statute. *Id.* at 131-32. *Daou* emphasized

---

[13] None of the cases BisB cites in its brief (*see* App. Br. at 28, n.11) state, or remotely stand for, the proposition that the domestic wire transfer must itself be unlawful to support specific personal jurisdiction. *No case does.* To the contrary, as noted *supra* at n.12, multiple cases in this Circuit have predicated personal jurisdiction on a U.S. wire transfer that, while not itself alleged to be wrongful, facilitated wrongful acts abroad.

26

that the complaint "does not include a single allegation that any defendant used an actual, specific transaction through a New York correspondent bank account in the course of bringing about the injuries on which the claims are predicated[,]" and on that basis determined that the nexus between the banks' forum contacts and plaintiffs' claims was too attenuated to support personal jurisdiction.[14]  By contrast, the "specific transaction" here—BisB's use of its New York correspondent bank account to obtain Arcapita's property—cannot be divorced from the Committee's claims, which seek the return of *that very property*.

Accordingly, BisB's use of its correspondent account—and hence the U.S. banking system—as an instrument to perpetrate the wrongs asserted by the Committee satisfies the minimum contacts component of the due process inquiry.

## C.    Exercising Personal Jurisdiction over BisB is Reasonable

Only by presenting a "'compelling case that the presence of some other considerations would render jurisdiction unreasonable'" can a defendant that has purposefully directed its activities at the forum defeat jurisdiction on due process

---

[14]    *Daou* likened the "merely coincidental" connection between the transactions and asserted claims in that case to *Johnson v. Ward*, 4 N.Y.3d 516 (2005), where the court held that even had the defendant "transacted business" in New York by obtaining his license and registration there, that transaction did not confer on New York courts personal jurisdiction over defendant in a personal injury suit, because it was his negligent driving in New Jersey, not his obtaining the license and registration, that was the subject of the asserted claims.  *Daou*, 42 F.4th at 130. Unlike *Johnson*, and all similar cases cited in *Daou*, removing BisB's alleged contact with the forum would nullify, rather than leave unaffected, the Committee's claims.

grounds. *Licci III*, 732 F.3d at 173 (quoting *Burger King*, 471 U.S. at 477). This Circuit has identified several factors relevant to determining reasonableness, including: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief." *Id.* at 170.

These factors support the exercise of personal jurisdiction over BisB. The Bankruptcy Court has an abiding interest in adjudicating claims that arise under the Bankruptcy Code (such as claims for turnover and violation of the automatic stay, on which the Bankruptcy Court granted summary judgment); administering Arcapita's estate for the benefit of creditors; and policing the use of the U.S. banking system. *See Chais*, 440 B.R. at 281 (finding that "[t]he United States has a strong interest in applying the provisions of its Bankruptcy Code"); *cf. Eldesouky*, 2014 WL 7271219, at *9 (recognizing New York's interest in adjudicating cases related to its banking system).

The Committee, meanwhile, has a strong interest in obtaining convenient and effective relief, and the Bankruptcy Court is the most efficient forum in which to adjudicate its claims, given the Bankruptcy Court's knowledge of Arcapita's business, its familiarity with the Bankruptcy Code, and its competence with foreign

28

law.  Any burden imposed on BisB is outweighed by these considerations.[15]  There

is nothing unfair, or even unexpected, about subjecting BisB to the jurisdiction of a

U.S. court under these circumstances.

In sum, the District Court correctly determined that BisB is subject to the

Bankruptcy Court's jurisdiction.

### D. The District Court Did Not Limit Its Ruling to the Committee's Preference Claim

BisB argues that because Judge Daniels focused on the Committee's

preference claim, it can be inferred he did not pass judgment on the jurisdictional

propriety of *any of* the Committee's other causes of action.  App. Br. at 31.  The

argument is irrelevant because, as covered above, BisB is subject to personal

jurisdiction on the Committee's claims.  It nevertheless misconstrues Judge

Daniels' ruling.

The Committee appealed the *entirety* of the Bankruptcy Court's order

dismissing all five of the Committee's claims for lack of personal jurisdiction, and

Judge Daniels vacated that decision in its *entirety*, without a whisper that his ruling

was cabined to just one-fifth of the issues on appeal.  *See* A-755 at A-756; A-761

---

[15]   *See, e.g.*, *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129-30 (2d Cir. 2002) ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.").

29

at A-762-63; *see generally* Dist. Ct. Personal Jdx. Op., 549 B.R. at 56. In prosecuting the appeal before the District Court, the Committee briefed and argued *each* claim, including the breach of contract claim, and Judge Daniels' opinion relied on the legal principles to which the Committee cited. *Compare* Brief for Appellant at 10-20, *Official Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahr. Islamic Bank*, No. 15-03838 (S.D.N.Y. July 16, 2015), ECF No. 16 *with* Dist. Ct. Personal Jdx. Op., 549 B.R. at 58-71. There is no basis to conclude that Judge Daniels artificially limited his ruling, or otherwise failed his task.[16]

## II. THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION BY DECLINING TO ABSTAIN ON INTERNATIONAL COMITY GROUNDS

BisB, which carries the burden on its comity challenge,[17] argues that the Bankruptcy Court abused its discretion because (i) as a matter of adjudicatory comity, the Bankruptcy Court should have deferred to a Bahraini "parallel proceeding" related to the issuance of the Formal Direction and the Committee

---

[16]    Even if Judge Daniels (covertly) found personal jurisdiction only with respect to the Committee's preference claim, the Bankruptcy Court would be justified in exercising pendent personal jurisdiction over the remainder of the Committee's claims. Under the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the claims derive from a "common nucleus of operative fact," personal jurisdiction is warranted over parties for related claims "even if personal jurisdiction is not otherwise available." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 88 (2d Cir. 2018). In an adversary proceeding, national service of process is authorized under Bankruptcy Rule 7004(d), and all of the Committee's claims arise from the same common nucleus of operative facts.

[17]    *See, e.g., Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993).

improperly seeks to enforce the Formal Direction in the United States instead of in such Bahraini proceeding and (ii) as a matter of prescriptive comity, the United States lacks both a strong link and a strong interest in this matter, and a true conflict exists between U.S. and Bahraini setoff laws. As the District Court concluded, these assertions are wrong.

### A. There is No Pending Foreign Proceeding to Which to Defer, and the Committee is Not Asking for Enforcement of the Formal Direction

#### 1. There is No Parallel Foreign Proceeding

Before BisB's reply brief to the District Court (A-6707 at A-6737-39), in the nearly eleven years of litigating this matter, BisB had not *once* characterized the issuance of the Formal Direction as a "parallel proceeding." It has, in fact, argued the *opposite*, even convincing the Bankruptcy Court of its former position.[18] This argument is waived.[19]

BisB resisted the argument with good reason. To qualify as a foreign parallel proceeding for purposes of adjudicatory comity, a proceeding must be *before a court. See, e.g, Maxwell Commc'n Corp. ex rel. Homan v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1047 (2d Cir. 1996)

---

[18] *See, e.g.*, A-785 at A-799 (BisB arguing that "no authority provides that application of comity requires the existence of two parallel proceedings."); *see also* Comity Order, 575 B.R. at 238 ("[a]s there is no parallel foreign proceeding . . . , adjudicatory comity is inapplicable").

[19] *See, e.g., Gordon v. Tese-Milner (In re Gordon)*, 577 B.R. 38, 47 (S.D.N.Y. 2017) ("[A]ny arguments not raised in the bankruptcy court are considered waived. . . .").

("*Maxwell*") (explaining that international comity "may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state, the so-called comity among courts"); *Nat'l Bank of Anguilla (Private Banking Tr.) Ltd. v. Nat'l Bank of Anguilla (In re Nat'l Bank of Anguilla (Private Banking Tr.) Ltd.)*, 580 B.R. 64, 94 (Bankr. S.D.N.Y. 2018) (explaining that U.S. courts may defer to a foreign proceeding out of "the proper respect *for litigation in and the court of* a sovereign nation, fairness to litigants, and judicial efficiency") (emphasis added). There is no court-based proceeding in Bahrain.

BisB also cites no authority that the issuance of the Formal Direction qualifies as a "parallel foreign proceeding" through which claims are adjudicated or damages awarded. Contrary to BisB's assertion, *Maxwell* (a case that actually involved a parallel insolvency proceeding pending in a foreign court) does not say that all that is required is an "alternative mechanism." Instead, the language on which BisB relies describes the parallel proceeding that was, indeed, pending—and does not signify that some unspecified alternative mechanism for achieving the result sought is all that is required. *See Maxwell*, 93 F.3d at 1052 ("Although a different result might be warranted were there no parallel proceeding in England— and, hence, no alternative mechanism for voiding preferences . . . "). BisB's adjudicatory comity argument fails.

32

Moreover, BisB's theory that deferring to the non-existing "regulatory proceeding" in Bahrain would provide it with relief fails: the Formal Direction made the CBB's *authoritative* position known on this issue. App. 1178 at 1179. In the Formal Direction, the CBB directed BisB (to the extent it refused to return the funds) to litigate its actions in "*the US Bankruptcy Court (in accordance with the US Bankruptcy Code)*." *Id*. (emphasis added). If this proceeding were re-venued in Bahrain, Bahraini courts will already have direction from BisB's regulator to send it *back* to the United States.[20] The District Court identified the circularity: "[i]f the Bahraini government had an interest in regulating the conduct itself, one might expect that it would only have instructed that BisB return the funds and not mentioned possible avenues for relief in the Bankruptcy Court." Dist. Ct. Affirmance, 640 B.R. at 619. The Formal Direction has not been withdrawn or lapsed.[21]

> 2. The Committee is Not Seeking to Enforce the Formal Direction

Contrary to BisB's remarkable assertion that the Committee's "primary goal is to enforce the CBB's directive, in the guise of a breach of contract suit" (App.

---

[20] BisB identifies the CBB's "interven[tion] in the dispute" as support for the Bankruptcy Court relinquishing jurisdiction in favor of Bahrain. App. Br. at 8. This is astounding: the CBB's contribution to this dispute was to instruct BisB to go to the United States.

[21] BisB's repeated emphasis that the CBB has "never enforced" the Formal Direction (*see, e.g.*, App. Br. at 45) only confirms that the CBB was content to leave enforcement to the U.S. courts where, it had decided, the dispute belonged.

33

Br. at 45), BisB misses the fact that the Formal Direction is *only* in issue in this litigation because *BisB* has raised setoff as an affirmative defense. As explained *infra* in Argument Section III, for BisB's setoff to be valid under the Bankruptcy Code, it had to be valid under Bahraini law, which requires analysis of the Formal Direction. Had BisB not asserted its setoff defense—which two U.S. courts have soundly rejected—the Formal Direction would be irrelevant to this litigation. As such, the Committee is *not* seeking to enforce the Formal Direction; it is relying on its terms (among other things) to defeat BisB's affirmative defense.

### B. BisB's Prescriptive Comity Challenge Fails

As an alternative, BisB contends the courts below abused their discretion in rejecting BisB's prescriptive comity challenge because (i) the United States does not have a stronger regulatory interest than Bahrain in these proceedings and (ii) there is a conflict between U.S. and Bahraini setoff laws. App. Br. at 35-45. BisB fails to carry its burden.[22]

---

[22]   Section 403 of the Restatement (Third) of Foreign Relations (1986) ("Restatement") sets forth factors considered by courts in a prescriptive comity inquiry, including: "[(a)] the link between the regulating state and the relevant activity, [(b)] the connection between that state and the person responsible for the activity (or protected by the regulation), [(c)] the nature of the regulated activity and its importance to the regulating state . . . and [(d)] the likelihood of conflict with other states' regulations." *Maxwell*, 93 F.3d at 1048 (citing Restatement § 403(2)).

1.    <u>The United States has a Strong Link to the Relevant Activity
and a Strong Interest in its Regulation</u>

a. *<u>There Is a Strong Link Between the United States and
the Transfer of Funds</u>*

BisB overlooks *the precipitating event that gave rise to each Committee
claim*—BisB's purposeful use of the U.S. banking system to complete the March
14 Placement.  This transfer, directed by BisB, formed the basis for every one of
the Committee's claims.  The courts below properly credited these facts.  *See, e.g.,*
Comity Order, 575 B.R. at 239; Dist. Ct. Affirmance, 640 B.R. at 618 (citing the
transfer through the New York account for giving "rise to *all* of [the Committee's]
claims").

BisB has cited no valid legal support for a claim-by-claim requirement
because no such support exists: neither the Restatement nor *Maxwell* requires a
claim-by-claim analysis.  *See generally* Restatement § 403; *Maxwell*, 93 F.3d at
1046-50.

Instead, following the Restatement's guidance to consider all relevant
factors, the courts below properly found a strong link between the relevant activity
and the United States.

b. <u>*The United States has a Strong Interest in Regulating
Relevant Activity*</u>

Arcapita filed for bankruptcy protection in the United States, as a proper
U.S. debtor—a fact BisB ignores.  Consistent with the U.S. Constitution, the

35

Bankruptcy Court has a strong interest in ensuring the fair and equitable administration of the Arcapita estate. *See, e.g.*, *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 363-64 (2006) ("Critical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property [and] the equitable distribution of that property among the debtor's creditors. . . ."). In addition, the Committee's turnover and automatic stay violation claims—both of which are on appeal—*arise under the Bankruptcy Code*, further implicating the United States' strong interest.[23]

### 2. No True Conflict Warrants Abstention on Comity Grounds

To prevail on its comity argument, BisB also must demonstrate a true conflict between the laws of the two jurisdictions. "[M]ere inconsistencies between U.S. law and foreign law [are] insufficient to raise serious concerns of international comity." *Florsheim Grp. Inc. v. USAsia Int'l Corp. (In re Florsheim Grp. Inc.)*, 336 B.R. 126, 133 (Bankr. N.D. Ill. 2005). Instead, a true conflict exists where a defendant *cannot comply* with the laws of both relevant regimes. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993) (finding no true conflict because defendants "do not argue that British law requires them to act in

---

[23] That interest is magnified where, as the courts below feared, "it is unclear whether [the Committee] would be able to bring . . . similar causes of action to those grounded in the United States bankruptcy code in a non-U.S. forum." Dist. Ct. Personal Jdx. Op., 549 B.R. at 451-52; *see also* Comity Order, 575 B.R. at 241.

36

some fashion prohibited by the United States or claim that their compliance with the laws of both countries is otherwise impossible"); *see also* Restatement § 403 cmt. E (a U.S. court is not obligated to defer to a foreign jurisdiction "where a person subject to regulation by two states can comply with the laws of both").

Here, no conflict exists. No provision of Bahraini law *required* BisB to exercise setoff.[24] To the contrary: the Formal Direction instructed BisB *not to exercise setoff* until it tested its position in the U.S. courts under U.S. law. App. 1178 at 1179; App. 1554. This is the *opposite* of conflict; it is Bahraini deference to the United States.

But even if the Formal Direction were disregarded (and it cannot be), BisB points to two requirements of U.S. law that purportedly create a true conflict with Bahraini law—(i) the "intent" requirement of Bankruptcy Code Section 553(a)(3)(C) and (ii) the requirement of court approval. Those requirements do not create conflict.

*First*, Bahraini law prohibits the exact type of collusion between a debtor and a creditor to the detriment of other creditors that Section 553(a)(3)(C) is meant

---

[24]  *See United States v. Int'l Bhd. of Teamsters*, 945 F. Supp. 609, 624-25 (S.D.N.Y. 1996) (finding no true conflict, despite inconsistencies, because foreign law granted a *right* to do something rather than made it a *requirement*); *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 846 n.5 (9th Cir. 1996) ("A foreign country's allowing or even encouraging particular conduct which is prohibited in the United States no longer provides a sufficient basis for finding a conflict between foreign and domestic law.").

to prevent. *See* A-2480 at A-2497 (citing Bahraini Civil Code, Art. 28); Bahraini

Civil Code, Art. 238, https://bahrainbusinesslaws.com/laws/Civil-Law (last visited

Dec. 16, 2022) (providing that preference payments are invalid).

*Second*, the requirement to obtain court approval before exercising setoff

*does not eliminate a right* of setoff, it only affects its timing. *See Citizens Bank of*

*Maryland v. Strumpf*, 516 U.S. 16, 20 (1995). Accordingly, it does not alter the

"distributional outcome," which BisB, citing *Maxwell*, identifies as the crucial test

of a conflict. App. Br. at 42-44; *Maxwell*, 93 F.3d at 1050.

*Finally*, if BisB were correct, a setoff could only be recognized under the

Bankruptcy Code if the relevant nonbankruptcy law contained *the exact same*

requirements. That would make the Bankruptcy Code setoff requirements

inoperative in favor of foreign law; and Congress should not be understood to have

legislated an ever-present comity conflict.

## III.   THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN REJECTING BISB'S ASSERTED SETOFF

Bankruptcy Code Section 553 governs setoffs. It does not create setoff

rights, but instead "recognizes and preserves" setoff rights that validly exist under

"applicable non-bankruptcy law," subject to certain exceptions. *In re Lehman*

*Bros. Holdings Inc.*, 404 B.R. 752, 757 (Bankr. S.D.N.Y. 2009). Among those

exceptions is that the debt owed to the debtor must not have been incurred "for the

purpose of obtaining a right of setoff against the debtor." 11 U.S.C. §

38

553(a)(3)(C).  But even if the "technical requirements of setoff are satisfied, the bankruptcy judge must [also] scrutinize the right of setoff in light of the Bankruptcy Code's goals and objectives.  These goals include . . . equitable treatment of all creditors."  *Official Comm. Of Unsecured Creditors v. Mfrs. & Traders Tr. Co. (In re Bennett Funding Grp., Inc.)*, 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998).

The courts below properly determined that BisB's claimed setoff is not valid under Bahraini law or Bankruptcy Code Section 553(a)(3)(C) and should, in any event, be disallowed on equitable grounds.[25]

## A.  BisB Had No Valid Setoff Right Under Bahraini Law

Despite BisB's assertion that the courts below did not analyze its purported setoff right under Bahraini law, that is precisely what both courts did.  And they both correctly found that BisB's purported setoff was invalid under such law.

### 1.  The CBB Law is A Special Law That Preempts General Laws Like the Bahraini Civil Code

The Committee's expert, Nezar Raees, provided unrebutted testimony that the Central Bank of Bahrain and Financial Institutions Law ("CBB Law") "*is a special law* that supervises and regulates financial institutions operating in Bahrain."  A-2480 (expert report of Nezar Raees) at A-2492 (emphasis added).

---

[25]  A creditor bears the burden of proving a right of setoff.  *See, e.g., In re Bennett Funding Grp., Inc.*, 212 B.R. at 212.

Moreover, "[b]oth parties' experts agree that the Bahraini Civil Code is a form of general law whose provisions do not supersede any special law dealing with a specific issue." Dist. Ct. Affirmance, 640 B.R. at 621-22. Thus, it is undisputed that *special laws* in Bahrain, such as the CBB Law, "*will always prevail over the provisions of the [Bahraini] Civil Code*." A-2480 at A-2492-93 (Raees, among other things, quoting the Court of Cassation (Bahrain's top court) Appeal No. 422 for the Year 2008: "'*A special law cannot be undermined by a general law* as such undermining contradicts the purpose for which the special law was enacted.'") (emphasis added).

Accordingly, as BisB's expert, Zeenat Al Mansoori, conceded, "[t]he provisions of the [Bahraini] Civil Code relating to statutory set-off constitute the provisions applicable to any statutory set-off, *subject to any special provisions with respect thereto under any other applicable law*." A-1902 at A-1912 (emphasis added); *see also* A-2480 at A-2492 (Raees concurring: "[i]t is a well-documented principle of law in Bahrain that the provisions of the [Bahraini] Civil Code do not supersede the provisions of any special law dealing with a specific subject matter").

The courts below therefore correctly found that the CBB Law supersedes the Bahraini Civil Code.

40

2.    The Formal Direction is a Special Law Overriding the Bahraini Civil Code

Both experts further agree that the CBB, a public entity established by the Central Bank of Bahrain and CBB Law, controls Bahraini institutions licensed by it to provide financial services and that it exercises its powers through the issuance of "formal directions," which, "'*[o]nce circulated to the intended addressees, . . . become binding*.'"  A-1902 at A-1924 (Mansoori quoting Art. 38(c) of the CBB Law) (emphasis added); *see also* A-2480 at A-2494 (Raees quoting Rules EN-3.1.2 and UG-1.1.7 of Volume 2 of the CBB Rulebook).[26]

Accordingly, a Formal Direction issued by the CBB *is binding law of Bahrain* as to its addressee and supersedes any applicable provision of the Bahraini Civil Code.  And, given their severity, the CBB issues such directions with extreme reluctance.  *See, e.g.*, A-2480 at A-2494 (Raees citing Rule EN-3.1.3 of Volume 2 of the CBB Rulebook).  The District Court therefore correctly found "no error in the Bankruptcy Court's conclusion that the CBB Formal Direction constituted controlling and applicable law."  Dist. Ct. Affirmance, 640 B.R. at 622.

---

[26]    The CBB has broad statutorily-defined objectives, including to "'regulate, develop and license the [financial services provided by the financial institutions] . . . exercise regulatory control over [such] institutions . . . [and] supervise and control any licensees providing financial services.'"  A-2480 at A-2493; A-1902 at A-1923.

41

### 3.  BisB Has Failed to Comply with the Formal Direction

*Nearly eleven years on, BisB still has not complied* with the Formal

Direction compelling BisB to "return the funds immediately" absent approval from

the Bankruptcy Court to retain them.  A-1548 at A-1549.  This is despite BisB's

acknowledgement of the CBB's view that BisB's setoff was "wrong" or "illegal."

A-1553 at A-1554.  There is no evidence in the record that the Formal Direction

has been withdrawn or lapsed.  A-4146 at A-4172; *see also* A-2741 at A-2918

(140:17-20), A-2922-23 (144:25-145:5).[27]

### 4.  BisB Incorrectly Asserts that the CBB's Powers Apply Only to Licensees' Future Actions

BisB propounds a spurious theory that a licensee has the power to extinguish

the CBB's prudential authority by acting in advance of a direction it knows is

coming.  It posits a non-existing temporal limitation to the CBB's authority: the

CBB is purportedly powerless to take enforcement action against prior improper

conduct of a licensee because "retroactive" enforcement is prohibited.  App. Br. at

48-50.

BisB cites no authority for this convenient fiction.  It relies solely on

---

[27]    BisB claims that the CBB never actually took an enforcement action with respect to the
Formal Direction.  *See*, *e.g.*, App. Br. at 45.  But the Formal Direction is *itself* an enforcement
action.  *See* A-1548 at A-1549 ("Failure to comply with this Formal Direction may result in the
CBB taking *further* enforcement action…) (emphasis added).  Besides, any lack of further action
by the CBB is irrelevant to the question of the *continuing validity* of the Formal Direction.

Mansoori's unsupported assertion that "the set-off was already created pursuant to Bahraini Law" when the Formal Direction was issued.  A-1902 at A-1925.

Raees persuasively rebutted Mansoori's statement by pointing out that her "opinion contradicts the texts of Article 38(c) of the CBB Law and Rules UG-1.1.7, EN-3.1.1 and EN-3.1.2 of Volume 2 of the CBB Rulebook . . . [which] confirm[] the binding nature of Directions issued by the CBB to its licensees."  A-2480 at A-2496.  In fact, the opposite of BisB's contrivance is true: BisB "cannot assert a right to a statutory set-off under the [Bahraini] Civil Code when it was obligated under Article 38(c) of the CBB Law by virtue of the CBB Direction issued to it to release and return the [Placement] Proceeds having failed to obtain the permission of the US Bankruptcy Court to withhold" them.  *Id*.

The Bankruptcy and District Courts agreed with Raees.  *See* MSJ Order, 628 B.R. at 443 ("[T]here is nothing in the Bahraini law cited by Ms. Mansoori that suggests such a temporal limitation on the CBB's authority."); Dist. Ct. Affirmance, 640 B.R. at 621 (". . . BisB cites no authority for its contention that CBB Formal Directions cannot supersede existing law and make previously lawful conduct unlawful once issued.").

BisB's repeated efforts to persuade the CBB to rescind the Formal Direction give away the game.  *See supra* at 9-10.  These are not the actions of a party that believes the CBB's direction was futile.  The District Court properly recognized

43

this: "[i]f BisB is correct that the CBB's Formal Direction could not be applied retroactively to invalidate the set-off right previously exercised, then it would have had no reason to challenge the Formal Direction at all." Dist. Ct. Affirmance, 640 B.R. at 621.

More fundamentally, BisB did not even finalize its purported setoff before the CBB issued its Formal Direction. As the Bankruptcy Court noted, BisB's counsel "confirmed at the hearing on these motions that BisB had yet to return" the amounts owed to Arcapita in excess of the Antecedent Debt, negating any possibility that setoff had been completed. MSJ Order, 628 B.R. at 442 n.29 (citing A-2741 at A-2984-85 (206:12-207:11)). Thus, the assumption on which Mansoori relies—that "the set-off was already created pursuant to Bahraini Law"—is faulty. A-1902 at A-1925. BisB's retroactivity argument fails at the outset.[28]

---

[28] Moreover, as the Committee argued below, BisB's purported setoff violates Article 355(a) of the Bahraini Civil Code, which precludes a statutory setoff "*where one of the two obligations consists of a thing of which the owner has been unjustly deprived*," as well as Article 28(d) of the Bahraini Civil Code, which provides that a party may be barred from asserting a statutory setoff if exercising such right is found by a court of law to have the effect of causing serious and unknown damages to third parties. *See* A-2480 at A-2490, A-2492 (Raees expert report) (emphasis in original). Arcapita has been unjustly deprived of the Placement Proceeds. And the CBB, through the Formal Direction, indeed recognized the risk of harm to other participants in the Bahraini financial sector. A-1549 at A-1550.

**B.      BisB's Purported Setoff is Invalid Under Bankruptcy Code Section 553(a)(3)(C)**

Even if BisB could establish it had a right of setoff under Bahraini law, it still fails to clear Bankruptcy Code Section 553(a)(3)(C).  The lower courts extensively reviewed the evidence and found that "the undisputed facts demonstrate that the debts incurred by [BisB] were for the purposes of obtaining a setoff right against the Debtor."  MSJ Order, 628 B.R. at 447; *see also* Dist. Ct. Affirmance, 640 B.R. at 629 ("The evidence, taken as a whole, supports the finding that BisB entered into the transaction to gain a setoff.").  These findings are not clear error.

Bankruptcy Code Section 553(a)(3)(C) precludes "affirmatively and purposely preferring one creditor over another" by prohibiting creditors from receiving transfers from debtors for the purpose of obtaining setoff rights.  *In re Bennett Funding*, 212 B.R. at 216.  The "archetypal situation" is "where a debtor has a preexisting obligation to the creditor, and, in the months prior to debtor's filing for bankruptcy, the debtor pays back the creditor by 'loaning' him money.  Later the parties notice the two debts and engage in setoff, canceling both of them."  *Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.)*, 940 F.2d 1507, 1513 (11th Cir. 1991).

The transactions between BisB and Arcapita are more egregious than this "archetypal situation."  The Placements were: (i) made as close as possible to

45

Arcapita's bankruptcy filing;[29] (ii) for a hair north of the $9.8 million owed to

BisB; (iii) initiated at a time when BisB knew Arcapita was in financial distress;[30]

(iv) anomalous to the parties' prior dealings;[31] and (v) collusive in nature.[32] *See*

*supra* at 4-10.

Indeed, that is what the Bankruptcy Court found after having examined the

undisputed record and making appropriate inferences as to intent. *See* MSJ Order,

628 B.R. at 451.[33]

BisB does not attempt to explain why the lower courts erred in these

findings. It instead footnotes inconsequential statements (*e.g.*, "BisB never exited

[29]  The Committee's financial expert explained that it would be "inconceivable" for management of an Islamic bank to "'allow such placements to be made knowing not only the deteriorating credit position of my institution, but also very likely knowing that my institution was due to file for bankruptcy in one business day.'" MSJ Order, 628 B.R. at 458 (quoting A-2534 at A-2546).

[30]  A creditor's awareness of the debtor's financial difficulties contributes to the conclusion that a creditor incurred the debt for the purpose of setoff. *See Union Cartage Co. v. Dollar Savings & Trust Co. (In re Union Cartage Co.)*, 38 B.R. 134, 138-40 (Bankr. N.D. Ohio 1984).

[31]  *See, e.g.*, MSJ Order, 628 B.R. at 447.

[32]  The collusion was not unique to BisB—phone records caught Arcapita personnel *coaching* Tadhamon counterparts, dictating messages to write back to Arcapita to properly execute a setoff. *See* A-4525 at A-4567, A-4572; *see id.* at A-4547 ("You support us, and we want basically pay you back."). As the Bankruptcy Court observed: "when there's a quote that says . . . we want basically to pay you back, that's not that mysterious." A-2741 at A-2935 (157:14-16); *see also* A-4264 (testimony of Tadhamon's CEO) at A-4280 (61:17-19); *id.* at A-4273 (30:22-31:4) (acknowledging that "the banking industry in Bahrain is so small and everybody knows each other" and "*bankers help each other*") (emphasis added).

[33]  *See, e.g., DuVoisin v. Foster (In re S. Indus. Banking Corp.)*, 809 F.2d 329, 332 (6th Cir. 1987) (noting that Section 553(a)(3)(C) requires a subjective inquiry of whether the purpose of the creditor's loan was to obtain setoff and improve the creditor's position, and finding that it was not clearly erroneous to infer from the facts that the intent was to set off the debt).

46

from its own prebankruptcy investments with Arcapita; agreed—at the request of *Arcapita*—to roll over its own *murabaha* investment with Arcapita, based in part on the latter's assurances that new financing was imminent; and did not even consider its setoff options until *after* Arcapita's Chapter 11 filing"). App. Br. at 41 n.15 (emphases in original). Yet, as the Bankruptcy Court properly found, "when all of the facts of the case are viewed in context, they clearly belie BisB's characterizations." MSJ Order, 628 B.R. at 451.

### C. BisB's Setoff Is Disallowable On Equitable Principles

As a court of equity, the Bankruptcy Court could, and did, reject BisB's purported setoff on equitable grounds. MSJ Order, 628 B.R. at 443-45.

As described above, BisB sat on its purported setoff right for months and only sought to exercise such right *days before* the issuance of the Formal Direction and with knowledge that the Formal Direction was forthcoming.

The Bankruptcy Court was correctly troubled that BisB, as well as Tadhamon, "were aware of the CBB's intention to issue the Formal Directions before the setoffs took place and had ample opportunity to inform the CBB of their legal position before the Formal Directions were issued . . . [and,] [e]ven knowing that the CBB intended to issue the Formal Directions, Tadhamon purported to exercise its setoff the same day it provided its legal opinion to the CBB—June 25, 2012—with BisB following three days later on June 28, 2012." *Id.* at 444.

47

BisB's setoff was an attempt to circumvent the CBB's enforcement and the Bankruptcy Code, and thus served as appropriate grounds for the Bankruptcy Court to "invoke equity to bend the rules, if required to avert injustice." *In re Bennett Funding*, 212 B.R. at 212.

## IV.  SETOFF IS NOT PERFORMANCE OF A CONTRACT UNDER BAHRAINI LAW

BisB argues that it is not in breach because setoff constitutes contractual performance under Bahraini law.  App. Br. at 50-52.  This is wrong on two levels.

As a threshold matter, and as explained above, BisB's claimed setoff is invalid as a matter of Bahraini law.  So the argument fails out of the starting gate.

It also lacks rigor.  Relying entirely on statutory *headers*—specifically, chapters of the Bahraini Civil Code titled "Methods of Extinction of the Obligation Equivalent to Performance" and "The Extinction of Obligations"—BisB asserts that, under Bahraini law, setoff is a method of extinguishing an obligation and thereby serves as "'a type of payment of the amounts due under the contract.'" App. Br. at 51 (quoting A-1902 at A-1914 and citing to Arts. 353-360 of the Bahraini Civil Code).  Therefore, according to BisB, its setoff, exercised three months after its contractual breach, constitutes retroactive performance, nullifying any such breach.  App. Br. 50-52.  Bahraini law does not yield this remarkable result.

48

Instead, Articles 128 and 129 of the Bahraini Civil Code govern performance under a contract: a contract "'*must* be performed *in accordance with its contents* and in compliance with the requirements of good faith and honesty.'" A-2480 at A-2499 (citing Bahraini Civil Code, Arts. 128 and 129) (emphasis added). Raees explains that under these "unambiguous" provisions, BisB "cannot be said to have performed its obligations under the [March 14 Placement] when it asserted the purported set-off on or about 28 June 2012. Such obligations *will not have been performed except by [BisB] transferring the [Placement] Proceeds to Arcapita*" when due in accordance with the March 14 Placement." *Id*. (emphasis added); *see also id.* at A-2500 ("Statutory set-off under Article 353 . . . cannot be regarded as performance by a party of its obligations under a contract, as such matter is unambiguously addressed by the text of Article 129[.]").[34]

This argument was properly rejected below.[35]

---

[34] Articles 353-360 articulate *procedures* for performance or circumstances where *setoff is not available*. *See* A-1902 at A-1912-14 (quoting Arts. 353-358 of the Bahraini Civil Code).

[35] BisB separately argues that the Committee's claim for violation of the automatic stay fails because BisB is not subject to Bankruptcy Court jurisdiction. App. Br. at 52-53. BisB is wrong because jurisdiction is established. *See supra* at Argument Section I. But BisB further mistakes the *applicability* of the automatic stay with the Court's ability *to enforce* a violation. Upon a bankruptcy filing, the automatic stay prohibits parties from exercising control over property of the estate, *wherever located*, without action by the debtor or the court. 11 U.S.C. §§ 362(a), 541(a). BisB violated the stay by retaining the Placement Proceeds, regardless of whether such violation is actionable here. Unsurprisingly, BisB's case law speaks only to enforceability. App. Br. at 53.

49

## V.    THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN SETTING THE PREJUDGMENT INTEREST RATE AT 9% PER ANNUM

After a thorough analysis of the Interest Rate Order, the District Court concluded: "Because the Bankruptcy Court made specific findings and provided cogent and well-founded reasons for its decision, I find no abuse of discretion and affirm the judgment."  Dist. Ct. Affirmance, 640 B.R. at 633.  This Court, too, should affirm the Bankruptcy Court's exercise of its broad discretion to award prejudgment interest at the rate of 9%.[36]

### A.    An Award of Prejudgment Interest Is Consistent With Bahraini Law

The parties agree that Bahraini law governs the award of prejudgment interest.  And BisB does not dispute that Bahraini law recognizes recovery in the event of a breach of contract, including restitution for ill-gotten gains.  Nor does BisB credibly dispute that, in the absence of applicable state law specifying a rate of prejudgment interest (as Bahraini law does not), the determination is committed to the Bankruptcy Court's sound discretion.[37]

---

[36]    *See Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1071-72 (2d Cir. 1995) ("The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion.").

[37]    BisB cites to *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) for the proposition that a "U.S. federal court is bound by the substantive law of the state on prejudgment interest and does not have the discretion to fashion its own interest rate."  App. Br. at 56.  But

In exercising that discretion, courts consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 955 F.2d 831, 834 (2d Cir. 1992). "Pre-judgment interest is *not a penalty*, but rather is viewed as delayed damages to be awarded *as a component of compensation* to the prevailing party." *Davis v. R.A. Brooks Trucking, Co. (In re Quebecor World (USA), Inc.)*, 491 B.R. 379, 389 (Bankr. S.D.N.Y. 2013) (citing *General Motors Corp. v. Devex Corp.*, 451 U.S. 648, 654 n.10 (1983) (emphases added).

Here, the lower courts appropriately credited Bahraini Civil Code provisions governing breach of contract remedies that "are consistent with the compensatory purpose of prejudgment interest under American law in providing compensation to the wronged party." Interest Rate Order, 633 B.R. at 211. Those provisions include:

> **Article 223**. "The amount of damages [when not fixed in contract or by law] includes *losses suffered by the creditor and profits of which he has been deprived*."

---

*Marfia* involved a case where the court inexplicably departed from the rate specified under New York law, which was binding on it. 147 F.3d at 90.

**Article 140**.  "In bilateral binding contracts if one of the parties does not perform his obligation, the other party may . . . demand from the judge the performance . . . of the contract, *with damages*[.]"

**Article 188**.  "If [a person] has received in bad faith [that which is not due to him], *[such person] is bound to restitute in addition the interest and profit that he has gained or that he has failed to gain by neglect on the thing unduly received*, from the date of payment or from the date he became of bad faith."

SPA-64-65 (emphases added).  Prejudgment interest serves as a proxy for the "profits of which [Arcapita] has been deprived" and the Bankruptcy Court's prejudgment interest award would transfer back to the estates "the interest and profit . . . unduly received."  Dist. Ct. Affirmance, 640 B.R. at 631 (quoting Bahraini Civil Code, Arts. 223 and 188).  On this basis, the lower courts determined that these provisions in Bahraini law are equivalent to prejudgment interest under U.S. laws because they have a compensatory purpose.

BisB argues that prejudgment interest cannot be granted here because Shari'a law, and therefore Bahraini law, forbids payment of interest.  This argument is newly-emphasized—BisB devoted just one paragraph to it in its briefing to the Bankruptcy Court.  A-3151 at A-3156.  And, tellingly, the proposed order BisB submitted in connection with that briefing *allowed for prejudgment interest*, albeit at a miniscule rate.  A-3168 at A-3169.  Thus, under BisB's current theory, had it obtained approval below of its proposed order, it would have condemned itself to violating Shari'a law.  App. Br. at 56 ("…a creditor like

52

Arcapita may not recover late payment interest from a debtor like BisB without violating Bahraini law and shari'a principles.").

An award of prejudgment interest does not, in any event, implicate Shari'a law. BisB argues that because "[n]one of the Bahraini statutes cited by the Bankruptcy Court and the District Court mention prejudgment interest," this Court must look to Shari'a law (specifically the Accounting and Auditing Organization for Islamic Financial Institutions (the "AAOIFI")) to gap fill. App. Br. at 54-55. But this argument "elevate[s] form over substance" (Dist. Ct. Affirmance, 640 B.R. at 631): the Bahraini Civil Code, as highlighted above, provides for precisely the compensatory damages that prejudgment interest provides; there are no gaps to fill, and no need to look to Shari'a law.

Even if it were appropriate to look to AAOIFI standards, however, they present no contradiction. BisB cites to AAOFI Standard No. 3, which states, in relevant part, that Shari'a law prohibits (i) "stipulat[ing to] any financial compensation, either in cash or in other consideration, as a penalty clause in respect of a delay by a debtor in settling his debt" or (ii) "mak[ing] a judicial demand on a debtor in default to pay financial compensation . . . for a delay in settling his debt." App. Br. at 55-56. But as explained above, prejudgment interest serves *not* to penalize, but to compensate. Also, BisB has not merely "delay[ed]" repayment of its debts, it breached its contract and refused to return Arcapita's

53

funds despite Arcapita's demands and the Formal Direction. Furthermore, AAOIFI Standard No. 3 serves to protect good faith debtors that are *unable* to pay their debts—not a solvent one who refuses to repay.[38]

The Bankruptcy Court then correctly found that an award of prejudgment interest is warranted here, as the Arcapita estate has been deprived of the use of the funds for more than a decade and was forced to incur significant expense for borrowing under a debtor-in-possession facility, in part to replace the monies transferred to BisB. *See* Interest Rate Order, 633 B.R. at 212.[39]

## B.     A Prejudgment Interest Rate of 9% is Appropriate

BisB argues that the lower courts' award of prejudgment interest rate at 9% overrated the import of BisB's contacts with New York. App. Br. at 57-58. BisB's contacts with New York, however, formed only one of *several* factors supporting the determination. *See* Interest Rate Order, 633 B.R. at 212-15. These factors were:

---

[38]    Appendix (B) of AAOIFI Standard No. 3 clarifies that the AAOIFI standards do not insulate a *solvent debtor* from punishment: "The Prophet (peace be upon him) says: *Default in payment on the part of a solvent debtor is unjust*. He (peace be upon him) also says: *Delay in payment by a solvent debtor would be a legal ground for his being publicly dishonoured and punished. . . .* However, an insolvent debtor should be granted a grace period." AAOIFI, *Shari'ah Standard No. (3), Procrastinating Debtor*, at 88, http://aaoifi.com/ss-3-procrastinating-debtor/?lang=en) (emphasis in original) (last visited Dec. 16, 2022).

[39]    Public policy also mandates an award of prejudgment interest. *See, e.g., Foresco Co. v. Oh*, 337 F. Supp. 3d 304, 306 (S.D.N.Y. 2018) ("Under New York law, prejudgment interest is awarded as a matter of right for contract damages.").

- **The Rate of Return in Analogous Dealings**.  The Bankruptcy Court had evidence before it that, when Arcapita and Tadhamon negotiated a six-month term deposit of $12 million in November 2011, the parties agreed on a return that equated to 8.08% on an annualized basis.  *See* A-4419 at A-4424.  Logically, a ten-year deposit of $10 million would have yielded a higher rate.

- **The Rate of Return in Contemporaneous, Conservative Investments**.  The withheld funds, even if conservatively invested by Arcapita (an investment banking firm) at that time, would have generated an annualized return between 11.072% and 12.375%.  Interest Rate Order, 633 B.R. at 214.

- **The Cost of Arcapita's DIP Facility**.  Arcapita borrowed funds to operate during bankruptcy under a debtor-in-possession financing facility, approved by the Bankruptcy Court roughly nine months after the Placements, with an annual "profit rate" of no less than 12%.  *Id.* at 213.

- **The New York State Rate**.  Lastly, the Bankruptcy Court considered the connection between New York and the relevant actions here, concluding, based on the minimum contacts found to be sufficient to assert personal jurisdiction over BisB, that such connection was sufficient to make relevant, as one data point, the New York statutory rate of prejudgment interest.[40]  *Id.* at 214-15.

In view of this, the Bankruptcy Court made "specific findings regarding the matter" and articulated sound reasons for its decision.  *Cf. Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 138, 140 (2d Cir. 2000) (finding abuse of discretion where district court gave no reasons for applying selected rate and made no findings as to why such rate would compensate the prevailing party).

---

[40]  BisB's reiteration of its personal jurisdiction and comity arguments is unavailing.  App. Br. at 57-58.  A significant connection between these actions and the state of New York has been established.  *See* Interest Rate Order, 633 B.R. at 214.

As such, the Bankruptcy Court appropriately exercised its discretion in awarding prejudgment interest to the Committee at the rate of 9%. This decision, too, should be affirmed.

## **CONCLUSION**

For the foregoing reasons, the Committee respectfully requests that the Court affirm the applicable orders of the Bankruptcy and District Courts.

Dated:  December 16, 2022           By: */s/ Andrew M. Leblanc*\_\_\_\_\_
       Washington, D.C.             Dennis F. Dunne
                                         Evan R. Fleck
                                         Milbank LLP
                                         55 Hudson Yards
                                         New York, NY 10001
                                         Telephone: (212) 530-5000

                                         Andrew M. Leblanc
                                         Samir L. Vora
                                         Milbank LLP
                                         1850 K Street, NW, Suite 1100
                                         Washington, DC 20006
                                         Telephone: (202) 835-7500

                                         *Counsel for Plaintiff-Appellee Official Committee of Unsecured Creditors of Arcapita BankB.S.C.(c), et al.*

## <u>CERTIFICATE OF SERVICE</u>

I, Samir L. Vora, hereby certify that on December 16, 2022, a true and correct copy of the foregoing Opening Brief for Plaintiff-Appellee was served upon all parties to this appeal via the Court's CM/ECF system.

Dated: December 16, 2022
       Washington, D.C.

By: /s/ *Samir L. Vora*_____
Dennis F. Dunne
Evan R. Fleck
Milbank LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000

Andrew M. Leblanc
Samir L. Vora
Milbank LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Counsel for Plaintiff-Appellee Official Committee of Unsecured Creditors of Arcapita BankB.S.C.(c), et al.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4) and Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 13,988 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: December 16, 2022
      Washington, D.C.

By: /s/ *Samir L. Vora*_____

Dennis F. Dunne
Evan R. Fleck
Milbank LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000

Andrew M. Leblanc
Samir L. Vora
Milbank LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Counsel for Plaintiff-Appellee Official Committee of Unsecured Creditors of Arcapita BankB.S.C.(c), et al.*